1

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2

 3   UNITED STATES OF AMERICA :
                             :
 4                           :
                             :
 5        vs                 :    3:CR-23-26
                             :
 6                           :
                             :
 7   KEVIN JONES             :
                             :
 8                           :

 9

10

11        BEFORE:      THE HONORABLE MALACHY E. MANNION

12        PLACE:       COURTROOM NO. 3

13        PROCEEDINGS: JURY TRIAL

14        DATE:        WEDNESDAY, MAY 29, 2024

15

16   APPEARANCES:

17   For the United States:

18   ROBERT J. O'HARA, ESQ.
     GERARD T. DONAHUE, ESQ.
19   OFFICE OF THE U.S. ATTORNEY
     WILLIAM J. NEALON FEDERAL BUILDING
20   235 NORTH WASHINGTON AVENUE
     SCRANTON, PA 18501
21

22   For the Defendant:

23   CORNELIUS J. ROTTEVEEL, ESQ.
     ROTTEVEEL LAW
24   410 JEFFERSON AVENUE
     SCRANTON, PA 18510
25
```

2

1

## INDEX TO WITNESSES

2

3

| FOR GOVERNMENT: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SHANE YELLAND | 3 | 23 | 46 | |
| LAUREN FETCH | 53 | 94 | | |
| RACHEL SMYDEN | 102 | 120 | 126 | |
| SAMANTHA SMART | 127 | 145 | 153 | |
| SHAYNA COLON ACOSTA | 155 | 173 | | |
| TYLA GRIFFIN | 177 | 200 | 214 | |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1        SHANE YELLAND resumed the witness stand.

2        THE COURT:  Agent Yelland, you are reminded you are

3   still under oath.

4        THE WITNESS:  Yes, sir.

5        THE COURT:  Mr. O'Hara.

6   BY MR. O'HARA:

7   Q.   Agent Yelland, yesterday we discussed a search of the

8   telephone, the iPhone of Davon Beckford.  You said he consented

9   to a search of his phone, correct?

10  A.   Yes.

11  Q.   Did he also execute a consent to search form?

12  A.   Yes.

13  Q.   I would ask if you would take a look at Government's

14  Exhibit 5.1, which I believe has been admitted without

15  objection.

16        MR. ROTTEVEEL:  That is correct.

17  BY MR. O'HARA:

18  Q.   Is that the consent form?

19  A.   Yes.

20  Q.   What does it say?

21  A.   I've been asked by a special agent of the F.B.I. to permit

22  a complete search of an Apple iPhone that was in the possession

23  of Davon Beckford on February 9, 2022.  That's the date of his

24  arrest.  It has pass code 032665.  Then his signature is at the

25  bottom on -- this was March 3rd, 2022, and my name is scribbled

4

1  there as a witness.

2  Q.    He was informed of his right to refuse consent?

3  A.    Right.  He also had his attorney with him.  If he had

4  questions, he can consult his attorney.

5           MR. O'HARA:  Your Honor, we will be discussing the

6  Cash App records 14.1 through 14.5.  And after discussions with

7  counsel it's my understanding there are no objection to those.

8           MR. ROTTEVEEL:  No objection, Your Honor.

9           THE COURT:  Thank you.  They're admitted.

10           MR. O'HARA:  Thank you, Your Honor.

11  BY MR. O'HARA:

12  Q.    Now, agent Yelland, pursuant to your investigation did you

13  subpoena the Cash App records of the defendant Kevin Jones?

14  A.    Yes.

15  Q.    And his girlfriend Sabrina Cleveland?

16  A.    That is correct.

17  Q.    And did you, in fact, receive those records?

18  A.    Yes.

19  Q.    I am going to show you Government's Exhibit 14.1.  Is that

20  what's known as a business record certification?

21  A.    That is correct.

22  Q.    And what company is it from?

23  A.    Block, Incorporated, formerly Square, Inc.  Block is the

24  owner of Cash App.

25  Q.    Block owns Cash App?

5

1   A.   Yes.

2   Q.   The certification indicates these are true and accurate

3   records of both Kevin Jones and Sabrina Cleveland?

4   A.   That is correct.

5   Q.   Okay.  If we can have exhibit 14.4.  Describe for the jury

6   what that is.

7   A.   That is the Cash App records provided to us from Block,

8   Inc., yes.

9   Q.   And -- go ahead.

10  A.   It's just like a bunch of raw data on a spreadsheet.

11  Q.   Are there several pages?

12  A.   Yes, yes, they come in several pages.

13  Q.   From that raw data, did you extract the Cash App records

14  of Kevin Jones pertinent to this investigation?

15  A.   Yes.

16  Q.   If we can have exhibit 14.5.

17  A.   That is Cash App records pertaining to Kevin Jones.

18  Q.   I know the print is small --

19  A.   It's very small.

20  Q.   We will go through that first page.  Whose account is

21  that?

22  A.   Kevin Jones.

23  Q.   Are there some addresses associated with the account?

24  A.   Yes.

25  Q.   And what are the addresses?

6

1  A.    15 Elder Street, 6 Woodward Street, 14 Potter Avenue, 14

2  Potter Avenue Unit 2 and 14 Potter Avenue Unit Two.

3  Q.    Scroll over to the far side.  Where is 15 Elder Street?

4  A.    Wilkes-Barre, Pennsylvania.

5  Q.    How about 6 Woodward?

6  A.    Wilkes-Barre, Pennsylvania.

7  Q.    How about 14 Potter Avenue Unit 2?

8  A.    Plainville, Massachusetts.

9  Q.    Is there a display name for the Cash App account?

10 A.    Yes.

11 Q.    What is the display name?

12 A.    Hat.

13 Q.    Did the investigation show that was, in fact, Kevin Jones'

14 street name or nickname or --

15 A.    That's correct.

16 Q.    Other name?

17 A.    Yes.

18 Q.    Is there an alias -- alias information associated with

19 that?

20 A.    Yes.

21 Q.    Is there a phone number?

22 A.    Yes.

23 Q.    Bring that up.  What is the phone number that's there?

24 A.    857-294-6836.

25 Q.    We will go back to the text messages yesterday.

7

1  A.    Yes.

2  Q.    The text message from Hat, is there a phone number?

3  A.    Yes.

4           THE COURT:  Is that an exhibit number?

5           MR. O'HARA:  Exhibit 15.17.

6           THE COURT:  Okay.

7           MR. O'HARA:  I'm sorry --

8           THE COURT:  5.17.

9           MR. O'HARA:  5.17.

10  BY MR. O'HARA:

11  Q.    Is there a phone number?

12  A.    Yes.

13  Q.    15.17?

14  A.    Yes.

15  Q.    Is that the same phone number if you depicted in the Cash

16  App information?

17  A.    Except for the first number, which would be a one, which

18  would be the country code.

19  Q.    Second page of 14.5, what's listed there?

20  A.    So this would be from the raw data we exported all the

21  Cash Apps that were sent to Davon Beckford a/k/a Dolo.

22  Q.    And did Davon Beckford have a Cash App account?

23  A.    Yes, the name was Justin Case and then Millionaire Mindset

24  E. N. T.

25  Q.    Changed?

8

1    A.    Yes.

2    Q.    Okay.  If we can go through the payments, what's the first

3    payment?

4    A.    May 28, 2021.

5    Q.    What's the amount?

6    A.    $1,250.

7    Q.    Who is the sender?

8    A.    Hat, Kevin Jones.

9    Q.    In fact, was that Kevin Jones' display name?

10   A.    Correct.

11   Q.    Who is the recipient?

12   A.    Justin Case.

13   Q.    Who was Justin Case?

14   A.    Davon Beckford, a/k/a Dolo.

15   Q.    How much was transferred?

16   A.    $1,250.

17   Q.    Next transaction, what's the date?

18   A.    July 5 -- I'm sorry -- June 5th, 2021.  It was $2,000 sent

19   from Hat, Kevin Jones, to Justin Case, Davon Beckford.

20   Q.    What's the third transaction?

21   A.    June 6th, 2021, $1,000 from Kevin Jones to Davon Beckford.

22   Q.    And what's the fourth transaction?

23   A.    The fourth one is June 24th, 2021.  It's $2,500.  It's

24   from Kevin Jones to Davon Beckford, and there's a comment for a

25   leather jacket.

9

1  Q.    Subject area?

2  A.    Yes.

3  Q.    What is the next one?

4  A.    Again, June 25th, 2021.  It's for $2,450.  It's from Kevin

5  Jones to Justin Case or Davon Beckford.

6  Q.    What's the amount again?

7  A.    $2,450.

8  Q.    Okay.  Next one?

9  A.    This is August 31st, 2021.  It's a thousand dollars.  It's

10  from Kevin Jones to Davon Beckford for -- it says in the

11  subject line new speakers.

12  Q.    What was the recipient's Cash App name now?

13  A.    Changed to Millionaire Mindset E. N. T., but it's still

14  Davon Beckford a/k/a Dolo.

15  Q.    The final one?

16  A.    The final one is September 2nd, 2021.  It's for $1,500.

17  It's from Kevin Jones to Davon Beckford at Millionaire Mindset

18  E. N. T. for $1,500.  The subject says new transmission.

19  Q.    If we can go to the next page, additional payments?

20  A.    Yes.

21  Q.    From Kevin Jones known as Hat to Davon Beckford known as

22  Millionaire Mindset?

23  A.    Yes.  September 15th, 2021.  It's for $1,250.  It's from

24  Kevin Jones to Davon Beckford.

25  Q.    How about the next one September 18th?

10

1  A.    September 18th, 2021 for $1,250 from Kevin Jones to Davon

2  Beckford.  Then we go to October 5th, 2021.  We have again

3  $1,250 from Kevin Jones to Davon Beckford, and this has subject

4  as a leather jacket.

5  Q.    How about October 8th?

6  A.    October 8th, 2021 this is again for $1,250.  It's from

7  Kevin Jones to Davon Beckford.  The next one is October 22nd,

8  2021, again $1,250.  It's from Kevin Jones to Davon Beckford.

9  Q.    October 26th?

10  A.    October 26th, 2021, $750 from Kevin Jones to Davon

11  Beckford.

12  Q.    The last one?

13  A.    October 27th, $400 from Kevin Jones to Davon Beckford.

14  Q.    Incidentally all these were paid out, correct?

15  A.    Correct.

16  Q.    Were there any rejected by Cash App?

17  A.    No, not from Kevin Jones.

18  Q.    Go to the last page?

19  A.    On the last page it's from November 24th, 2021.  It's for

20  $1,250.  It's from Kevin Jones to Davon Beckford, and the

21  subject says show case.  Then the last one is from November

22  27th, 2021.  It's for $500, and it's from Kevin Jones to Davon

23  Beckford.

24  Q.    Okay.  How many transactions do we have approximately?

25  A.    16.

11

1  Q.   What is the total of those payments from May 28th of 2021
2  to November 27th of 2021?
3  A.   $20,850.
4  Q.   $20,850?
5  A.   Yes.
6  Q.   Now, you mentioned that Kevin Jones had a girlfriend?
7  A.   That is correct.
8  Q.   What was her name?
9  A.   Sabrina Cleveland.
10 Q.   Where did she live?
11 A.   14 Potter Avenue Unit 2, Plainville, Massachusetts.
12 Q.   And did the investigation show Kevin Jones sometimes
13 resided there as well?
14 A.   Correct.
15 Q.   Did you also subpoena the Cash App records of Sabrina
16 Cleveland?
17 A.   Yes, we did.
18 Q.   Okay.  And were they part of the same subpoena?
19 A.   Yes.
20 Q.   So the same business record?
21 A.   Yes.
22 Q.   Certification?
23 A.   Yes, sir.
24 Q.   Exhibit 14.1 applies also to Sabrina Cleveland's records?
25 A.   Yes.

12

1  Q.   If we can look at 14.2.

2  A.   Again, this is the raw data provided by Cash App or Block,

3  Inc. pursuant to the subpoena for Sabrina Cleveland's Cash App

4  records.

5  Q.   Okay.  Does it go on for pages and pages?

6  A.   Yes, several pages long.

7  Q.   Okay.  Now, again pertinent to this investigation did you

8  extract some of the records?

9  A.   Yes.

10  Q.   And if we can look at exhibit 14.3 and the cover page

11  account page, correct?

12  A.   Yes.

13  Q.   Let's go over some of that information.  So who is the

14  account holder?

15  A.   Sabrina Cleveland.

16  Q.   Okay.  And does she have a display name for her Cash App

17  account?

18  A.   Yes, Sabrina.

19  Q.   Does the account have some addresses associated with it?

20  A.   Yes.

21  Q.   And what is the address?

22  A.   14 Potter Avenue, 14 Potter Ave. Apartment 2, Plainville,

23  14 Potter Avenue, Plainville.

24  Q.   That's Massachusetts, correct?

25  A.   Yes.

1  Q.    Are there some aliases listed there?

2  A.    Yes.

3  Q.    Notable to this investigation is there a particular Cash

4  App alias?

5  A.    Yes, bean, b-e-a-n C. 22.

6  Q.    Bean C. 22?

7  A.    Correct.

8  Q.    Go back to exhibit 5.17 again.  Text messages?

9  A.    Yes.

10  Q.    Okay.  What are the text messages?

11  A.    It's a Cash App name of bean C. 22.

12  Q.    What's the next text message?

13  A.    You got in like half.  Let me drop this in the bank real

14  quick.

15  Q.    Okay.  And what follows after that?

16  A.    That's not the right name, and then it came back with the

17  dollar sign bean C. 22.

18  Q.    Dollar sign bean C. 22?

19  A.    Correct.

20  Q.    What was the first response from Davon Beckford?

21  A.    Oh, yeah, Sabrina question mark, yeah, sent.

22  Q.    Okay.  Let's go through some of the payments from Sabrina

23  Cleveland's Cash App account.  When we went through the Kevin

24  Jones' account, they were all paid out, correct?

25  A.    Kevin Jones, all of his went to Davon Beckford or paid

1  out, yes.

2  Q.    How about with Sabrina Cleveland?

3  A.    No, she had some declined.

4  Q.    Why is that?

5  A.    It can be numerous reasons, the money wasn't in the

6  account, Davon Beckford's account wasn't accepting money

7  because he has a limit, Sabrina Cleveland has a limit.  Cash

8  App had a malfunction, something with the internet.  I mean,

9  there could be numerous reasons why.  It could be flagged on

10  one end until the bank clears out their issues.

11  Q.    Let's start with the first one, March 17th of 2021.

12  A.    Yes.

13  Q.    The first one is declined, correct?

14  A.    Yes, that's correct.

15  Q.    The second one the same day?

16  A.    Yes.

17  Q.    And is it paid out?

18  A.    Yes, it was paid out $350 to Justin Case or Davon Beckford

19  from Sabrina.

20  Q.    If we go to the bottom.  March 18th?

21  A.    Yes, you can see there was two more payments that were

22  declined on the 17th, and then on the 18th there's one

23  declined.  Later on in the morning there was one that was paid

24  out March 18th, 2021 for $350 from Sabrina Cleveland to Davon

25  Beckford a/k/a Dolo.

15

1  Q.    Justin Case?

2  A.    Justin Case.

3  Q.    What about the last one?

4  A.    The last one was March 22nd, 2021 $700 from Sabrina

5  Cleveland to Davon Beckford.

6  Q.    Next page?

7  A.    March 30th, 2021, $700 sent from Sabrina Cleveland to

8  Davon Beckford.  April 10, 2021, $200 was paid out from Sabrina

9  Cleveland to Davon Beckford.

10  Q.    Okay.  How about April 14th?

11  A.    April 14th, 2021, $700 was paid out from Sabrina Cleveland

12  to Davon Beckford.

13  Q.    Okay.  April 17th?

14  A.    Again, on Sabrina April 17th, 2021, $700 was paid out from

15  Sabrina Cleveland to Davon Beckford.

16  Q.    April 19th?

17  A.    April 19th, 2021, $700 paid out from Sabrina Cleveland to

18  Davon Beckford, and in the subject line it says Hat.

19  Q.    On April 14th?

20  A.    April 24th, 2021, $700 paid out from Sabrina Cleveland to

21  Davon Beckford, and this has, like, a cup emoji it guess it

22  looks like with a straw.

23  Q.    Subject area?

24  A.    In the subject area, correct.

25  Q.    April 29th?

16

1   A.    April 29th, 2021, $700 was paid out from Sabrina Cleveland

2   to Davon Beckford, and in the subject line it says Hat.

3   Q.    Next page, please.  How about on May 1st?

4   A.    May 1st was an attempt for $1,800 but it was declined from

5   Sabrina Cleveland to Davon Beckford.

6   Q.    Was there a later attempt May 1st?

7   A.    Yes, then the May 1st one went through for a thousand

8   dollars from Sabrina Cleveland to Davon Beckford.

9   Q.    Okay.  And do we have now again on May 1st some more

10  declined?

11  A.    Yes, there were four more that were declined from Cash

12  App.

13  Q.    Finally on the bottom May 1st, do we have another one paid

14  out?

15  A.    Yes, May 1st, $400 was paid out from Sabrina Cleveland to

16  Davon Beckford.

17  Q.    Last page, May 1st, another attempt?

18  A.    Yes, again May 1st declined, and then later on May 1st

19  $400 was paid out from Sabrina Cleveland to Davon Beckford.

20  May 4th, 2021, $1,975 was paid out from Sabrina Cleveland to

21  Davon Beckford.  May 26th, 2021, $250 was paid out from Sabrina

22  Cleveland to Davon Beckford.  Finally, May 26th, 2021, $1,000

23  was paid out from Sabrina Cleveland to Davon Beckford.

24  Q.    From our first one, which was March 17th of 2021 --

25  A.    Yes.

17

1    Q.    -- to our last one, which was May 26th of 2021 --

2    A.    Yes.

3    Q.    -- what's the total?

4    A.    Total amount of money was $10,825.

5    Q.    That's in about 70 days or so?

6    A.    Right around 70 days.

7    Q.    So between the Kevin Jones' Cash App account and Sabrina

8    Cleveland's Cash App account how much money is sent?

9    A.    Over $31,000.

10   Q.    That's either through the Justin Case or Millionaire

11   Mindset?

12   A.    Yes, that was to Davon Beckford.

13   Q.    Officer Yelland, were you familiar with Kevin Jones?

14   A.    Yes.

15   Q.    He was charged in this investigation?

16   A.    Yes.

17   Q.    The man you talked about in your testimony is Kevin Jones

18   known as Hat.  Is he present in the courtroom?

19   A.    Yes, he is.

20   Q.    For the record can you just identify for him for us,

21   please?

22   A.    Sitting next to attorney Rotteveel with the white dress

23   shirt on and dark color tie.

24          THE COURT:  The record will reflect he identified the

25   defendant.

18

1    MR. O'HARA:  Thank you, Your Honor.

2  DIRECT EXAMINATION

3  ON QUALIFICATIONS

4  BY MR. O'HARA:

5  Q.    Officer Yelland, I want to ask you some questions in a

6  different area.  I would like to go over with you for the jury

7  how long have you been in law enforcement?

8  A.    19 years.

9  Q.    Have you -- what has been your primary area of

10  investigation?

11  A.    Narcotics.

12  Q.    Have you attended classes at schools regarding narcotics

13  trafficking?

14  A.    Yes, I have.

15  Q.    And in all those years, any idea approximate number as to

16  how many drug trafficking investigations you've been involved

17  in?

18  A.    That's a great question, over hundreds.

19  Q.    Have you arrested individuals for drug trafficking?

20  A.    Yes.

21  Q.    And have those persons been successfully prosecuted?

22  A.    Yes.

23  Q.    Have you -- have you been engaged in writing search

24  warrants and conducting searches regarding narcotics

25  trafficking?

19

1   A.    Yes, I have.

2   Q.    Again, it's hard to quantify --

3   A.    Hundreds.  I've been involved in hundreds of

4   investigations.  During patrol I focused mainly on drug

5   interdiction.  So you can have two, three, four traffic stops a

6   night, so that's, like, four or five investigations, debriefs,

7   could lead to search warrants.  We try to stay pretty busy.

8   That's for, like, ten years.

9   Q.    Have you interviewed or debriefed individuals involved in

10  drug trafficking?

11  A.    Yes.

12  Q.    Both cooperators and defendants?

13  A.    Almost on a daily basis.  That's a big part of our job.

14  Q.    Are you familiar with drug trafficking terminology and the

15  words that drug traffickers use?

16  A.    Yes, it constantly changes.

17  Q.    Have you been accepted as an expert in the field of

18  narcotics investigations and narcotics trafficking in the

19  courts of Pennsylvania?

20  A.    Yes, in Luzerne County.

21          MR. O'HARA:  Your Honor, at this point we would offer

22  agent Yelland as an expert in narcotics trafficking

23  investigations.

24          MR. ROTTEVEEL:  Judge, just briefly if I can.

25  CROSS EXAMINATION

20

1   ON QUALIFICATIONS

2   BY MR. ROTTEVEEL:

3   Q.   You indicated 19 years in law enforcement?

4   A.   That is correct.

5   Q.   That's all with the Wilkes-Barre police?

6   A.   Yes -- I'm employed by Wilkes-Barre police, but then the

7   last eight years I've been pretty much detached with the F.B.I.

8   I'm still employed by Wilkes-Barre police.  Its confusing.

9   Q.   Who pays you, Wilkes-Barre police or F.B.I.?

10  A.   So the Wilkes-Barre Police Department still pays me.  The

11  F.B.I. offers like -- they reimburse half overtime that is

12  incurred.  They provide me with vehicles.  They provide me with

13  top secret clearance.  I have access to the bureau's databases.

14  I'm required to do annual trainings for the bureau.  I'm pretty

15  much employed by the bureau but just not employed by the bureau

16  if that makes sense.

17  Q.   In your 19 years of experience in law enforcement though

18  were you always a detective or --

19  A.   No, so you start off in Wilkes-Barre as a patrol officer.

20  From --

21  Q.   How long were you a patrol officer for?

22  A.   From 2005 to right around 2015 I was a patrol officer, so

23  about ten years.  Two of them years I was assigned to the drug

24  -- our drug unit, drug squad.  For one of those years I was in

25  charge of the drug unit.

21

1  Q.    And for the next nine years though you became a detective?

2  A.    Yes, so then I did -- I got promoted to criminal

3  detective.  I did maybe about a year, year and a half into the

4  criminal side of investigations.  And that's when the

5  opportunity to join the F.B.I. task force presented itself, so

6  I joined the task force.

7  Q.    Throughout those 19 years you testified that you've

8  attended many courses and trainings on drug trafficking, so on

9  and so forth?

10  A.    Yes.

11  Q.    Do you do that on a yearly basis?

12  A.    Not necessarily a yearly basis.  It depends on your

13  schedule and when the courses are available.

14  Q.    Have you ever taught any of these courses?

15  A.    No, not particularly involving drug -- or drug

16  investigations.

17  Q.    And you never taught any of these courses.  Have you ever

18  published anything, any books or publications about drug

19  trafficking?

20  A.    No.

21  Q.    How many times have you testified as an expert?

22  A.    In state court approximately four or five.

23  Q.    Okay.  And in federal court?

24  A.    Never.

25  Q.    Never in federal court?

22

1  A.    Never in federal court.

2           MR. ROTTEVEEL:  Judge, I have nothing further.

3           THE COURT:  Do you have any objection?

4           MR. ROTTEVEEL:  I have an objection considering the

5  fact he's never testified in federal court as an expert and

6  he's unsure whether or not it's four or five times in state

7  court he qualified as an expert.

8           THE COURT:  All right.  We will accept you as an

9  expert.  It appears based upon your background and experience

10  you would qualify as an expert.  As to not having been

11  requested to be an expert in federal court before if that was

12  the method by which we made a determination, of course nobody

13  could never be an expert for the first time in federal court,

14  so we will accept him as an expert.

15           MR. O'HARA:  Thank you, Your Honor.  May I proceed?

16           THE COURT:  Yeah.

17  BY MR. O'HARA:

18  Q.    Officer Yelland, I want to present some facts to you.  If

19  an individual was receiving packages in the mail containing 500

20  or more fentanyl pills and that individual received at least

21  ten packages and that individual have paid at least $31,000 for

22  those packages, the recipient of those pills based upon your

23  training, your experience in the field, your expertise, is that

24  quantity of fentanyl pills typically possessed for further

25  distribution to others or for personal use?

23

1  A.    Further distribution to others.

2  Q.    Why do you believe that?

3  A.    Based on the sheer amount, the quantity, based on the

4  amount of money that is paid to the drug dealer, the supplier.

5  It is a lot of pills.  You're talking about on the low end ten

6  packages, 500 pills, 5,000 pills and on the high end it could

7  be 10,000 pills.

8        MR. O'HARA:  Can we have a moment, please, Your

9  Honor?

10        THE COURT:  Sure.

11        MR. O'HARA:  Your Honor, we have no further direct.

12        THE COURT:  All right.  Mr. Rotteveel?

13        MR. ROTTEVEEL:  Thank you, Your Honor.

14  CROSS EXAMINATION

15  BY MR. ROTTEVEEL:

16  Q.    At the beginning of your testimony you had discussed four

17  controlled buys between Mr. Burns and Mr. Beckford, correct?

18  A.    No, it was Akee Miller, and three controlled purchases

19  were off of Davon Beckford and one was off of Tyla Griffin.

20  Q.    Thank you for correcting that.  On those four controlled

21  buys though -- obviously you qualify as an expert.  You have 19

22  years of experience you understand the concept of controlled

23  buy, but this was a unique controlled buy, you agree?

24  A.    That's correct.

25  Q.    Because the normal controlled buy is, you know -- one for

24

1  example is where you give prerecorded buy money to a

2  confidential informant, you observe the confidential informant

3  go and meet with the source and they exchange the preordered

4  buy money, they come back with drugs and, of course, the drugs

5  are, in fact, some sort of controlled substance and then

6  perhaps in turn you go and arrest the individual and find that

7  prerecorded buy money on that individual.  That's one way to do

8  it, correct?

9  A.    That's correct.

10  Q.    And in this scenario though you utilized the text messages

11  to go back and forth.  And while you were doing this you had

12  complete oversight of the messaging, correct?

13  A.    Most of them, yes, huh-uh.

14  Q.    So when the messages were sent out to Davon Beckford from

15  Mr. Miller, Mr. Beckford would respond then, correct?

16  A.    Yeah, eventually, yes.

17  Q.    And then eventually pills would show up in the mail to the

18  location that you found in Wilkes-Barre?

19  A.    Yes, after the payment was sent.

20  Q.    So for all intents and purposes this was a controlled buy

21  that was conducted against Mr. Beckford and against Ms.

22  Griffin, and they were solid controlled buys you would agree?

23  A.    I think so, yes.

24  Q.    I don't disagree.  It's not a trick question.  So I mean

25  you had them dead to rice with these controlled buys?

25

1   A.    Yeah.

2   Q.    You agree these controlled buys you went over none of them

3   involved Mr. Jones, correct?

4   A.    Correct.

5   Q.    And the lab reports that were all produced and stipulated

6   to here, those lab reports involved the fentanyl pills that

7   were sent from Mr. Beckford to Wilkes-Barre -- to Akee Miller

8   as part of that controlled buy, correct?

9   A.    That's correct.

10  Q.    Again, none of those pills were recovered from Mr. Jones,

11  correct?

12  A.    That's correct.

13  Q.    Moving on to the chat between Mr. Beckford and Mr. Jones,

14  I believe that's exhibit 5.17, you are able to determine this

15  chat takes place between Mr. Beckford and Mr. Jones?

16  A.    Yes, it was in Davon Beckford's telephone.

17  Q.    You were able to take his cell phone and do what is called

18  a phone dump, correct?

19  A.    Correct.

20  Q.    A phone dump is where you extract all the information you

21  possibly can from that phone, text messages, photos, calender,

22  et cetera?

23  A.    Yes, it's whatever the program grabs from the phone.

24  Q.    And this was the only chat you were able to obtain between

25  my client and Mr. Beckford, correct?

26

1  A.   No, I think there was additional conversation, nothing

2  involving the narcotics aspect.

3  Q.   And in your position these text messages do, in fact,

4  involve narcotics?

5  A.   They involve the Cash App sent from the Cash App name sent

6  from Kevin Jones of his girlfriend Sabrina Cleveland to Davon

7  Beckford so payments could be made, yes.

8  Q.   You agree though in these chat messages there's no

9  mentioning of fentanyl, correct?

10  A.   No, there's no mention of fentanyl.

11  Q.   There's no mentioning of 500 to 1,000 pills, correct?

12  A.   Not in these, no.

13  Q.   Moving on to the packages delivered to the addresses

14  associated with my client, you have associated two addresses.

15  There's one in Massachusetts.  We will call that the

16  Massachusetts address, and then the other one is the 6 Woodward

17  address?

18  A.   Yes, the Wilkes-Barre address.

19  Q.   Now, going through these packages there's -- again, strike

20  that -- Sabrina Cleveland is also associated with the

21  Massachusetts address, correct?

22  A.   That is correct.

23  Q.   Is she also associated with the Wilkes-Barre address?

24  A.   Not that I'm aware of.

25  Q.   But with respect to the packages delivered from Beckford,

27

1  the first one was April 21st, 2021.  That was delivered to the

2  Massachusetts address, correct?

3  A.    I believe so.  I'd have to check the --

4  Q.    Go ahead.

5  A.    -- the receipts.

6  Q.    Please do.

7  A.    Or the -- what was the date again?

8  Q.    April 21st, 2021.

9  A.    Yes, this looks like the first one that was in Davon

10 Beckford's phone, government's 5.5.  This would be the screen

11 shot that the package was delivered to North Attleboro,

12 Massachusetts.

13 Q.    That screen shot was found in Mr. Beckford's phone,

14 correct?

15 A.    That's correct.

16 Q.    And he saved it in his photo album?

17 A.    All in the photo album, yes.

18 Q.    Now, that package was, in fact, delivered, correct?

19 A.    Yes.

20 Q.    And that package was never intercepted by yourself or the

21 post office or anything like that, correct?

22 A.    That is correct.

23 Q.    So for all intents and purposes though when you break this

24 down, the only person that can actually verify there was drugs

25 or fentanyl pills in that package is Davon Beckford, correct?

28

1  A.    Based on the Cash App records also it would be highly

2  unlikely there was reselling of Dollar Store Legos being sent

3  back and forth --

4  Q.    Let me ask you another way.  Who packaged the package?

5  A.    It would be Davon Beckford.

6  Q.    What -- did Tyla Griffin package that package?

7  A.    No, not that I'm aware.

8  Q.    Samantha Smart?

9  A.    No.

10 Q.    Sabrina Cleveland?

11 A.    No.

12 Q.    Rachel Smyden?

13 A.    No.

14 Q.    So really the only person to actually physical package

15 that package was, in fact, Davon Beckford?

16 A.    Correct.

17 Q.    So only he truly knows the contents of what's in that

18 package before mailing it out, correct?

19 A.    Correct.

20 Q.    May 3rd, 2021 another package was sent.  That was to

21 Massachusetts from Davon Beckford?

22 A.    Yes, again this was government 5.6.  It is a screen shot

23 of one of the receipts, the tracking receipts that was sent

24 out, and it was going to Plainville, Massachusetts.

25 Q.    And similar to the April 21st, 2021 package it would have

29

1  been Davon Beckford who packaged this package before mailing it

2  out, correct?

3  A.    That's correct.

4  Q.    And again he's the only individual that can actually

5  verify whether or not there were fentanyl pills in that

6  package, correct?

7  A.    No, your client could.

8  Q.    As far as anyone you've interviewed --

9  A.    Okay.

10 Q.    -- Samantha Smart, Tyla Griffin, Davon Beckford has given

11 you information it was fentanyl pills in that package, correct?

12 A.    Yes.

13 Q.    May 27th, 2021, another package was delivered to

14 Massachusetts from Davon Beckford?

15 A.    Correct.

16 Q.    Again, this package was never intercepted?

17 A.    Correct.  That's again the screen shots from Davon

18 Beckford's cell phone that show that the package was mailed and

19 that it was delivered.

20 Q.    Okay.

21 A.    Government 5.7.

22 Q.    Similar to the other packages, it's only Davon Beckford

23 who can verify what are the contents in the package?

24 A.    That is correct.

25 Q.    You see where I'm going with this.  Could you say the same

30

1  about the same package on June 25th, 2021 that was packaged by

2  Davon Beckford, only he can verify the contents that was sent

3  to Massachusetts?

4  A.    Correct.

5  Q.    July 24th, 2021?

6  A.    Yes.

7  Q.    September 1, 2021?

8  A.    I think it arrives September 2nd.

9  Q.    Okay.

10  A.    The scheduled date was September 1st, but I think it got

11  there September 2nd.

12  Q.    Fair enough.  That went to Massachusetts as well?

13  A.    Yes.

14  Q.    The next transactions or deliveries, September 16th, 2021

15  that was to the Wilkes-Barre address, correct?

16  A.    That went to Wilkes-Barre, correct.

17  Q.    And again that package that went to Wilkes-Barre was sent

18  out by Davon Beckford?

19  A.    Correct.

20  Q.    Through the course of your investigation, everyone you

21  interviewed, only Davon Beckford can indicate whether there was

22  any fentanyl or controlled substance in that package, correct?

23  A.    That's correct.

24  Q.    The same with October 6th, 2021, that went to

25  Massachusetts?

31

1  A.    October 26th did you say?

2  Q.    October 6th.

3  A.    Oh, okay, yes, I believe this is the picture of the

4  package itself, parcel itself.  It went to Massachusetts,

5  that's correct.

6  Q.    And then 11/26/2021 again that was another package

7  delivered to the Wilkes-Barre address packaged by Davon

8  Beckford and only Mr. Beckford can verify whether or not there

9  was actually fentanyl or any kind of controlled substance in

10  that package, correct?

11  A.    Yes.

12  Q.    Moving on to the Cash App transactions, I mean, we can

13  pull up exhibit 14.5 if that helps.

14  A.    Yes, please.

15  Q.    Maybe the next page on 14.5 -- we can go through all of

16  these transactions, and I broke them down to periods in time

17  starting in May 28th, 2021 going through June 25th, 2021.

18  There's a total of five transactions from my client's Cash App

19  to Justin Case, which is also Dolo, which is also Davon

20  Beckford, correct?

21  A.    That is correct.

22  Q.    And the total transactions there amount to $9,200?

23  A.    For the month of June?

24  Q.    Yeah, end of May through June, yes, that 30-day period,

25  May 28th would have been the first transaction.

32

1  A.    I think that's correct, yes.

2  Q.    When you interviewed Davon Beckford, is he indicating that

3  all those Cash App transactions were for fentanyl for drugs?

4  A.    Yes, Davon Beckford when interviewed stated and informed

5  us that -- also confirmed what we already knew how the

6  transactions took place -- stated that he wasn't reselling

7  Dollar Store toys, every package he sent contained fentanyl

8  pills.

9  Q.    Okay.

10  A.    Not only to the defendant but to everyone that we have

11  associated to this investigation.  The 161 photographs that

12  were located containing tracking numbers, every one of them

13  contained fentanyl pills.

14  Q.    Now, to the transaction that took place on June 24th, 2021

15  -- it should be four lines down --

16  A.    Yes.

17  Q.    -- in the subject line it indicates there leather jacket?

18  A.    Correct.

19  Q.    Did you ask Mr. Beckford about that?

20  A.    Yes.

21  Q.    Okay.  What did Mr. Beckford say?

22  A.    Again, any package that was sent from Davon Beckford the

23  161 tracking numbers all contained fentanyl pills.  There was

24  no leather jacket sent to him.

25  Q.    And with respect to that payment of $2,500 sent out did

1  Mr. Beckford indicate to you that was not for a leather jacket?

2  A.    All the money that was sent from Kevin Jones to Davon

3  Beckford was for fentanyl pills.

4  Q.    Did you ask him why the subject line read leather jacket?

5  A.    Correct, yes.

6  Q.    You did ask him?

7  A.    Yes, yes, sorry.  Yes, that's obviously a question, was

8  there a leather jacket, were there new speakers, was there a

9  new transaction, another leather jacket, show case, and that is

10 just something -- if you look through the raw data you'll see

11 people will put rent or something else just to justify the

12 money that was sent, but it's for fentanyl pills.

13 Q.    Again moving on to new speakers and new transmission, Mr.

14 Beckford indicated that those were not payments for new

15 transmission, not payments for new speakers, correct?

16 A.    That's correct.

17 Q.    Moving on to the other Cash App transactions, again there

18 are several, and these take place from my client to Mr.

19 Beckford between the months of September of 2021 to November of

20 2021 for a total of $11,650.  That's where he starts sending it

21 to the Millionaire Mindset handle for Cash App, correct?

22 A.    Like, the payment name, yes.

23 Q.    And according to Mr. Beckford, all that cash that was sent

24 to the Millionaire Mindset was also for nothing other than a

25 controlled substance, namely fentanyl, correct?

34

1   A.    Correct.

2   Q.    All right.  Again, your other witnesses here that are

3   testifying, Tyla Griffin, Samantha Smart, Rachel Smyden, none

4   of those indicated that money on that date was sent for drugs,

5   correct?

6   A.    From your client?

7   Q.    Yeah.

8   A.    Correct.

9   Q.    So again with respect to all of the Cash App transactions

10  whether it goes to Millionaire Mindset or Justin Case, both

11  handles or labels for Cash App for Davon Beckford, the only

12  person you're relying on to say that that Cash App transaction

13  was, in fact, for controlled substance is again Davon Beckford?

14  A.    That's not what the investigation shows.  There's

15  additional information.  The people that we did arrest were

16  interviewed, and they also told us all of the money that was

17  being sent from them to Davon Beckford was for fentanyl pills.

18       We did controlled purchases where originally Akee Miller

19  told us he can get fentanyl pills from Davon Beckford, so we

20  told him to prove it.  He did prove it.  He got fentanyl pills

21  from Davon Beckford.  So there's a little more than just his

22  say so.  We corroborated as much as we could in this

23  investigation.

24  Q.    Right.  But the other individuals are saying their cash

25  sent in their Cash App with their Cash App handle to Davon

35

1  Beckford was for fentanyl but they can't verify whether or not
2  the cash from Mr. Jones that was sent from his handle to Mr.
3  Beckford's handle was, in fact, for drugs.  The only person you
4  can rely on is Davon Beckford that says, yes, this payment on
5  October 22nd, 2021, Kevin Jones sent me $1,250 only Davon
6  Beckford can, in fact, say yes, he sent me that $1,200 for
7  fentanyl, correct?
8  A.    Yes.
9  Q.    With respect to Sabrina Cleveland, we have the months of
10 March 2021 to May 2021.  There's a total of 70 days.  And again
11 these are exhibit 14.3 if that helps.
12 A.    Correct.
13 Q.    Again, the total transactions -- there's numerous
14 transactions from Sabrina Cleveland to Davon Beckford.  That
15 was $10,925?
16 A.    I have $10,825.
17 Q.    That's correct.  Those numerous transactions, that's from
18 Sabrina to Mr. Beckford, correct?
19 A.    That's correct.
20 Q.    Did you interview Sabrina with respect to that?
21 A.    Yes.
22 Q.    Okay.  Did she inform you as to what those Cash App
23 transactions were for?
24 A.    She wasn't sure.  She thought maybe they were party
25 promotions.

36

1  Q.   She's not able to verify whether or not those Cash App

2  transactions were, in fact, for drugs then, correct?

3  A.   Correct.

4  Q.   And only Davon Beckford can, in fact, verify, yes, those

5  Cash App transactions sent to me in that 70 day timeframe those

6  were for drugs, correct?

7  A.   Sure.

8  Q.   Were you involved in the arrest of Mr. Jones?

9  A.   No.

10  Q.   Okay.

11  A.   Our -- once we received the arrest warrants we planned to

12  arrest as many people as we can that was indicted.  There was

13  about 15 of them.  Mr. Jones and Sabrina Cleveland were in

14  Massachusetts, so we sent the arrest warrants to the F.B.I.

15  office up in Boston, and they executed the arrest.

16  Q.   Okay.  And did you receive a report with respect to the

17  arrest?

18  A.   Yes.

19  Q.   Okay.  And was there anything interesting found in that

20  report or anything of interest relayed to you with respect to

21  drug trafficking?

22  A.   No, it was just a strict arrest warrant.  There was no

23  search warrant attached to it.  So I believe they knocked on

24  the door.  Sabrina answered the door.  They called her out.

25  Kevin Jones was up on the second floor.  They called him down.

1   They arrested him and transported him away.  They didn't secure

2   any kind of evidence.  They didn't look for any evidence.  They

3   just wanted the bodies to keep it simple.

4   Q.   When you arrest someone, you always search them though?

5   A.   On their person, yes.  This was early morning.  My

6   understanding is he was just in sweatpants or some kind of

7   sleeping attire.

8   Q.   In his sweatpants or sleeping attire did he have any

9   baggies on him used for distributing drugs?

10  A.   Not during the arrest, no.

11  Q.   Did he have any scales used to weigh drugs or anything

12  like that?

13  A.   Again, not on his person.

14  Q.   What about any kind of ledgers or written documents

15  indicating who he's going to sell drugs to or some sort of

16  manifest who his customers are, anything like that?

17  A.   Again, nothing was found on his person.  They did not

18  search the residence.

19  Q.   When you're going to arrest him for drug trafficking, I

20  will ask you why didn't you search his residence.  Are you

21  interested to find out what was in there?

22  A.   We didn't have the proper probable cause to get a search

23  warrant for the arrest of the residence.

24  Q.   And you would agree that recovering -- I mean, as an

25  expert, it's helpful to recover certain items on someone that's

38

1  indicative of, you know, being in the business of dealing drugs

2  or selling drugs, correct?

3  A.    Yes.

4  Q.    So this might include small little baggies used for

5  packaging?

6  A.    Yes.

7  Q.    Scales used to measure out weight of powder or marijuana,

8  correct?

9  A.    Yes.

10 Q.    Perhaps sometimes they leave it in written ledger who they

11 sell to or who owes money, correct?

12 A.    It has been a long time since we saw that, yeah.  That

13 used to be the old days.  Now it's in some kind of an

14 electronic device like a cell phone.

15 Q.    Large amounts of cash as well?

16 A.    Yes.

17 Q.    Similar to how you found a large amount of cash on Davon

18 Beckford?

19 A.    Correct.

20 Q.    Going back to the relationship between Davon Beckford and

21 Tyla Griffin, it was -- they had originally met here, correct,

22 in the Wilkes-Barre --

23 A.    In the Wilkes-Barre area, yes.

24 Q.    And then it was Tyla's idea to move to Arizona, correct?

25 A.    Yes, that's correct.

39

1  Q.   And Davon Beckford followed her out there?

2  A.   Yeah, for lack of a better word.

3  Q.   And they resided together.  They were boyfriend and

4  girlfriend?

5  A.   Yes.

6  Q.   Okay.  And they moved out there it was in February of

7  2020?

8  A.   Correct.

9  Q.   Okay.  And then you received reports from both Tyla and

10 Davon Beckford they broke up in November of 2020, correct?

11 A.   Right around that time, yeah.

12 Q.   And then you agree in November of 2020 they are broken up.

13 Do you know why they broke up?

14 A.   Marital problems or, you know --

15 Q.   She's testifying.  I can ask her.

16 A.   I'm not exactly sure.  It was some type of arguments,

17 maybe domestic violence.  I'm not sure.

18 Q.   Going through you also interviewed these individuals just

19 recently, correct?

20 A.   The individuals said --

21 Q.   Yeah, I'm sorry.  Tyla Griffin?

22 A.   Yes.

23 Q.   In preparation for trial you interviewed her on May 15th,

24 2024, correct?

25 A.   Correct.

40

1  Q.    Davon Beckford sometime in May 2024 as a trial prep

2  interview?

3  A.    That is correct.

4  Q.    And Samantha Smart again, she was May 14th, 2024?

5  A.    That sounds right.

6  Q.    Rachel Smyden her last interview was January 25th, 2024,

7  correct?

8  A.    January 25th -- she also had a trial prep interview also.

9  Q.    She did, okay.  You don't recall the date of the trial

10  prep interview, do you?

11  A.    No, it's in my phone.

12  Q.    No problem.  And, in fact, some of these individuals, they

13  offered new information to you?

14  A.    That's correct.

15  Q.    In fact, Tyla Griffin on her interview, what, not even two

16  weeks ago, she had indicated that she knew my client was a

17  customer of Davon Beckford's correct?

18  A.    That's correct.

19  Q.    Now, this information was never revealed to you before,

20  and she's been incarcerated for about two and a half years give

21  or take a few months, and you've had several interviews with

22  Tyla.  This is the first time she's revealing this information?

23  A.    Yeah, with Tyla we focused her first two interviews on her

24  customers.

25  Q.    Davon Beckford, he came in just recently?

41

1  A.    Yes.

2  Q.    Okay.  I don't have an exact date but sometime in May 2024

3  so let's say within the last 30 days?

4  A.    Fair.

5  Q.    Okay.  And you've had interviews with him back on March

6  3rd, 2022 and March 15th, 2022?

7  A.    Yes.

8  Q.    Okay:  And those were obviously subsequent to his

9  immediate arrest which would have occurred either in March of

10  2022 or February 2022, correct?

11  A.    That is correct.

12  Q.    But, of course, you have this trial prep interview in May

13  2024, and during this interview he reveals that he completed a

14  hand-to-hand drug transaction with Kevin Jones in early of June

15  2021, correct?

16  A.    That's correct.

17  Q.    This is the first time this information is being revealed

18  to you, correct?

19  A.    First time I heard it, yes.

20  Q.    The March 3rd interview and the March 15th interview he

21  never mentioned this.  It wasn't until -- within the last 30

22  days he brings this information to light?

23  A.    March of 2022, yes, again that was his distribution

24  network.  As we got closer to trial we started to focus in on

25  the defendants that were going to take a trial.

42

1  Q.    Specifically he indicated that it was -- the transaction

2  took place at this Hollywood party in June 2021?

3  A.    This was his friend's name Hollywood birthday party in the

4  Wilkes-Barre area, yes.

5  Q.    And did you do anything to corroborate whether or not this

6  drug transaction actually took place?

7  A.    At this point, no, there's not much we can do.

8  Q.    Did you interview Hollywood or anyone else that was at the

9  party to determine whether or not my client was actually at

10  that party?

11  A.    No.

12  Q.    Did you check my client's -- I don't know -- his Easy Pass

13  records to see if he actually traveled from Massachusetts down

14  to Wilkes-Barre?

15  A.    I'm not sure he -- Davon Beckford said he flew in for

16  Hollywood -- his friend's Hollywood party.  He didn't

17  necessarily say he did the hand to hand at the party.  It was

18  while he was in the Wilkes-Barre area the hand to hand took

19  place, not that it was at the party, you know, at the specific

20  party that I remember.

21  Q.    You agree that in your interview that you provided to us

22  the says during the Hollywood party?

23  A.    It's during the timeframe of the Hollywood party, not

24  necessarily at the Hollywood party.  Davon Beckford flown into

25  Avoca -- Wilkes-Barre area for the party, and sometime during

43

1  that timeframe he alleged the hand to hand.

2  Q.    Samantha Smart was also interviewed again May 14th, 2024,

3  about two weeks ago?

4  A.    Yes.

5  Q.    And the at this point in time you showed her a picture of

6  Kevin Jones?

7  A.    Yes.

8  Q.    How many pictures did you show her?  Was it a photo array

9  or one individual of Kevin Jones?

10  A.    Just one individual of Kevin Jones.

11  Q.    She was also interviewed by the F.B.I. back in March of

12  2023, over a year ago, correct?

13  A.    Sounds about right on the date.

14  Q.    Okay.

15  A.    I'm not sure.

16  Q.    You have no reason to distrust that date?

17  A.    Yeah, it could be that day.

18  Q.    During that interview back over a year ago was there any

19  point in time that she mentioned Kevin Jones in that interview?

20  A.    Not that I recall.

21  Q.    Okay.  But in this interview again about two weeks ago you

22  show her a pick of Kevin Jones.  She indicates that, oh, yes,

23  she had purchased pills off of Kevin Jones in early 2020,

24  correct?

25  A.    That's correct.

44

1  Q.    The individuals I just mentioned that were brought in just

2  recently for these interviews, they've all pled guilty,

3  correct?

4  A.    Yes.

5  Q.    And, in fact, Davon Beckford is facing a possibility of

6  life imprisonment, correct?

7  A.    I believe so.

8  Q.    Maximum penalty of life imprisonment?

9  A.    Yes.

10 Q.    He's facing a mandatory minimum sentence of 20 years

11 though, correct?

12 A.    That's correct.

13 Q.    How old is Davon Beckford now approximately?

14 A.    That's a great question.

15 Q.    Give or take 30?

16 A.    He's in his 30s, I believe.

17 Q.    We will ask him when he comes in.

18 A.    I'm not sure exactly his age.

19 Q.    Fair enough.   Tyla Griffin also signed a plea agreement,

20 correct?

21 A.    That's correct.

22 Q.    Her maximum penalty is possibly life in prison, correct?

23 A.    I believe that is the maximum penalty, yes.

24 Q.    But her mandatory minimum is ten years, correct?

25 A.    Sounds right.

45

1  Q.    Samantha Smart also signed a plea agreement?

2  A.    Yes.

3  Q.    Maximum penalty is 20 years on that one, no mandatory

4  minimum sentence, correct?

5  A.    I think so.

6  Q.    And a mandatory minimum sentence, can you explain that?

7  What does that mean?

8  A.    It means that's your mandatory minimum for sentence based

9  upon your guidelines.  It can go higher.

10 Q.    So when you say guidelines, it depends on someone's prior

11 record history?

12 A.    Correct.

13 Q.    So if they committed crimes in the past it can change

14 their guidelines and go beyond that 20 years, correct?

15 A.    That would be correct.

16 Q.    Sometimes those guidelines it can justify someone serving

17 a life sentence, correct?

18 A.    Yes.

19 Q.    Okay.  But at a bare minimum they have to serve that 20

20 years, correct?

21 A.    Yes, the minimum mandatory.

22 Q.    How does one circumvent that 20-year mandatory minimum?

23 A.    Cooperation.

24 Q.    Okay.  And that's what these individuals are agreeing to

25 do here today.  They signed cooperation agreements, correct?

46

1  A.    That's correct.

2  Q.    And so they are hoping that the government will file

3  something called a 5 K. motion.  Does that sound about right?

4  A.    Sounds right.

5  Q.    That 5 K.  That motion allows the judge to sentence those

6  individuals under that mandatory minimum?

7           THE COURT:  I don't want -- you're incorrect.  It's a

8  3553 E. motion not a 5K1.1.  Why don't we stick to the gist of

9  what you're doing, and let's not get into areas of the law

10  where you're correct in your statements?  All right.

11          MR. ROTTEVEEL:  Fair enough, Judge.  Sorry about

12  that.

13  BY MR. ROTTEVEEL:

14  Q.    But again all of these individuals are looking to

15  cooperate and looking to get a reduced sentence at the end of

16  the day, correct?

17  A.    Yes.

18          MR. ROTTEVEEL:  One moment, Your Honor.

19          THE COURT:  Sure.

20          MR. ROTTEVEEL:  I have nothing further.  Thank you.

21          THE COURT:  Redirect?

22  REDIRECT EXAMINATION

23  BY MR. O'HARA:

24  Q.    Officer Yelland, you don't determine anybody's sentence,

25  do you?

47

1  A.    No.

2  Q.    Mr. Donahue and I, we don't determine anybody's sentence,

3  do we?

4  A.    No.

5  Q.    The sentencing is up to the presiding judge, correct?

6  A.    Correct.

7  Q.    Taking a number of factors into consideration?

8  A.    Correct.

9  Q.    Okay.  These individuals that were recently interviewed,

10  had you ever asked them specific questions about Kevin Jones

11  before?

12  A.    No.

13  Q.    How many people were charged in this particular

14  indictment?

15  A.    This particular indictment had 15 defendants.

16  Q.    And Mr. Beckford cooperated?

17  A.    Yes.

18  Q.    And Tyla Griffin cooperated?

19  A.    Yes.

20  Q.    And as a result of their cooperation, were you able to

21  arrest at least Mr. Beckford's case his source out in Arizona?

22  A.    Yes.

23  Q.    Was that an individual named Shane Burns?

24  A.    That is correct.

25  Q.    He's in this indictment, too, correct?

48

1   A.    Yes, we indicted him also.

2   Q.    As well as his girlfriend?

3   A.    Yes, Christina Patacky-Beghin.

4   Q.    She was charged?

5   A.    Yes.

6   Q.    Now, Mr. Beckford if I remember from your direct

7   testimony, he was arrested at the airport in Avoca?

8   A.    That is correct.

9   Q.    February of 2022?

10  A.    Yes.

11  Q.    After he's arrested in February of 2022 is he able to sell

12  any more fentanyl pills?

13  A.    No.

14  Q.    Why not?

15  A.    He's incarcerated ever since.

16  Q.    And when was Mr. Jones arrested?

17  A.    March 3rd of 23.

18  Q.    Almost a year and month later, right?

19  A.    Yes.

20  Q.    Would you expect to find any fentanyl pills on Mr. Jones

21  that came from Beckford a year and a half later?

22  A.    No.

23  Q.    No fentanyl pills were found on Mr. Jones' person,

24  correct?

25  A.    That's correct.

49

1  Q.   He was arrested in Massachusetts?

2  A.   That is correct.

3  Q.   Were there any fentanyl pills found on Sabrina Cleveland

4  at the time of her arrest?

5  A.   No.

6  Q.   Were any fentanyl pills found on other co-defendants in

7  this case, Samantha Smart?

8  A.   No.

9  Q.   How about Rachel Smyden?

10  A.   No.

11  Q.   Yuamir Grayson?

12  A.   No.

13  Q.   Robert Thompson?

14  A.   No.

15  Q.   Giavanna Twyman?

16  A.   No.

17  Q.   Shayna Colon Acosta?

18  A.   No.

19  Q.   Mercedes Smith?

20  A.   No.

21  Q.   Maurice Faulkner?

22  A.   No.

23  Q.   Howard Bell?

24  A.   No.

25  Q.   Christina Patacky-Beghin?

50

1    A.    No.

2    Q.    Shane Burns?

3    A.    No.

4    Q.    No fentanyl pills found on any of them at the time of

5    their arrest, correct?

6    A.    Correct.

7    Q.    If we can have 1.1.  Bringing up Government's Exhibit 1.1.

8    That's from the first controlled buy, right?

9    A.    Correct.

10   Q.    Who packaged that package?

11   A.    Davon Beckford.

12   Q.    What was found?

13   A.    Fentanyl pills.

14   Q.    1.4 up there, the physical exhibit?

15   A.    Oh, yes.

16   Q.    Hold that up for the jury.  What was found in that

17   package?

18   A.    These fentanyl pills.

19   Q.    Again, who packaged it?

20   A.    Davon Beckford.

21   Q.    How about 3.1, that's the photo and 3.1 on the screen

22   before you.  That's the third controlled buy, the second one

23   from Davon Beckford, right?

24   A.    Correct.

25   Q.    Who packaged that?

51

1   A.   Davon Beckford.

2   Q.   What was found in it?

3   A.   Fentanyl pills.

4   Q.   Showing 3.5, fentanyl pills?

5   A.   These are fentanyl pills.

6   Q.   Packaged by Davon Beckford?

7   A.   Correct.

8   Q.   If we can have exhibit 4.1 from the fourth and final

9   controlled buy, third one from Davon Beckford.  Who packaged

10  that package?

11  A.   Davon Beckford.

12  Q.   What was found in there?

13  A.   Fentanyl pills.

14  Q.   If you can show the jury 4.4.  Those are the pills found

15  in that package?

16  A.   Correct.

17  Q.   Packaged by Davon Beckford?

18  A.   Yes.

19  Q.   The Cash App you were asked about Rachel Smyden, Samantha

20  Smart and I think some other individuals.  They didn't send

21  their money through Kevin Jones, right?

22  A.   Correct.

23  Q.   They sent their money directly to Davon Beckford, did they

24  not?

25  A.   Correct, directly to Davon Beckford.

52

1  Q.    You were asked about Sabrina Cleveland and she was sending

2  money via Cash App to Justin Case, correct?

3  A.    Yes.

4  Q.    At whose direction did she do that?

5  A.    Kevin Jones.

6  Q.    The Cash App reference -- 14.5 -- if you can go to the

7  next page -- the subject lines.  You were asked about the

8  subject lines?

9  A.    Yes.

10  Q.    6/24 leather jacket, 8/1 31 new speakers, 9/2 new

11  transmission, next page these, 10/5 another leather jacket.

12  Was Davon Beckford selling leather jackets?

13  A.    No.  Fentanyl pills.

14  Q.    New transmissions?

15  A.    Fentanyl pills.

16  Q.    He's in Arizona, right?

17  A.    Correct.

18  Q.    And Mr. Jones is either in Pennsylvania or in

19  Massachusetts?

20  A.    Correct.

21  Q.    I guess they don't sell transmissions in Massachusetts or

22  Pennsylvania, do they?

23  A.    They sell them.

24          MR. O'HARA:  If I may have a moment, please, Your

25  Honor.

53

1          THE COURT:  Sure.

2          MR. O'HARA:  Nothing further, Your Honor.  Thank you.

3          THE COURT:  All right.  You may step.  Ladies and

4  gentlemen, we will take our morning break.  Admonitions you

5  will be tired of hearing, no conversation or discussions among

6  yourselves or with anybody else.  Keep an open mind until you

7  heard all of the evidence and law related to the case, so don't

8  form any opinions.  Don't listen to or read anything about the

9  case.  No research of any kind concerning anything about the

10 case.  If anyone were to try to speak to you about the case,

11 you must advise us of that immediately.  See you in about ten

12 minutes.

13          (A brief recess was taken.)

14          THE COURT:  Mr. Donahue.

15          MR. DONAHUE:  The government calls United States

16 postal inspector Lauren Fetch.

17          LAUREN FETCH, called as a witness, being duly sworn,

18 testified as follows:

19 DIRECT EXAMINATION

20 BY MR. DONAHUE:

21 Q.    Good morning.

22 A.    Good morning.

23 Q.    How are you presently employed?

24 A.    I'm a postal inspector with the United States Postal

25 Inspection Service.

54

1  Q.    How long have you been employed with the United States

2  Postal Inspection Service?

3  A.    I've been a postal inspector for 11 years.

4  Q.    How long have you been employed by the United States

5  Postal Service?

6  A.    Before becoming a postal inspector I worked for the post

7  office for approximately eight years.  I started doing world

8  delivery, city delivery as well as being retail clerk and post

9  master in post offices.

10 Q.    Inspector Fetch, can you briefly describe your duties and

11 responsibilities and your current position?

12 A.    As a postal inspector I investigate any type of crime that

13 involves the mail in any way, so we investigate a lot of mail

14 theft, mail fraud, identity theft, narcotics investigations.

15 There's a lot of dark web investigations based off narcotics

16 being shipped via the dark web, things like that.

17 Q.    You stated earlier you started in this position

18 approximately 11 years ago?

19 A.    That is correct.

20 Q.    And when you started that position did you undergo any

21 type of training?

22 A.    Yes, there was a 12-week academy program that I undertook.

23 Q.    And what type of courses did that training have?

24 A.    That covered both law enforcement side of investigations,

25 defensive tactics and different types of crimes that would be

1  covered by postal inspectors I mentioned before, that mail

2  theft, if there was burglaries of post offices, we learned

3  about that and fraud and narcotics investigations.

4  Q.    And over the course of the past 11 years have you

5  undergone continuing trainings?

6  A.    Yes, I did advanced trainings in most those areas, money

7  laundering investigations, narcotics investigations, some week

8  long advanced trainings.

9  Q.    Do you teach courses now?

10 A.    I do.  I am a facilitator teacher for our mail theft

11 courses.

12 Q.    With respect to narcotics investigations, have you

13 undergone any advanced training for those?

14 A.    Yes, I did go to multiple week long trainings that kind of

15 focused briefly on narcotics investigations.

16 Q.    Inspector Fetch, over the course of your 11 years where

17 have you been stationed?

18 A.    I started as a postal inspector in New York City, and I've

19 been in Scranton for the past six years.

20 Q.    And as part of your position as a postal inspector, do you

21 have a current case load?

22 A.    Yes, an extensive case load.  I would say I primarily

23 focus on narcotics cases.  Probably 75 percent of my case load

24 is narcotics cases.

25 Q.    What types of narcotics have you investigated in your drug

56

1 trafficking investigations?

2 A.    Cocaine, methamphetamines, OxyContin and different types

3 of synthetic opioids have been increasing since probably just

4 prior to the pandemic.  We have seen a lot more of that type of

5 investigation with narcotics.

6 Q.    Have you ever conducted an investigation or been involved

7 in an investigation that involved the trafficking of fentanyl

8 pills?

9 A.    Yes.

10 Q.    How do you typically get involved in investigations

11 whether it be under the United States Postal Service or with

12 other agencies?

13 A.    There's a couple different ways that cases can start.  In

14 this area we do work well with both local and federal law

15 enforcement partners, so we do get a lot of information from

16 investigations they're working, and then we pack it into postal

17 information sometimes looking through our databases we identify

18 suspicious parcels that could be narcotics based just on our

19 own information.

20 Q.    Approximately how many drug investigations have you been a

21 part of or you conducted yourself?

22 A.    Even in the past week I've -- just yesterday I was looking

23 up three different leads that I was looking in into, overall

24 investigations that -- it's hard to ball park.  I would say

25 hundreds.

57

1  Q.   So based on your training and your experience, could you

2  describe just briefly for the members of the jury how drug

3  traffickers generally use the mail?

4  A.   Sure.  Among all of the other methods people can use to

5  try to move narcotics from one area to where they are being

6  distributed, the postal service is one of those methods that

7  drug trackers use to move narcotics.  It typically happens from

8  source locations along the boarder, California, Texas, Puerto

9  Rico typically is very large area of narcotics being moved from

10  the post office to different areas.  So depending on what type

11  of narcotic it is, how it enters the country, it is then used

12  -- then can be further trafficked through the postal service

13  because of the level of supposed anonymity.  So if someone is

14  trying to move something with a whole truck load of narcotics,

15  they have a higher chance of that entire truck load being

16  intercepted versus if you send multiple smaller packages with

17  narcotics there's less people who could be pointed and involved

18  in the -- you know, in being caught with those narcotics.  So

19  unfortunately the postal service is frequently used by drug

20  traffickers.

21  Q.   Is there a particular type of parcel service that you

22  found in your experience drug traffickers use most frequently?

23  A.   They typically use either priority mail or express mail,

24  which is sometimes called priority mail express because we had

25  make branding really confusing.  I say express mail.  It's the

58

1   faster service.  It costs more money, but it is guaranteed

2   delivery.  It kind of makes sure it's in the mail stream for

3   the shortest amount of time, so that is frequently used.  But

4   if it's not express, I would say the priority mail, which is

5   the two to three days.

6   Q.   With respect to the express mail, what's the typical

7   timeline in the United States that it takes for a parcel to be

8   delivered?

9   A.   It's guaranteed usually next day, if not the next day

10  there's some days it could be two-day service.

11  Q.   Does the express mail package also come with a tracking

12  number?

13  A.   Yes, tracking is included with the priority express.

14  Q.   The members of the jury have heard a lot of about tracking

15  numbers.  Can you explain how tracking numbers work?

16  A.   Sure.  I'll try not to go too postal geek on tracking

17  numbers.  So each type of different service that the postal

18  service offers, most of the packaging service is -- now I think

19  all the packaging service actually include tracking numbers

20  with them now.

21       Based on the number and letter sequence, you can kind of

22  determine what type of class of mail it is.  For the ones that

23  we're talking most of them were express packages so they either

24  start with E. S., E. J., some kind of E. and another letter

25  followed by a number sequence and then end in U.S., which

59

1  designates that it was a United States parcel.

2  Q.    Who can check on the tracking numbers of a particular

3  parcel?

4  A.    Anybody with a tracking number can check on the tracking

5  status parcel.

6  Q.    How do you do that?

7  A.    You can go to the U.S. P. S. website and there's a spot on

8  there you can type in the tracking number, and it will provide

9  you updates on the status of the parcel.

10 Q.    Inspector Fetch, can you just describe what it looks like

11 on the United States Postal Service website when you check

12 that?

13 A.    Sure.  So when you go to the website it will -- there's a

14 spot where you type the tracking number.  It's actually like

15 back -- you can do -- if you're getting an E. Bay parcel, you

16 can through the link in your e-mail.  It still pulls up through

17 the same system and it just spits it out to that database.  Say

18 you get your e-mail with the tracking number and you click on

19 it in there, it may not go directly to the postal service

20 website but it pulls up from the same postal service database.

21     So if you go into the postal service website, type the

22 tracking number, it will give you information on -- I think on

23 the customer side it shows when it was mailed.  It will show,

24 like, if it hits a processing facility.  It will show when it's

25 out for delivery and show when it's delivered.

60

1  Q.   Inspector Fetch, I'm going to show you what has previously

2  been moved into evidence as exhibit 5.5, and it will show up on

3  your screen there.  We were just discussing the tracking

4  results on the U.S.P.S. website.  Is that what they look like?

5  A.   Yes.

6  Q.   Can you just describe for the members of the jury

7  specifically what's on there?

8  A.   So at the top there next to, like, that green check mark

9  circle, that E. J. number is the tracking number.  It shows

10  that it was delivered.  It gives North Attleboro,

11  Massachusetts.  It doesn't give the exact delivery address just

12  for security reasons for people it doesn't put -- unless

13  you're, like, logged into your account, it doesn't give the

14  exact address on the customer side.  It gives the city of North

15  Attleboro, Massachusetts.  It gives the date and time of

16  delivery.

17      It shows the scheduled delivery time.  It's just a service

18  metric to say it was guaranteed by 3 p.m., we delivered it at

19  2:45 p.m.  It shows that money back guarantee, which I said

20  comes with the express parcels.  It says signed for, waived.

21  That is because express does offer the option to have a

22  signature with items.  But it defaults to being waived to make

23  sure the item does get left there and it doesn't delay delivery

24  by having the signature.  It's showing waived, but a signature

25  is an option.  Additional information is kind of repeating that

1  same stuff that was above, and then in the tracking history

2  section it shows those different steps that are publically

3  visible.  It's showing 2:45 delivered time and that at 10:36 on

4  the 21st it's showing that it reached a distribution center it,

5  so it's just showing some of the steps that the express took

6  along the way of travel.

7  Q.    Thank you.  Inspector Fetch, is there anything else over

8  the course of your training and experience in drug trafficking

9  in the mail that you've learned drug traffickers like about the

10  express mail packages?

11  A.    I mean, especially with that signature not being required

12  it can just be left there without having to hand-to-hand

13  interaction with anyone.  So those parcels typically can just

14  get left at an address without having presented to someone.

15  Q.    What, if anything, have you learned in your training and

16  experience about sequencing of tracking numbers?

17  A.    So for -- especially for the -- this type of express

18  label, this was back when express labels paper forms that were

19  sitting on the counter at expresses -- or at post offices, and

20  you would grab your label and fill it out by hand.  That stack

21  that's sitting out there is actually a sequence batch there.

22        It's, like, a couple numbers in the sequencing starts, but

23  typically with a lot of narcotics trafficking, sometimes when

24  they go in because they -- the less time in the post office the

25  better.  So they'll take a stack of 20 or 30 and take them back

1  with them so they can package everything up beforehand and then

2  just bring them in as they are preparing instead of having to

3  prepare them in the office there.  So that sequencing can come

4  in handy when you're looking for possible related parcels that

5  seem to be sent by the same individual or individuals.

6  Q.    And in your experience have you found that drug

7  traffickers typically use real names sending these packages?

8  A.    No, they do not.  Typically they do not.

9  Q.    Why is that?

10 A.    The sender -- nothing confirms against the names in the

11 system.  So when someone comes in to present a mailing for

12 something, you can write Big Bird, 123 Main Street, and the

13 person in the office is not going to say show me your I. D.,

14 show me your Big Bird 123 Main Street.  So you can write any

15 address on there as the sender.  That's not confirmed.  The

16 recipient side it checks to makes sure the delivery address is

17 a valid address.  It does not check the name against anything.

18 Q.    Inspector Fetch, can you describe what investigative tools

19 you have at your disposal when you're investigating these types

20 of cases?

21 A.    So when people check the tracking information on parcels,

22 that information on their I. P. from the device they use is

23 catalogued in a postal database that we can go back and see

24 which I. P. addresses are associated with tracking parcels.  We

25 also have the ability to look at what parcels were delivered to

63

1  a specific address for a certain amount of time historically.

2  Q.    With respect to the tracking results, you briefly

3  mentioned this, but when you looked that up, what are you able

4  to see on your side?

5  A.    We can see the exact delivery address.  We don't just see

6  the town like that.  We can see the exact address an item was

7  delivered to.  We actually have the capabilities of seeing when

8  that item was scanned, delivered where the geolocation of that

9  delivery scan occurred based on the carrier scanner or that geo

10 information occurred.  There's sometimes different processing

11 facilities it goes through or at least different steps when it

12 arrived at a processing facility, when it went through certain

13 machines at a processing facility that show up on our side that

14 don't show up on the customer side of things.

15 Q.    With respect to your side of things, are you able to see

16 the sender's name?

17 A.    No, only if we can get an image of the label can we see

18 the sender name.  That doesn't show up in the database.

19 Q.    Are you able to see the recipient's name?

20 A.    Only if it's, like, a computer generated postage where the

21 person who created the postage label typed in that information.

22 In this case where it was, like, in a retail hand off, that

23 recipient information does not get typed into the database, so

24 it isn't viewable unless I can physically see the label.

25 Q.    For the tracking results, is there a certain time period

64

1  on your database that the information is wiped?

2  A.    Yes, and that depends on the service how quickly it just

3  siphons out.  With the tracking information I can usually see

4  it around six months to a year.  Sometimes it can hold on more.

5  It's not a hard fast date on that.

6  Q.    I just want to talk about historical package information.

7  Can you describe that database for the members of the jury?

8  A.    With that system I can type in a specific address, and I

9  can see what U.S.P.S. parcels were delivered to that address or

10  addressed to that address because sometimes, you know, an item

11  may not have gotten delivered.  Even if a company recreated a

12  shipping label it would show up in there.  That's only as good

13  as if the information was typed properly, but -- so whatever

14  information was typed into the database, I can see, yes, this

15  address received 15 parcels the past month, those parcels came

16  from a certain geographical area.

17       I can see the parcels were sent from, the tracking number

18  with that parcel, the weight of that parcel and postage paid on

19  that parcel comes up in the system as well.

20  Q.    With respect to the historical package information, do you

21  have access to the sender and the recipient's names?

22  A.    The recipient name would show up if that was computer

23  generated label where it was typed in.  Otherwise -- and then

24  none -- the only information that shows up from that sender

25  information is the post office it was mailed from so it would

65

1  show, like, the town and the zip code where it was mailed from

2  but not any information of the actual sender.

3  Q.    Does this database also have a timeline where it wipes

4  clean?

5  A.    That one goes back two years.

6  Q.    So today being May 29th of 2024, is it fair to say that

7  you would be able to access up until at least May 30th, 2022?

8  A.    Correct.

9  Q.    The packages that were sent on May 28th, 2022 you would

10  not have access to?

11  A.    Correct.  It would not let me see that in the historical

12  information for an address.

13  Q.    You also referenced earlier a database regarding the I. P.

14  addresses?

15  A.    Correct.

16  Q.    So let's take a big step back.  Could you just briefly

17  describe what I. P. addresses are?

18  A.    I. P. is a unique code associated with any device.  So if

19  you look on your cell phone, that would show a specific I. P.

20  If you -- if your cell phone goes into your home and you

21  connect to your Wi-Fi at your home, it would show a different

22  I. P. based upon the service in your home from that I. P.  It's

23  a unique identifier tied to either the way the device is

24  connecting to cellular service or Wi-Fi service.

25  Q.    What technology does the United States Postal Service have

66

1  with respect to the I. P. address look up?

2  A.    So when I search -- I can start by saying find out what I.

3  P. address is searched for a specific parcel.  That would then

4  give me the I. P. address of whatever that connection occurred

5  on.  I can then take that I. P. number, which is a long string

6  of letters and numbers -- I can take that and then kind of flip

7  it into the database and say, okay, looking at this I. P. what

8  parcel has this I. P. checked.

9  Q.    We were talking earlier about the website that you can

10  track your package, correct?

11  A.    Correct.

12  Q.    When you're talking about the I. P. checking on a package,

13  it's through those tracking numbers, correct?

14  A.    Yes.

15  Q.    Inspector Fetch, does the U.S. Inspection Service also

16  employ another tool called reverse I. P. address?

17  A.    Yes, that's what the tool is referred to in our system.

18  It's called -- we refer to it as RIP, reverse I. P. system or

19  something like that, but -- if it's ever shown as RIPS that's

20  reverse I. P.  So that's the same system that we use for either

21  the tracking number or if we have the I. P. and we want to see

22  what parcels -- what have been checked by that I. P. recently.

23  Q.    What is the timeline for the reverse I. P. database?

24  A.    It's from that 60 to 90 days that I can put in the I. P.

25  and get the parcels that were checked in that timeframe.

67

1  Q.   In your role as a postal inspector, you mentioned that

2  sometimes fictitious names are used.  Do you have any tool that

3  you can use to check the veracity of that name?

4  A.   Yes, we have a service that our -- that we use called

5  clear, which is different comingle of different credit bureau

6  information and different database information from bank

7  records and things like that where it can search for names,

8  associated addresses or different ways to see what names belong

9  to an address.

10 Q.   Inspector Fetch, did there come a time when you became

11 involved in the investigation of the trafficking of fentanyl

12 pills from Arizona to Pennsylvania and elsewhere in and around

13 January of 2020 to February 2023?

14 A.   Yes.

15 Q.   When did you become involved in that investigation

16 approximately?

17 A.   It was the beginning of June of 21 after the first

18 undercover purchase was made but before it was delivered to the

19 area.

20 Q.   So how did you become involved?

21 A.   F.B.I. T. F. O. Yelland approached -- he contacted me and

22 said, hey, I have a tracking number associated with an

23 undercover purchase that we made of pills.  I was -- they

24 reached out to me to try to intercept it before it was

25 delivered.

68

1  Q.    Did you know officer Yelland prior to this?

2  A.    I believe I met him before.  I might have run a couple

3  intel information off of things for him before.

4  Q.    And you mentioned that you started working on this case in

5  June of 2021?

6  A.    Yes.

7  Q.    How long have you been working on it?

8  A.    From June of 2021 until we wrapped up things.  I don't

9  remember -- that would have been about a year later after that

10 I think.

11 Q.    So directing your attention to that first controlled buy,

12 you indicated that officer Yelland told you that a package had

13 been sent.  What, if anything, did you do with that

14 information?

15 A.    So using those databases I just mentioned, I was able to

16 take that tracking number that they had for their purchase that

17 was going to be coming in, looked for I. P. information tied to

18 that package who was already tracking this package.  Then I

19 think that started right from there that we identified some I.

20 P.s that were tracking this parcel.  We also identified this

21 parcel was sent out with some other parcels.

22        So that gave us more delivery addresses right around the

23 at the same time that I can run that historical information on

24 and see if there have been other parcels matching the same

25 profile meaning they were sent express from the Phoenix area

1   around the same weight as our suspect parcel to different

2   addresses.

3   Q.    And with respect to this first controlled buy, did you

4   make any notification or anything about that specific parcel?

5   A.    I'm not -- I'm not sure.  Like, we intercepted it and we

6   -- you know, we got it before it was delivered, and I started

7   digging into the data with the I. P. information and other

8   possible addresses and things like that, so it -- I started

9   building a spreadsheet of other suspected parcels.

10  Q.    But with respect to that first control buy, the parcel was

11  seized?

12  A.    Huh-uh.

13  Q.    What did you do with the parcel or your team do with the

14  parcel once it had been seized?

15  A.    I -- -- F.B.I. and myself, we opened the parcel and

16  examined the contents of it.  We photographed it, and I think

17  that first one they sent to a lab after it was secured.

18  Q.    How many controlled buys were you involved in specifically

19  with respect to Davon Beckford and Tyla Griffin?

20  A.    I think it was four.

21  Q.    When was the next controlled buy?

22  A.    July of '21.

23  Q.    Could you just briefly describe your involvement in that

24  controlled buy?

25  A.    In that one I -- trying to think if we already knew it was

1  going to happen before they had the tracking number, but

2  regardless, once we had the tracking number we were able to get

3  the information on the parcel that was coming in and start

4  looking at the postal databases and that location where that

5  one was sent because that location was able to obtain video of

6  the sender of that parcel.  So we got that information as well.

7  Q.    And did the United States Postal Inspection Service

8  ultimately seize that package?

9  A.    Yes.

10  Q.    And was it turned over to the F.B.I.?

11  A.    Yes.

12  Q.    When was there a third controlled buy?

13  A.    I believe it was September of '21.

14  Q.    And again could you just briefly describe your involvement

15  in that third controlled buy?

16  A.    Same type of thing where we had the tracking number.  We

17  got the information from the postal databases we could related

18  to that one with the I. P. information of who was tracking it,

19  who was looking at that.  I believe for that one there was also

20  video from the Phoenix side of the sender as well that was able

21  to be obtained from that one.

22  Q.    And did the United States Postal Inspection Service seize

23  that package?

24  A.    We seized that parcel, and we opened it with the F.B.I.,

25  yes.

71

1  Q.    And was there a fourth controlled buy involving Davon

2  Beckford and Tyla Griffin?

3  A.    Yes, but I can't recall the date of that one offhand.  I

4  can try to look on the spreadsheet here and try to find it.

5  Q.    Yes.  Inspector Fetch, while you're doing that, can you

6  briefly describe your involvement in that buy?

7  A.    The fourth buy we had the tracking information from the

8  purchase.  We got the information linking the I. P. information

9  from the postal database.  We looked for video, and then once

10  the parcel came in we were able to intercept it and open the

11  parcel with the F.B.I.

12  Q.    Now, inspector Fetch, you referenced earlier a spreadsheet

13  that you developed.

14  A.    Yes.

15  Q.    Can you just briefly describe the spreadsheet you created?

16  A.    The spreadsheet was based off of the snowball of

17  information that came in when we were able to link I. P.

18  information, when we were able to link the historical address

19  information.  So once they -- once we had multiple parcels

20  mailed at the same time, so there was a lot of different

21  sources we were able to kind expand this parcel list out to

22  quite a few parcels where it was either label sequence, like I

23  said earlier where they grab that handful of labels and that

24  one label we had in there we knew because it was either a

25  controlled buy or an address we had identified, then we found

72

1   out during that same transaction they mailed two or three other

2   addresses or maybe a transaction the next day, but it was that

3   same label sequence.  They mailed to additional addresses.  So

4   this spreadsheet was just the compiling of all that data from

5   all the different tracking numbers we were able to identify.

6   The spreadsheet also has what time they were mailed, the date

7   they were mailed, the location they were mailed from, if we had

8   the sender information, which I said we'd only get it if we saw

9   the label on the item.  That sender information would get in

10  there.  Then there was the recipient name.  Again the recipient

11  name would only be -- in this case we only had the recipient

12  name if we were able to see the label on it.

13      So for the labels it was either we physically saw it or

14  sometimes labels when they are going through machinery

15  sometimes there's an image captured of that label going through

16  the machinery.  It doesn't happen as frequently with expresses

17  which is why we don't have too much of this, but there might be

18  some that we had label information on that we didn't physically

19  get a hold of.  That might be why we have the label information

20  and have some of that sender information on here.  It also

21  included postage amounts and weights and all of the information

22  we can get out off the database at the time that we were able

23  to recover it.

24  Q.   Inspector Fetch, in front of you is a disk marked exhibit

25  6.1.

73

1  A.    Yes.

2  Q.    Do you see that?  And does that disk contain the

3  spreadsheet that you developed during the course of this

4  investigation?

5  A.    Yes.

6        MR. DONAHUE:  Your Honor, it's my understanding in

7  speaking with counsel that for series six and seven there's no

8  objection to admit.

9        MR. ROTTEVEEL:  That's accurate.  No objection.

10        THE COURT:  Thank you.  6.1 through 6.9 are admitted

11  without objection, and 7.1 through 7.3 also admitted without

12  objection.  All right.  Go ahead.

13        MR. DONAHUE:  Thank you, sir.

14  BY MR. DONAHUE:

15  Q.    Put up exhibit 6.2, please.  Inspector Fetch, on the

16  screen is going to be an item 6.1 -- I'm sorry.  6.1.

17  Inspector Fetch, what is this?

18  A.    The spreadsheet created with all of the parcels that we

19  identified.

20  Q.    Can you just briefly describe first what is on the bottom

21  there in different colors?

22  A.    There are various tabs to the spreadsheet.  This first tab

23  is called label list where it -- it has all the parcels, the

24  labels of the parcels listed and the specifics we have from

25  each label that we were able to obtain.  The next tab is mailer

74

1  photo doc.  It's a different one used on the back side.  So

2  there's some information that we have from there.  It's going

3  to be fairly repeated on here.  The next one is called RIPS,

4  which is that reverse I. P. information, that database where we

5  get the I. P. information.  So in that tab there's a whole

6  bunch of information where we go into the postal database and

7  we type that tracking number and it gives us all of the

8  different I. P.s that are linked with that parcel.  It spits it

9  out in Excel format.  We kind of cut and paste that information

10 into this spreadsheet here because it has that limited time

11 that it is available, so it helps keep all of the data in one

12 spot here.

13 Q.    Inspector Fetch, to streamline --

14 A.    It's a lot.

15 Q.    So for people who perhaps have not used Excel before, the

16 tabs at the bottom are just different --

17 A.    Different pages, right, a different kind of binder of

18 information.

19 Q.    And earlier we discussed the different investigative tools

20 that you use in your job.  Are the tabs related to those tools?

21 A.    Some of them, and some of them are just other spots where

22 we were keeping information related to the investigation in one

23 clean spot.

24 Q.    With respect to that first tab entitled label list, what

25 packages are listed on there?

75

A.    So that column A. is all the parcels that were identified
as being linked with the investigation.  The ones that are
highlighted in yellow are parcels that were seized as part of
the investigation, and ones that list, like, in the first
column are orange there, those are ones we have label images or
at least partial images of.

Q.    It is it fair to say that the label list tab has any
suspicious packages that you identified during your -- during
your investigation?

A.    Correct.

Q.    And directing your attention to the tab that says I. P.s,
can you just describe what's on there?

A.    So that is kind of a subset off of that RIP spreadsheet.
The RIP spreadsheet was all the data dump.  This one
consolidates it down a little bit more.  It is similar to the
RIPS tab.

Q.    Inspector Fetch, I'm going to ask you pull exhibit 6.2
from your folder.

A.    Uh-huh.

Q.    Could you describe what exhibit 6.2 is?

A.    6.2 is a printout of that Excel spreadsheet from the label
list.

Q.    And you said earlier that the label list includes any
suspicious packages you identified from Arizona to Pennsylvania
and elsewhere?

1  A.    Correct, like I mentioned, it was kind of either the

2  address had received one that we identified, so anything

3  historical from that address could have been in there.    That

4  came from Phoenix.    That was sent express.    That was within

5  that weight range where these were typically lighter parcels.

6  So we weren't pulling if it came from Amazon in New Jersey.

7  Q.    Inspector Fetch, during the course of your investigation

8  did you keep communication with officer Yelland?

9  A.    Yes.

10  Q.    Did there come a time in the investigation when officer

11  Yelland provided you with tracking numbers?

12  A.    Yes.

13  Q.    Approximately how many tracking numbers did he provide?

14  A.    It was a good number.    I would say it was over 50,

15  probably close to a hundred.    I don't recall, but it was quite

16  a few tracking numbers.

17  Q.    And are they included in your label list tab?

18  A.    They are.    Some of them had previously been identified,

19  and we were just going, yep, we already had that one.    Some of

20  them were ones we did not already have on the list.

21  Q.    Can you please publish 6.2?    And, inspector Fetch, the

22  document on your monitor right now, that's the full label list?

23  A.    Yes.

24  Q.    Inspector Fetch, I am going to ask you take out exhibit

25  6.3.    Could you describe what exhibit 6.3 is?

77

1  A.    6.3 is a much pretty concise -- the bigger spreadsheet

2  that shows these were labels that were sent to 450 South

3  Franklin Street in Wilkes-Barre.

4  Q.    And is that the address associated with the controlled

5  buys?

6  A.    Yes.

7  Q.    And one moment, please.  So could you just describe all of

8  the information that's displayed there?

9  A.    So --

10 Q.    Briefly.

11 A.    So this list it starts with that -- the label column,

12 which is that express mail number that starts with in this case

13 E. J., and one is E. I., ends in U.S., the date these items

14 were mailed, the time would be the time they were accepted,

15 mailed from a zip code.  It's longer than a normal zip code,

16 that zip code, the first five numbers, and there's the second

17 four, which is kind of like when you get your stuff delivered

18 at home it breaks it down into more points.  So post offices

19 all end in 9998.  There is more postal geek knowledge there.

20 It's the zip code and the 9998 indicating it was mailed from a

21 post office, the city -- because they were controlled buys, we

22 had images of all the labels.  So we were able to see the

23 return name on there, the return address and all of the rest of

24 the return address that was on the label , the name it was

25 addressed to, our delivery address, and again that zip code is

1  the regular five digit zip code plus the extra bit for

2  delivery.

3      It includes how we obtained the information, which in this

4  case it was -- they were our purchase, so we had the tracking

5  information.  And then the date of delivery is the last one.

6  So it just shows the date sent at the beginning and the date

7  the item was delivered in the last column.

8  Q.    These four packages are also included in that big

9  spreadsheet?

10  A.    Yes.

11  Q.    Inspector Fetch, I'm going to ask you to pull out exhibit

12  6.4.  Inspector Fetch, during the course of the investigation,

13  did you identify any address associated with an individual

14  named Rachel Smyden?

15  A.    Yes, there were 11 parcels sent to 42 Red Maple Avenue in

16  Mountain Top.

17  Q.    And so specifically looking at the middle of this page,

18  why are we missing some information there?

19  A.    Because we weren't able to see the actual label on it to

20  obtain any of the return address information that was written

21  on those labels, so this was all information we just gathered

22  from going through the databases where I can see the tracking

23  information but the return information does not populate in

24  just the databases.

25  Q.    Just showing the first page and the second page, you

79

1   indicated that you found 11 different parcels that went to that

2   location?

3   A.    That is correct.

4   Q.    Inspector Fetch, I am going to ask you to look at exhibit

5   6.35 and ask that be displayed to the jury.  Inspector Fetch,

6   during the course of the investigation, did you identify an

7   address that was associated with an individual named Samantha

8   smart?

9   A.    Yes, we identified parcels that were sent to 82 Parsonage

10  Street in Pittston.

11  Q.    How many sent to 82 Parsonage?

12  A.    13 parcels.

13  Q.    Now, inspector Fetch, earlier you indicated that in your

14  experience you see that drug traffickers sometimes send

15  packages -- multiple packages at the same time.  Is that

16  correct?

17  A.    That is correct.

18  Q.    We discussed earlier a controlled buy that began on

19  September 28th, 2021, correct?

20  A.    Yes.

21  Q.    One moment, please.  Inspector Fetch, I believe you have

22  in your folder there an exhibit previously moved into evidence

23  as 3.8.  Do you recognize this document?

24  A.    Yes.

25  Q.    How do you recognize it?

80

1  A.    It is a combination of some of the data from the

2  spreadsheet and images that were gathered in a P. D. F. form.

3  Q.    Can you just describe what is displayed in the top two

4  panes?

5  A.    That top information lists a mailing date of 9/28/21.

6  Under label it lists two express mail items that were mailed.

7  They were both mailed during the same transaction from that

8  specific post office in Phoenix, Arizona.

9  Q.    And directing your attention to the left-hand pane, what

10 is the information regarding the -- one of the packages that

11 was sent on 9/28/21?

12 A.    One of the parcels was sent to 82 Parsonage Street in

13 Pittston.

14 Q.    That is the location that you identified as associated

15 with Ms. Smart?

16 A.    That is correct.

17 Q.    Directing your attention to the right-hand pane, what is

18 that parcel?

19 A.    That is an image of the parcel that was sent to our -- as

20 part of the undercover purchase.

21 Q.    Is it your understanding that Davon Beckford sent both of

22 these packages at the same time on September 28th, 2021?

23 A.    Yes.

24 Q.    Inspector Fetch, I'm going to ask you to go back in your

25 folder and pull out exhibit 6.6.  I ask that be published to

81

1  the jury.  Inspector Fetch, did there come a time where you

2  identified an address associated with Shayna Colon Acosta?

3  A.   Yes, we identified 15 Lanning Lane, Wilkes-Barre with

4  Acosta.

5  Q.   Through your investigation approximately how many parcels

6  did you find that went from Arizona to 15 Lanning Lane?

7  A.   There were 13 parcels that we identified.

8  Q.   Inspector Fetch, during the course of your investigation

9  did you identify any addresses associated with the defendant

10 Mr. Jones?

11 A.   Yes, there was --

12 Q.   Go ahead.

13 A.   I was going to say an address in Wilkes-Barre, 6 Woodward.

14 Q.   Did you find one associated with Mr. Jones in

15 Massachusetts?

16 A.   Yes.  I think 14 Potter Avenue.  Was that the

17 Massachusetts one?  Yes.

18 Q.   I'm going to ask that exhibit 6.7 be published to the

19 jury.  Inspector Fetch, can you just explain what we're looking

20 at in exhibit 6.7?

21 A.   So this is a label list of parcels associated with being

22 delivered to 14 Potter Avenue Unit 2 in Plainville,

23 Massachusetts, and the next page goes into couple parcels that

24 were -- three parcels that were addressed to 6 Woodward Street

25 in Wilkes-Barre that were sent from Arizona.

82

1  Q.    So overall how many parcels did you find that were sent

2  from Arizona to addresses associated with Mr. Jones?

3  A.    Ten parcels.

4  Q.    And with respect to the 6 Woodward?

5  A.    Three to the 6 Woodward.

6  Q.    How many to the 14 Potter Avenue?

7  A.    Seven to 14 Potter Street.

8          MR. DONAHUE:  One moment, Your Honor.

9  BY MR. DONAHUE:

10 Q.    Inspector Fetch, you will see on your monitor what is I

11 think exhibit 6.3.

12 A.    Yes.

13 Q.    Compared to exhibit 5.3, which has previously been moved

14 into evidence.  And exhibit 6.3 was the parcels that we

15 identified as going to -- involved in the controlled buy,

16 correct?

17 A.    Correct.

18 Q.    And specifically, what do you see on the right?

19 A.    On the right there is a receipt from the purchase of an

20 express mail item being sent.  Right around the middle of that

21 receipt from a purchase right around the fold there it includes

22 a tracking number of E. J. 954971326 U.S.  That matches a

23 number we had on our spreadsheet related to our undercover

24 purchases.

25 Q.    We are going to pull up the pertinent information from

83

1  your label list related to Mr. Jones' parcels.  While we're

2  doing that, looking at the exhibit that is 5.5, we've

3  identified this parcel going to 14 Potter Avenue Unit 2 in

4  Plainville, Massachusetts.  Could you explain to the jury why

5  this tracking result says North Attleboro?

6  A.    Yes, the best way to explain it is similar to something

7  that might happen around here where Scranton has multiple zip

8  codes and there's some other town names that fall under the

9  same area of Scranton.  So, like, for example, here Scranton it

10  might say Dunmore.  It might say Taylor.  The numbers might

11  change on zip codes, but the carriers all come out of one

12  location.  Especially with expresses, if it comes in later in

13  the day your zip code may be 18505, but maybe a carrier who is

14  assigned to 18504 or 18506 might take that express out and it,

15  like, show a different delivery town than the town you actually

16  live in.  In that case in Plainville, Massachusetts, North

17  Attleboro -- Plainville and Attleboro falls -- are all

18  delivered out of the same delivery spot there and the carriers

19  are all based out of one location there.  Sometimes zip codes

20  and towns show different -- depending on how they have to

21  deliver the items, especially with express, is when the carrier

22  might be coming technically from another zip code.

23  Q.    With respect to the seven packages we spoke about earlier

24  that went to the 14 Potter Avenue, Plainville address, in your

25  investigation did you find that all those packages were

84

1  delivered to that location?

2  A.    Yes.

3  Q.    Inspector Fetch, we're looking at now exhibit 5.5, and

4  it's up against exhibit 6.7.  In the course of your

5  investigation did you identify a tracking number that matches

6  the one in the tracking results found in 5.5?

7  A.    Yes, so in 5.5 the last sequence of the number is 775

8  U.S., which is at the top of that exhibit there, that number is

9  included in the spreadsheet of parcels that was delivered to 14

10  Potter Avenue Unit 2.  It's the first one listed on exhibit

11  6.7.

12  Q.    Directing your attention now to exhibit 5.6.  Is this a

13  receipt associated with a package that was mailed on April

14  30th, 2021 from the Phoenix area?

15  A.    I can see it from postal records that's when it was sent,

16  yes.

17  Q.    Just referring to the information that we have culled from

18  your label list on the left-hand side there, that matches the

19  second item?

20  A.    Correct.

21  Q.    And asking that exhibit 5.7 be brought up here.  Because

22  we have 5.7 up here, could you just describe the differences

23  between the picture on the right versus the picture on the

24  left?

25  A.    The picture on the right is someone holding the receipt

85

1  from at the time of purchase, so that at the very top there you

2  can see the mailing date of 5/26/21.  It shows that it was an

3  express one day guaranteed flat rate envelope going to an

4  address in Plainville, Massachusetts, and it was expected to be

5  delivered by 5/27 and includes that tracking number ending in

6  588 U.S.  On the left there, that is what you would see if you

7  went to U.S.P.S. dot com tracking website.  With that tracking

8  number that's the information that would show up when you were

9  tracking a parcel.

10  Q.   Is the tracking number associated with these two items

11  found in exhibit 5.7 reflected on the items pulled from your

12  label list in exhibit 6.7?

13  A.   Yes.

14  Q.   Is that the third pane there or third row I should say?

15  A.   Yes.

16  Q.   Thank you.  I will ask that exhibit 5.8 be pulled up.  And

17  is this the receipt and tracking results associated with a

18  package that was sent on June 24th, 2021?

19  A.   Yes, it is.

20  Q.   Looking at the tracking number on that receipt, I realize

21  it's difficult to see.  Is that associated with the fourth row

22  in your exhibit 6.7?

23  A.   Yes.

24  Q.   Moving to exhibit 5.9, is 5.9 associated with a package

25  found to have been sent from the Phoenix area on July 23rd,

86

1   2021?

2   A.    Yes.

3   Q.    And is that tracking number associated with the

4   information found in row five?

5   A.    Yes.

6   Q.    And moving to exhibit 5.10, is this a receipt and tracking

7   results from the website associated with a package that was

8   sent on August 31st, 2021?

9   A.    Yes.

10  Q.    And is the information related to that package found in

11  the sixth row of your exhibit 6.7?

12  A.    Yes, it is.

13  Q.    Now, you mentioned these parcel packages -- I believe it's

14  within 24 hours guaranteed?

15  A.    It's by a specific time.  You can see it on the receipt if

16  it shows.  It gives, like, the -- for this specific one it was

17  guaranteed by Wednesday, September 1st by 6 p.m.

18  Q.    Despite that guarantee, are the packages always on time?

19  A.    No.

20  Q.    Moving to the second page of 6.7 and to exhibit 5.11, is

21  exhibit 5.11 a receipt related to a package that was sent on

22  September 15th, 2021 from the Arizona area?

23  A.    Yes.

24  Q.    And is that package information reflected in the first row

25  of the second page on exhibit 6.7?

87

1    A.    Yes.

2    Q.    Moving to exhibit 5.12, is that a receipt related to a

3    package that was sent from the Arizona area on October 5th,

4    2021?

5    A.    Yes.

6    Q.    And is that information reflected in exhibit 6.7's second

7    page second row?

8    A.    Yes.

9    Q.    And moving to exhibit 5.14, is that a receipt related to a

10   package that was sent from the Arizona area on October 22nd,

11   2021?

12   A.    Yes.

13   Q.    And is that information regarding that parcel reflected in

14   the third row of exhibit 6.7 second page?

15   A.    Yes, it is.

16   Q.    And to conclude this very exciting display, could we go to

17   exhibit 5.15?  Is this a receipt related to a package that was

18   sent from the Phoenix area on November 24th, 2021?

19   A.    Yes.

20   Q.    And is that information reflected in exhibit 6.7's last

21   row of the second page?

22   A.    Yes, it is.

23   Q.    Just to be clear, everything found in exhibit 6.7 is

24   related to packages that were sent from the Arizona area and

25   that were delivered to addresses associated with Mr. Jones?

88

1  A.    Yes, they are.

2           THE COURT:  MR. DONAHUE, how much more do you think

3  you have?

4           MR. DONAHUE:  Ten minutes.

5           THE COURT:  Go ahead.

6           MR. DONAHUE:  All right.

7  BY MR. DONAHUE:

8  Q.    Inspector Fetch, earlier we are discussed the use of I. P.

9  address look up.  During the course of your investigation, did

10 you find that any of the packages associated with the addresses

11 of Mr. Jones were tracked by an I. P. address?

12 A.    Yes, they were.

13 Q.    And just referring to your folder, exhibit 6.8, I ask that

14 be published to the jury.  Do you recognize that document?

15 A.    I do, yes.  This is one of the tabs in that spreadsheet

16 with all of the labels as one of the I. P. tabs.

17 Q.    Is it fair to say that this document contains all of the

18 information about your investigation related to I. P.

19 addresses?

20 A.    Yes.

21 Q.    Inspector Fetch, we covered the ten packages sent to Mr.

22 Jones' address.  Of those ten packages did I. P. address track

23 -- check on the tracking results?

24 A.    Yes, there was an I. P. that was in the Wilkes-Barre area

25 that checked on one of the parcels that was sent to 6 Woodward

89

1   -- a couple parcels checked by that I. P.

2   Q.    I'm going ask you to pull out exhibit 6.9 and that it be

3   published to the jury.  Inspector Fetch, is this information

4   pulled from your I. P. address investigation tab?

5   A.    Yes, it is.

6   Q.    Okay.  Could you just specifically describe what we're

7   looking at here in 6.9's first page?

8   A.    On the first page here it starts with that parcel tracking

9   number, so that parcel number that ended in 533 U.S., that

10  second column is the I. P. that checked on that parcel.  It

11  also documents the date and time where the -- when this

12  tracking occurred.  The domain is pulled up automatically based

13  on the I. P. information.  That's where it puts that one in.

14  There is a possibility of a V. P. N. connection.  This was not

15  a V. P. N.  T. O. R. connection.  That was more a dark web

16  thing -- if it hits off a Switzerland I. P. -- I.P.s are

17  location based -- was it a Switzerland I.P. or China I. P?

18       So it also gives a geolocation based on that I. P.  It

19  doesn't mean, like -- it's not an exact pinpoint, but it's in

20  the area of Wilkes-Barre and the zip code, and that user I. D.

21  is the way it was gathered in the postal system.  So it was

22  from U.S.P.S. tools.

23  Q.    Directing your attention to the second column of the first

24  page of 6.9, how many different I. P. addresses checked on this

25  package?

90

1  A.    I'd have to go to the master big one to see how many --

2  Q.    Specifically for this package -- or for this I. P. data

3  that you're looking at here, how many I. P. addresses checked

4  on it?

5  A.    For this I. P. data it's all related to that one specific

6  I. P. starting in the 24.115.167.230.

7  Q.    How many times did that specific I. P. address check --

8  A.    Check for this parcel -- on this parcel it checked six

9  times.

10 Q.    The tracking number that is there, that's related to a

11 specific parcel, correct?

12 A.    Correct.

13 Q.    That parcel is the parcel that was sent from Arizona on

14 October it 2nd, 2021 to one of Mr. Jones' addresses, correct?

15 A.    That is correct.

16 Q.    Just directing your attention to the second page, what are

17 we looking at here?

18 A.    This is additional information from that same I. P.  It's

19 showing -- but the tracking numbers are changing, so that same

20 I. P. also checked on an additional parcel.  This is a

21 different express parcel that was also sent.  It was on our

22 previous sheet sent to 6 Woodward Street.

23 Q.    And the I. P. address that checked on late October package

24 is the same I. P. checking on this late November package of

25 2021?

91

1   A.    Correct.

2   Q.    And the I. P. address is located somewhere near

3   Wilkes-Barre, Pennsylvania when they are checking, correct?

4   A.    Correct.

5   Q.    And directing your attention to the domain I. P. info,

6   what is PenTeleData?

7   A.    An internet service provider.  So in this specific case

8   it's like a home Wi-Fi home router.

9   Q.    How were you able to find that information?

10  A.    Just that it is a PenTeleData number, there's -- our

11  system automatically pulls it, but it's publically accessible.

12  You can go to an I. P. finder just on -- there's certain

13  websites you can just -- I. P. finder -- and it will tell you

14  who that provider associated with that I. P. address is.

15  Q.    So you can take the information in that second column, put

16  it into this database and it will tell you the domain?

17  A.    Who that I. P. belongings to, in this case PenTeleData,

18  Verizon, T. Mobile, Comcast.  It will tell you who the provider

19  associated with that I. P. is.

20  Q.    Inspector Fetch, I'm going to ask you to pull exhibit 7.1

21  and that it be published to the jury.  Inspector Fetch, is the

22  subpoena response for information related to I. P. addresses

23  you identified in the course of your investigation?

24  A.    Yes.

25  Q.    And directing your attention specifically to exhibit 7.3,

92

1  I ask that be it published to the jury.  Inspector Fetch, with

2  respect to the two I. P. -- the one I. P. address that checked

3  on two packages sent to Mr. Jones, did you request that

4  subscriber information?

5  A.    Yes.

6  Q.    And did you use the I. P. address listed 24.115.167.230 to

7  PenTeleData?

8  A.    Yes.

9  Q.    Did they provide a response?

10 A.    Yes, they provided a response related to that I. P.

11 number.

12 Q.    Directing your attention to the top of the document where

13 it says account holder information, could you just tell us what

14 that document says?

15 A.    PenTeleData said that the subscriber for this service was

16 Kevin Jones, 6 Woodward Street, Wilkes-Barre, P.A. 18705, and

17 it provided a phone number as well.

18 Q.    So is it fair to say that somewhere -- someone associated

19 with this account checked on the two packages in October 2021

20 and November 2021?

21 A.    Correct.

22        MR. DONAHUE:  One moment, please.

23 BY MR. DONAHUE:

24 Q.    Inspector Fetch, just directing your attention to the last

25 two rows, those are the packages sent in October and November

93

1  in 2021?

2  A.    Correct.

3  Q.    Earlier we discussed the timeline for these packages was

4  24 hours or something close to 24 hours?

5  A.    Correct.

6  Q.    And for both of these packages -- well, withdrawn.  Can

7  you please tell me how long it took for the October 2021

8  package -- the second to last row -- to be delivered?

9  A.    October 2021 package shows it was sent on the 22nd and

10 wasn't delivered until the 25th.  So that would be three days,

11 two days, yeah, depending on the time of day, not within the

12 guaranteed time, no.

13 Q.    Again, for the November 24th, 2021 package that was sent

14 from the Phoenix area, was that package on time?

15 A.    That was sent on the 24th and delivered on the 27th.  It

16 does not appear that was delivered on time.

17              MR. DONAHUE:  No further questions.  Thank you.

18              THE COURT:  All right.  We will break for lunch.  The

19 timing is good because I looked at the weather, and for the

20 next hour or so it's supposed to be mostly sunny outside.  So

21 we will take an hour and ten minutes.  Be back at quarter of

22 two.  That will give you time to get where you want to go, sit

23 down, relax and have some lunch and come back afterwards.  Same

24 admonitions always, no conversation and discussion with anyone

25 including among yourselves.  Don't form any opinions.  Keep an

94

1  open mind until you heard all of the evidence and the law

2  related to the case.  No research of any kind concerning

3  anything that you heard here.  Don't listen to or read anything

4  about the case.  If anyone were to try to speak to you about

5  the case, you must advise us of that immediately.  All right.

6  Enjoy your lunch.  See you in about an hour and a half.  See

7  everybody after lunch.

8           (A lunch recess was taken.)

9           THE COURT:  Welcome back.  Inspector, you are

10 reminded you are still under oath.  MR. DONAHUE?

11          MR. DONAHUE:  Your Honor, we have no further

12 questions.

13          THE COURT:  All right.  Mr. Rotteveel.

14          MR. ROTTEVEEL:  Thank you, Your Honor.

15 CROSS EXAMINATION

16 BY MR. ROTTEVEEL:

17 Q.   Can you hear me from over here?  I seem to talk loud.  I

18 want to use my computer, and I am afraid to unplug it at all

19 times.  So if at any time you can't hear me, just please ask me

20 to repeat.

21          THE COURT:  If you slide the mic over to you, that

22 will --

23          MR. ROTTEVEEL:  Sure.

24 BY MR. ROTTEVEEL:

25 Q.   Look at exhibit 6.3.  These are the four packages you had

95

1  investigated to 450 South Franklin Street, correct?

2  A.    That is correct.

3  Q.    These are the packages you investigated along with

4  detective -- or agent Yelland, correct?

5  A.    Correct.

6  Q.    And these four packages involve the controlled buys,

7  correct?

8  A.    Yes.

9  Q.    Okay.  So this involved Tyla Griffin, Davon Beckford, Akee

10  Miller, correct?

11  A.    Yes.

12  Q.    All of these packages that were sent out, they were easily

13  obtainable, correct?

14  A.    Correct.

15  Q.    So you were able to recover all packages that were mailed

16  out to this 450 South Franklin Street and then in turn take

17  those drugs and hand them over to the F.B.I., correct?

18  A.    Correct.

19  Q.    The F.B.I. would send them for lab analysis to determine

20  whether or not the drugs recovered here were, in fact, a

21  controlled substance?

22  A.    Yes.

23  Q.    In this case they turned out to be fentanyl, correct?

24  A.    Correct.

25  Q.    So just for clarity purposes though, these four

96

1   transactions at 450 South Franklin Street have nothing to do

2   with Kevin Jones.  He was not involved in any of these

3   controlled buys, correct?

4   A.    No, I do not believe he was involved in the controlled

5   buys.

6   Q.    Exhibit 6.4 shows numerous transactions as well --

7   A.    That is just the tracking numbers, not the transactions

8   per se.

9   Q.    You're right.  One second.  I mislabeled them on my

10  computer.  42 Red Maple Avenue.  And this was an address

11  associated with a Rachel Smyden, correct?

12  A.    Correct.

13  Q.    And again these show the tracking numbers and packages

14  being sent from -- it shows several addresses -- several areas

15  in Arizona, Tucson, Arizona, Phoenix, Arizona and the packages

16  being sent to 42 Red Maple Avenue, Rachel Smyden's address?

17  A.    Correct.

18  Q.    All these transactions -- there's one, two, three, four,

19  five, six, seven, eight, nine, ten, eleven -- none of them have

20  anything to do with Kevin Jones to the best of your knowledge,

21  correct?

22  A.    Correct.

23  Q.    Turning to the next exhibit dealing with 82 Parsonage

24  Street, I believe that would be 6.5, likewise this follows

25  several tracking numbers and dates of packages being delivered

97

1  from the Arizona area -- we have Tempe, Arizona, Phoenix,

2  Arizona to the 82 Parsonage Street address?

3  A.    Correct.

4  Q.    Again, this address is associated to the best of your

5  knowledge with an individual by the name of Samantha Smart,

6  correct?

7  A.    Correct.

8  Q.    But these packages being delivered have nothing to do with

9  Kevin Jones to the best of your knowledge?

10 A.    Not that I am aware of, correct.

11 Q.    The next exhibit would be 6.6.  This deals with packages

12 again being delivered from Arizona to 15 Lanning Lane, correct?

13 A.    Correct.

14 Q.    And this address is associated with Shayna Acosta Colon,

15 correct?

16 A.    Correct.

17 Q.    None of these packages have anything to do with Kevin

18 Jones, correct?

19 A.    That I'm aware of.

20 Q.    Okay.  And finally we get to 6.8, the last exhibit --

21 that's not the last exhibit.  But with respect to the

22 transactions or the deliveries that would be 6.8 -- excuse me

23 -- 6.7 -- that deals with 14 Potter Avenue and 6 Woodward

24 Street.  These addresses are associated with Kevin Jones and

25 Sabrina Cleveland to the best of your knowledge, correct?

98

1  A.    Yes.

2  Q.    Okay.  Now, it shows that on the sheet on exhibit 6.7, it

3  indicates -- and this works with exhibit 5.5 where a photograph

4  was shown delivering -- showing the receipt of the package

5  being delivered to 14 Potter Avenue and 6 Woodward Street,

6  correct?

7  A.    Yes.

8  Q.    And it shows how obtained.  It says on this chart all the

9  way to the right, the second column -- second to last column I

10  should say, it says Beckford phone received 6/1/2022 postal

11  investigator Fetch via F.B.I.?

12  A.    Correct.

13  Q.    Does that mean the F.B.I. found that photograph and gave

14  it to you, or you did your investigation and found the

15  photograph?

16  A.    It was information that was -- the image was found on the

17  phone, and then I ran it through the postal databases to fill

18  in some of the other information that wasn't available on the

19  receipt as best I could at that point in time.

20  Q.    Fair enough.  And again that was obtained from Mr.

21  Beckford's phone, correct?

22  A.    Correct.

23  Q.    Okay.  And same with the next transaction, that was also

24  found on Mr. Beckford's phone as well.  That would be the April

25  30th, 2021?

99

1   A.    Yes.

2   Q.    The third transaction is May 26, 2021 again obtained from

3   Beckford's phone?

4   A.    Yes.

5   Q.    Going down to the next one, June 24th, 2021, again

6   obtained from Beckford's phone?

7   A.    Yes.

8   Q.    July 23rd, 2021 again obtained from Beckford's phone,

9   correct?

10  A.    Correct.

11  Q.    Now, the next one was August 31st, 2021, and it says how

12  obtained V. S. T. 1445 U.S.  What's that?

13  A.    Label sequencing.  So that's a bar code.  It's a bar code

14  sequencing tool, which is the label sequence.  So that ending

15  of that 1445 U.S. is a different tracking number which we had

16  identified this specific parcel that was sent on 8/31/21 was in

17  a label sequence with that one.

18  Q.    But you don't have any pictures of the receipts from

19  Beckford's phone addressing this transaction?

20          MR. DONAHUE:  Objection.  Your Honor, I don't believe

21  that that is a proper characterization of the testimony thus

22  far.

23          THE COURT:  I think it's a question.  It's overruled.

24  You can answer the question.

25          THE WITNESS:  This is just how it was obtained.  So

1  this specific one we identified it from the label sequencing

2  first.  It does not mean that there was not an image of it or

3  anything else obtained later, just our initial way we linked it

4  to the investigation was because the label sequence.

5  BY MR. ROTTEVEEL:

6  Q.   Is that similar for the next few transactions -- if you go

7  to the next page, September 15, October 5, October 22, November

8  24 where it says how obtained?

9  A.   Yes, so those were all obtained from the label sequence

10  bar code.  The label sequencing tool with two of the ones

11  specifically referencing what label it was linked with that top

12  one, it was just in the label sequencing tool.  I don't recall

13  offhand which label that would have been linked with, and then

14  that -- if you want to jump to the bottom one, the Q. L. I. K.

15  is another database where we can drill down into parcels sent

16  from a certain area to a specific area and as well as that

17  label sequencing tool.

18  Q.   Okay.  And then moving forward to exhibit 6.8 and 6.9

19  then, this is the I. P. data for the package on October 23,

20  2021 to October 24, 2021.  This is -- basically what you're

21  doing here is you're following someone who is accessing -- has

22  access to this I. P. while tracking this package.  You're

23  indicating that this is Mr. Jones' I. P. address associated

24  with his internet?

25  A.   Correct.

101

1  Q.    And you're showing he's tracking this package in

2  particular, correct?

3  A.    Yes.

4  Q.    And that is the package from October 24th, 2021?

5  A.    Yes.

6  Q.    All right.  I'm sorry --

7  A.    I -- I see the parcel number there.  I'd have to go back

8  to the other sheet to confirm the exact mailing date on that

9  one.  It was mailed October 22nd.

10 Q.    Okay.  He's tracking this particular package, just this

11 one package right here, correct?

12 A.    Yes, on the screen it's showing that.  I think on the next

13 screen it did have an additional parcel.

14 Q.    That's right.  So the next page would be November 27th,

15 2021.  You have him through his I. P. address tracking that

16 package as well, correct?

17 A.    Correct.

18 Q.    You don't have him on his I. P. address tracking any of

19 the other previous addresses, correct?

20 A.    Not on this specific I. P.

21 Q.    So out of the ten packages sent to either the Wilkes-Barre

22 address associated with my client or the Massachusetts address

23 associated with my client, only two do you have him tracking

24 with his I. P. associated with him, correct?

25 A.    Correct, because the limited holding time of the I. P.

1  information.

2  Q.   Got it.  Okay.  Out of all the packages -- out of these

3  ten transactions, all ten packages, none of those packages were

4  recovered to the best of your knowledge?

5  A.   No, I don't believe any of them were recovered by law

6  enforcement.

7            MR. ROTTEVEEL:  I have nothing further.  Thank you.

8            THE COURT:  Any redirect?

9            MR. DONAHUE:  No redirect, Your Honor.

10            THE COURT:  You may step down.  Thank you.  Your next

11  witness.

12            MR. DONAHUE:  Your Honor, with the Court's permission

13  the United States calls Rachel Smyden.

14            THE COURT:  Okay.

15            RACHEL SMYDEN, called as a witness, being duly sworn,

16  testified as follows:

17  DIRECT EXAMINATION

18  BY MR. DONAHUE:

19  Q.   Good morning, Ms. -- good afternoon, Ms. Smyden.  How old

20  are you?

21  A.   I'm 30 years old.

22  Q.   Ms. Smyden, were you arrested as part of a criminal

23  indictment in the Middle District of Pennsylvania involving

24  this case on trial?

25  A.   I was.

1          MR. DONAHUE:  Your Honor, it's my understanding that

2    series eight, which is 8 and 8.1, defense counsel does not have

3    any objection to it being admitted.

4          MR. ROTTEVEEL:  That's accurate.

5          THE COURT:  8 and 8.1 are admitted.

6    BY MR. DONAHUE:

7    Q.   Ms. Smyden, I am going to direct your attention to the

8    folder I just passed up to you, exhibit 8.  If you can publish

9    that to the jury, please.  Ms. Smyden, have you entered a

10   guilty plea in connection with this indictment?

11   A.   Yes.

12   Q.   And when you entered that guilty plea you were represented

13   by an attorney?

14   A.   Yes.

15   Q.   Are you still represented by that attorney?

16   A.   Yes.

17   Q.   Did you enter your guilty plea before Judge Mannion?

18   A.   Yes.

19   Q.   Was the guilty plea that you entered part of a written

20   document that had terms and conditions?

21   A.   Yes.

22   Q.   Did you sign that plea agreement?

23   A.   Yes.

24   Q.   Prior to signing the plea agreement, did you read it?

25   A.   Yes.

1  Q.    Did you ask your attorney any questions about the plea?

2  A.    Yes.

3  Q.    Did your attorney answer those questions?

4  A.    Yes.

5  Q.    When you signed the plea agreement, did you understand its

6  terms and conditions?

7  A.    Yes.

8  Q.    Did your attorney also sign the plea agreement?

9  A.    Yeah.

10 Q.    Ms. Smyden, looking at exhibit 8, do you recognize that

11 document?

12 A.    Yes.

13 Q.    What is it?

14 A.    This is the plea agreement.

15 Q.    And directing your attention to the last page of exhibit

16 8, the plea agreement, do you see your signature?

17 A.    Yes.

18 Q.    Do you see your attorney's signature?

19 A.    Yes.

20 Q.    And did your attorney sign that plea agreement at or near

21 the time you signed it?

22 A.    Yes.

23 Q.    Ms. Smyden, after you signed that plea agreement, did you

24 come to court in front of Judge Mannion and enter a guilty

25 plea?

1  A.    Yes.

2  Q.    I want to direct your attention to paragraph one on page

3  one of your plea agreement.  What charge did you enter a guilty

4  plea to?

5  A.    Conspiracy to distribute a controlled substance.

6  Q.    Looking at that same paragraph a little further down, what

7  is the maximum possible penalty for that offense?

8  A.    20 years.

9  Q.    Is there a maximum fine associated with that penalty?

10  A.    Yes.

11  Q.    What is it?

12  A.    $1 million.

13  Q.    Is there a maximum term of supervised release?

14  A.    Minimum of at least three years.

15  Q.    Is there a maximum -- looking at that same page --

16  A.    Oh, I don't see that, no.

17  Q.    So if I can direct your attention to the second to last

18  sentence of the paragraph on page one.

19  A.    Okay, yeah, maximum term of supervised release of life.

20  I'm sorry.

21  Q.    Ms. Smyden, are you, in fact, guilty of conspiring with

22  others to distribute controlled substances?

23  A.    Yes.

24  Q.    Directing your attention now to page nine, paragraph 11,

25  what is that paragraph named?

1  A.    Specific sentencing guidelines recommendations.

2  Q.    Do you see the bolded paragraph shortly down the page?

3  A.    Yes.

4  Q.    What does that bolded paragraph state?

5  A.    For purposes of the USSG, the parties agree that the

6  defendant is responsible for the distribution of and possession

7  with intent to distribute at least 280 grams but less than 400

8  grams of fentanyl, a schedule two controlled substance.

9  Q.    Thank you.  Ms. Smyden, are you, in fact, guilty of that?

10  A.    Yes.

11  Q.    Ms. Smyden, directing your attention now to page ten,

12  paragraph 12, what is that paragraph named?

13  A.    Appropriate sentence recommendation.

14  Q.    Just giving you a second to look that paragraph over, does

15  it indicate that the United States may make a recommendation at

16  the time of sentence that it considers appropriate based on

17  your participation in the offense?

18  A.    Yes.

19  Q.    Later in that paragraph does the United States reserve the

20  right to recommend a maximum sentence?

21  A.    Yes.

22  Q.    Directing your attention now to page 22, paragraph 22,

23  what is that paragraph named?

24  A.    Court not bound by terms.

25  Q.    Do you understand that the Court is not bound by this plea

107

1  agreement?

2  A.    Yes.

3  Q.    Do you understand that the agreement you reached is

4  between yourself and the government?

5  A.    Yes.

6  Q.    Ms. Smyden, I'm going to ask you to take out exhibit 8.1

7  from your folder.  I ask it be published to the jury.  Ms.

8  Smyden, along with your plea agreement, did you also sign

9  another separate document that's referred to as an addendum?

10  A.    Yes.

11  Q.    Do you recognize exhibit 8.1?

12  A.    Yes.

13  Q.    What is that?

14  A.    This is the addendum.

15  Q.    I will direct your attention to the last page of that

16  addendum.  Do you see your signature -- I'm sorry, the second

17  to last page?

18  A.    Yes.

19  Q.    Do you see your signature?

20  A.    Yes.

21  Q.    Do you also see the signature of your attorney?

22  A.    Yes.

23  Q.    Was your attorney with you when you signed this document?

24  A.    Yes.

25  Q.    Did you read it before signing it?

1  A.    Yes.

2  Q.    Ms. Smyden, what do you understand the addendum to mean?

3  A.    That I agree to give a proffer and cooperate if needed for

4  helping in the case.

5  Q.    Directing your attention to the first paragraph on the

6  first page of the addendum, what is that paragraph named?

7  A.    The addendum to plea agreement.

8  Q.    One moment, please.  I'm sorry.  So the first numbered

9  paragraph.

10 A.    Full cooperation.

11 Q.    You agreed to fully cooperate with the government?

12 A.    Yes.

13 Q.    Directing your attention to the top of page three of the

14 addendum, your cooperation requires that you testify fully and

15 truthfully before any grand jury, hearing, trial or other

16 proceeding where your testimony is deemed relevant, correct?

17 A.    Yes.

18 Q.    And directing your attention to lower on the page, No.

19 Paragraph 2, what is that paragraph called?

20 A.    Substantial assistance.

21 Q.    This paragraph indicates that upon your completion of the

22 substantial assistance the United States may request that the

23 Court sentence you to a penalty below the applicable sentencing

24 guidelines, correct?

25 A.    Yes.

1  Q.    I'm going to now direct your attention to page eight,

2  paragraph eight.  What is that paragraph named?

3  A.    Page eight, paragraph eight?

4  Q.    Yes.  Oh, seven, I'm sorry.

5  A.    Further prosecution for perjury, false statements.

6  Q.    And when you read this addendum, you read that paragraph,

7  correct?

8  A.    Yes.

9  Q.    What did you understand that paragraph to mean?

10 A.    Which is telling the truth and nothing but.

11 Q.    Nothing in the agreement protects from you prosecution for

12 perjury or false statement?

13 A.    No.

14 Q.    Do you understand if you testify untruthfully here none of

15 the terms and conditions of either your plea agreement or

16 addendum will apply?

17 A.    Yes.

18 Q.    Ms. Smyden, this offense you pled guilty to is not your

19 first conviction related to drugs, correct?

20 A.    Correct.

21 Q.    What other drug convictions do you have?

22 A.    I had a previous possession -- possession with the intent

23 to distribute when I was 21 as well as two D.U.I.s.

24 Q.    Did you plead guilty in those cases?

25 A.    I did.

110

1  Q.   Specifically with the intent to distribute, do you recall

2  what the sentence was?

3  A.   I think six months' probation.

4  Q.   How old were you at the time you completed that sentence?

5  A.   23.

6  Q.   Do you have any convictions related to providing a false

7  identification to law enforcement?

8  A.   Yes.

9  Q.   Did you plead guilty in that case?

10  A.   Yes.

11  Q.   What year was that conviction?

12  A.   I don't recall.

13  Q.   What was the sentence in that case?

14  A.   I don't recall, I'm sorry.

15  Q.   How old were you?

16  A.   Maybe 23.

17  Q.   Do you have any convictions for retail theft?

18  A.   Yes.

19  Q.   Did you plead guilty in a case related to retail theft?

20  A.   Yes.

21  Q.   How old were you at that time?

22  A.   27.

23  Q.   In the case where you pled guilty, what was the sentence?

24  A.   Probation.

25  Q.   Ms. Smyden, did there come a time in your life when you

1  began to take what you believed to be Percocet pills?

2  A.    Yes.

3  Q.    When did you begin to use Percocet pills or pills?

4  A.    At the age of about 18.

5  Q.    How do you recall that it was that time period?

6  A.    I started taking, like, Vicodin pills, and then it moved

7  to Percocet pills.

8  Q.    In 2019 were you taking pills?

9  A.    Yes.

10 Q.    Were you living at that time?

11 A.    89 North Empire Street in Wilkes-Barre.  I'm sorry I have

12 to take that back.  I lived with my father at that time in

13 Pittston.

14 Q.    Were you working?

15 A.    I was in school and working as a C. N. A.

16 Q.    What school were you attending?

17 A.    I was going to C. T. C. in Wilkes-Barre.  It's a nursing

18 program.

19 Q.    Was it around that time you began your pill usage?

20 A.    Before that, but it had escalated.

21 Q.    When you were at school at C. T. C., were you taking the

22 pills?

23 A.    Yes.

24 Q.    Could you describe what the pills looked like when you

25 started to take them in 2019?

112

1  A.    They were, like, a circle, blue pill with an M. on top and

2  a line in the middle.

3  Q.    And at the beginning -- well, withdrawn.  In the fall of

4  2019, approximately how many pills were you taking a day?

5  A.    One to two pills a day.

6  Q.    How long were you taking pills from 2019 onward?

7  A.    Up until 2022 in June.

8  Q.    Did the frequency with which you took those pills increase

9  after the fall of 2019?

10 A.    Yes.

11 Q.    At the time that you were taking the most how much would

12 you take in a day?

13 A.    All the way up to ten pills a day.

14 Q.    Ms. Smyden, from 2019 through the summer of 2020 how did

15 you obtain your pills?

16 A.    I would buy them from various people.

17 Q.    Who did you buy them from?

18 A.    I bought them from Hat or buy them from this girl Sam,

19 anybody I knew that had them.

20 Q.    You referred to an individual named Hat.  Is that person's

21 real name?

22 A.    No, it's just what they were calling him.

23 Q.    When did you start to buy pills from Hat?

24 A.    The summer of 2019.

25 Q.    How long did you take pills -- withdrawn.  How long did

113

1  you purchase the pills from the individual you knew as Hat?

2  A.    Probably over a year.

3  Q.    So if you began in the summer of '19, somewhere in the

4  summer of 2020 you would say you would stop buying from him?

5  A.    I would say.

6  Q.    Is the person you know as Hat presently in this courtroom?

7  A.    Yes.

8  Q.    Can you identify the person you know as Hat citing a few

9  articles of clothing?

10 A.    A White shirt and black tie.

11        THE COURT:  The record will reflect the witness

12 identified the defendant.

13 BY MR. DONAHUE:

14 Q.    Did you know Hat before you began to purchase pills off of

15 him?

16 A.    Just briefly seeing him from bars in Wilkes-Barre.

17 Q.    How long had you known him before you started to purchase

18 pills?

19 A.    Not very long, maybe a couple months.

20 Q.    The pills that you did purchase from Mr. Jones, could you

21 describe them?

22 A.    They were the small blue pills with the 30 on it.

23 Q.    How would you contact Mr. Jones in order to buy the pills?

24 A.    Call or text.

25 Q.    What did Mr. Jones typically charge you for a pill?

1  A.   25 to $30.

2  Q.   How many would you normally purchase in a given buy?

3  A.   If it wasn't one or two, maybe five at a time.

4  Q.   Did Mr. Jones ever offer you type of discount?

5  A.   Maybe five for a hundred or four for a hundred -- five for

6  a hundred.   Sorry.

7  Q.   In 2020 how often would you purchase pills from Mr. Jones?

8  A.   So once I had gotten better connected it would be less,

9  but I can't recall the time, or it would be almost every day

10 when I needed pills every day so --

11 Q.   With respect to the pills that you received from Mr.

12 Jones, did you take them and get high?

13 A.   Yes.

14 Q.   And you mentioned a person named Sam.   Do you know that

15 person to be Samantha Smart?

16 A.   Yes.

17 Q.   Why did you stop getting pills from Mr. Jones in 2020?

18 A.   Because I had a friend that I knew that moved to Arizona,

19 and she would get the pills cheaper, so I started getting them

20 from her.

21 Q.   What's the name of your friend that went out to Arizona?

22 A.   Tyla Griffin.

23 Q.   How did you meet Tyla Griffin?

24 A.   I met her in jail when I was in jail for the possession

25 with the intent to deliver the first time.

115

1  Q.    Did you stay in touch with her?

2  A.    No, I didn't.  I ran into her at the Woodlands for new

3  years eve I guess it would be 2020 -- new years eve of 2020.

4  That's when we reconnected.

5  Q.    You mentioned that Ms. Griffin offered to sell you pills.

6  Approximately when did that happen?

7  A.    I'd say going into summer of 2020.  I can't specifically

8  pick a time.

9  Q.    How did Ms. Griffin contact you?

10 A.    Through text message.

11 Q.    And what did she offer to sell you at that time?

12 A.    The same pills that I was buying already, the 30 marked.

13 Q.    Ms. Smyden, did you know if Ms. Griffin moved out to

14 Arizona with anyone?

15 A.    She did with her boyfriend at the time.

16 Q.    Who was that?

17 A.    A Davon or Dolo.

18 Q.    You knew him as Dolo?

19 A.    Yeah.

20 Q.    Do you know his name to be Davon Beckford?

21 A.    Yes.

22 Q.    Did you ever buy any pills from Mr. Beckford?

23 A.    No.

24 Q.    Ms. Smyden, could you just briefly describe for the

25 members of the jury how you purchased pills from Ms. Griffin?

116

1  A.    So how it would work is I would tell her how many I

2  wanted, and I would send her half the money upfront, and then

3  she would pack them up and send them U.S.P.S. and then send me

4  the tracking number receipt, what it looks like.

5  Q.    So let's go back to the beginning.  You would reach out to

6  her and tell her how many pills you wanted?

7  A.    Yeah.

8  Q.    What typically did Ms. Griffin charge you?

9  A.    Anywhere from three to five dollars depending on how many

10 you got.

11 Q.    Was there a -- was there a typical amount that you

12 purchased?

13 A.    500 or maybe a thousand.

14 Q.    How would you send Ms. Griffin the money?

15 A.    Cash App mostly.

16 Q.    Did you have a Cash App name you used?

17 A.    Yeah, it was under the name Maria.

18 Q.    Do you recall what Ms. Griffin's name was?

19 A.    I don't.  It goes by your phone number, so you just type

20 in the phone number.

21 Q.    And you indicated that you would send half the money

22 upfront?

23 A.    Yes.

24 Q.    When you received packages from Ms. Griffin, what would be

25 inside?

1  A.    She would vacuum pack the pills mostly and sometimes put

2  them in, like, a little box of Legos or child's toy.

3  Q.    What happened once you received a package from Ms.

4  Griffin?

5  A.    Then I would send her the remainder of the money, or

6  sometimes we would do, like, three times, or whenever I had got

7  the rest of the money I would send it.

8  Q.    What would you do with the pills after you received them?

9  A.    I would open them and count them.

10  Q.    Did you ever use any of the pills?

11  A.    Yes.

12  Q.    And when you used them, did you get high?

13  A.    Yes.

14  Q.    Could you describe what those pills looked like you got

15  from Ms. Griffin?

16  A.    Yes, they were just a circle, blue round with the 30 on

17  there with a line across.

18  Q.    Were they similar in looks to the pills you had been

19  previously been getting from Mr. Jones?

20  A.    Yes.

21  Q.    Where would you have Ms. Griffin send the pills to?

22  A.    I would have her send them to my grandfather's house.

23  Q.    What was your grandfather's address?

24  A.    42 Red Maple Avenue in Mountain Top.

25  Q.    Why would you have the packages sent to that location?

118

1  A.   Because I felt like it was safer to send them there.

2          MR. ROTTEVEEL:  Excuse me, Your Honor.  I can't hear.

3  I'm having trouble.

4          THE WITNESS:  I felt like it was safer to send them

5  there.

6  BY MR. DONAHUE:

7  Q.   You mentioned Ms. Griffin would notify you when she sent

8  the package, correct?

9  A.   Yes.

10 Q.   And would she send you a picture?

11 A.   Yes.

12 Q.   And the picture was of a receipt?

13 A.   Yes, with a tracking number.

14 Q.   Did you ever track the packages?

15 A.   Maybe the first time, but after that I didn't.

16 Q.   How many packages do you think you received from Ms.

17 Griffin at that Red Maple Avenue address?

18 A.   I can't say -- maybe eight, ten.

19 Q.   Did you sell some of the pills that you received from Ms.

20 Griffin?

21 A.   I did.

22 Q.   Why did you stop buying pills from Ms. Griffin?

23 A.   Because she had gotten arrested.

24 Q.   Did you continue to use after Ms. Griffin was arrested?

25 A.   I did.

1  Q.   Did you have some difficulty obtaining pills after Ms.

2  Griffin was arrested?

3  A.   I did.

4  Q.   How long would you say you continued to use pills after

5  Ms. Griffin's arrest?

6  A.   Three to four months.

7  Q.   What happened at the end of that three to four months?

8  A.   I went -- I had checked myself into rehab.

9  Q.   When did you enter that rehab facility?

10 A.   June 21st, 2022.

11 Q.   What facility did you go to?

12 A.   I went to Pyramid in Dallas.

13 Q.   Was that inpatient or outpatient or a mix?

14 A.   It was inpatient, and then I went to outpatient after.

15 Q.   Have you used pills since you entered that rehab facility?

16 A.   No.

17 Q.   Outside of your arrest for this indictment, have you been

18 arrested since you left that rehab facility?

19 A.   No.

20 Q.   One minute, please.  Ms. Smyden, with respect to the

21 packages you received from Ms. Griffin, did you ever get any

22 that didn't have fentanyl pills inside?

23 A.   No, not that I could recall.

24       MR. DONAHUE:  I have no further questions at this

25 time, Your Honor.

120

1    THE COURT:  All right.  Mr. Rotteveel.

2    MR. ROTTEVEEL:  Thank you, Your Honor.

3  CROSS EXAMINATION

4  BY MR. ROTTEVEEL:

5  Q.    Good afternoon, Ms. Smyden.  You're 30 now, correct?

6  A.    Yes.

7  Q.    Okay.  And are you still living in the area?

8  A.    Yes.

9  Q.    Okay.  And what are you doing these days?

10  A.    I am a stay-at-home mom to my soon to be one-year-old son.

11  Q.    And so you're not working or anything?

12  A.    Not at this time.

13  Q.    Okay.  Are you following steps for recovery?

14  A.    I do.  I go to A. A.

15  Q.    How often go to A. A.?

16  A.    Maybe three times a week.  I'm also a certified recovery

17  specialist, so I help people into recovery.

18  Q.    It okay.  Now, you started using pills back in 2018.

19  Doing quick math you were about 23, 24 at that point in time.

20  Is that fair to say?

21  A.    I started doing pills when I was about 18 years old.

22  Q.    Okay.  So for the last 12 years or ten years since you

23  were in recovery you were using pills?

24  A.    Yes.

25  Q.    Using anything else other than pills?

121

1  A.    I'm an alcoholic at the same time I take pills.  I'm

2  basically a garbage can.  I would do anything.

3  Q.    What got you started when you were 18?

4  A.    I had a boyfriend at the time that did it, and I tried it

5  and I loved it.

6  Q.    You were in high school at the time or --

7  A.    I was just graduating high school, graduating when I was

8  17.

9  Q.    And you've been to rehab prior -- more than once or just

10  this once?

11  A.    Just once.  I've been to jail before.

12  Q.    Let's talk about that just a little bit.  You were 23.

13  You had a felony drug conviction, correct?

14  A.    21.

15  Q.    21, okay.  What was the substance?

16  A.    Cocaine.

17  Q.    And you got six months' probation for that?

18  A.    If I could recall I think it was my first time ever

19  arrested, and I couldn't do the probation due to my drug -- my

20  substance abuse problem.

21  Q.    Okay.  But you were sentenced to probation.  You said you

22  couldn't do the probation?

23  A.    Yeah, at the time.

24  Q.    What do you mean?

25  A.    I wasn't able to stay clean.

122

1    Q.    So you violated the terms of your probation?

2    A.    Yes.

3    Q.    And would they reincarcerate you?

4    A.    Yeah.

5    Q.    They never sent you to rehab or anything?

6    A.    No.

7    Q.    And in 2018 you pled guilty or were convicted of false

8    identification to law enforcement?

9    A.    Yes.

10   Q.    That's basically a probation officer stopped you and you

11   told him you were someone other than yourself?

12   A.    Correct.

13   Q.    All right.  They asked for your I. D.  You gave them a

14   false name?

15   A.    Yes.

16   Q.    Do you recall the name you gave them?

17   A.    I think Maria Argo or Maria Rizzo.

18   Q.    In 2019 again you committed a retail theft.  That's

19   basically for lack of a better way of putting it shoplifting,

20   correct?

21   A.    Yes.

22   Q.    That you got nine months' probation, correct?

23   A.    Yes.

24   Q.    Okay.  You've don't some time in jail, but if you got

25   probation on your felony drug, probation on your false

123

1  identification to law enforcement, probation on your retail

2  theft.  This is your first time actually exposed to some

3  significant jail time, correct?

4  A.    I would say.

5  Q.    Have you spent any time in jail on this?

6  A.    No.

7  Q.    Okay.  So you were arrested, and you were released?

8  A.    Yes.

9  Q.    Okay.  The charge you pled guilty to carries a maximum

10 penalty up to 20 years incarceration, correct?

11 A.    Yes.

12 Q.    You had come in and you proffered.  You signed this

13 proffer agreement, and that's where your lawyer and the

14 government attorney went over that with you, and that's

15 basically you agreeing to cooperate and share everything with

16 the government relative to this, correct?

17 A.    Yes.

18 Q.    Okay.  And are you hoping with that proffer agreement

19 considering you're at home, you're a stay-at-home mom, recovery

20 specialist, you have a one year old, maybe a husband or father

21 of the child you're living with -- you're hoping not to go to

22 jail and to remain with them, correct?

23 A.    It would be ideal, but --

24 Q.    Of course, the government has made you no promises in that

25 respect?

124

1    A.    Correct.

2    Q.    But the goal for you personally, your goal is to stay home

3    with your father of your children -- father of your child and

4    your child, correct?

5    A.    Yes.

6    Q.    It was January 25th, '24, so a few months ago I would say

7    that's when -- correct me if I'm wrong -- that's when you gave

8    your proffer statement to law enforcement, correct?

9    A.    I'm not sure of the date, but it sounds about right.

10   Q.    Okay.  And at that time you were aware of your criminal

11   indictment, correct?

12   A.    Yes.

13   Q.    You're aware of many of the names listed on that

14   indictment, correct?

15   A.    Yes.

16   Q.    All right.  It's your name.  It's Tyla Griffin.  It's

17   Kevin Jones, correct?

18   A.    Yes.

19   Q.    It was at that point in time you had indicated to law

20   enforcement that you had purchased pills off of Kevin Jones,

21   correct?

22   A.    Yes.

23   Q.    That was the first time you came forward and shared that

24   information, correct?

25   A.    Yes.

125

1  Q.    When exactly were you arrested on this?

2  A.    February '23, I believe.

3  Q.    February '23 -- oh, February 2023?

4  A.    Yes.

5  Q.    Okay.  Your indication here today was that it was my

6  client who sold you little blue pills with the number 30 on it,

7  correct?

8  A.    Yes.

9  Q.    And as far as you obtaining pills yourself, you obtained

10 them from Tyla Griffin?

11 A.    Yes.

12 Q.    Okay.  Tyla Griffin is your friend or was your friend?

13 A.    Yeah, I thought she was my friend.

14 Q.    Current situation though is up in the air, fair to say,

15 all right.  And Tyla Griffin, she would send you a boat load of

16 pills from Arizona, correct?

17 A.    Yes.

18 Q.    And those pills were blue with the number 30 on the back,

19 correct?

20 A.    Yeah.

21 Q.    You in turn would use those pills and in turn sometimes

22 sell those pills yourself, correct?

23 A.    Yes.

24 Q.    And other individuals you bought pills from were Samantha

25 Smart also listed on the indictment, correct?

126

1  A.    Yes.

2  Q.    Has your lawyer given you any type of indication of what

3  type of jail sentence you may be serving?

4  A.    No, no.

5  Q.    Okay.  The government has not promised you to remain out

6  of jail or stay on probation, anything like that?

7  A.    No.

8         MR. ROTTEVEEL:  I have nothing further.  Thank you.

9         THE COURT:  Redirect?

10        MR. DONAHUE:  Just very briefly, Your Honor.

11 REDIRECT EXAMINATION

12 BY MR. DONAHUE:

13 Q.    Ms. Smyden, defense counsel just referenced a proffer

14 meeting that you had with members of the F.B.I. and the United

15 States Attorney's Office in January 2024.  Do you recall that

16 meeting?

17 A.    I do.

18 Q.    Was that the first time that someone from law enforcement

19 asked you whether you had bought pills from Kevin Jones?

20 A.    Yes.

21        MR. DONAHUE:  I have nothing further.

22        THE COURT:  All right.  You may step down.  All

23 right.  We will take a short break, same admonitions, no

24 discussions or discussions among yourselves or anyone else.

25 Don't form any opinions until you heard all of the evidence and

127

1  the law in the case.  Keep an open mind.  In the meantime, no

2  research of any kind, no listening or reading anything about

3  the case.  If anyone were to try to talk to you about the case,

4  you must advise us of that immediately.  See you in about five

5  minutes, ten minutes.

6              (A brief recess was taken.)

7              SAMANTHA SMART, called as a witness, being duly

8  sworn, testified as follows:

9  DIRECT EXAMINATION

10 BY MR. DONAHUE:

11 Q.    Good afternoon, Ms. Smart.

12 A.    Good afternoon.

13 Q.    How old are you?

14 A.    48.

15 Q.    Are you currently in custody?

16 A.    Yes.

17 Q.    Are you in custody related to this case?

18 A.    Yes.

19 Q.    Where are you housed at this time?

20 A.    Lackawanna County Prison.

21 Q.    Ms. Smart, were you arrested as part of a criminal

22 indictment in the Middle District of Pennsylvania involving

23 this case on trial?

24 A.    Yes.

25 Q.    Have you entered a guilty plea in connection with that

128

1  indictment?

2  A.    Yes.

3  Q.    When you entered that guilty plea were you represented by

4  an attorney?

5  A.    Yes.

6  Q.    Are you still represented by that attorney?

7  A.    Yes.

8  Q.    Did you enter your guilty plea before Judge Mannion?

9  A.    Yes.

10 Q.    Was the guilty plea that you entered part of a written

11 document that had terms and conditions?

12 A.    Yes.

13 Q.    Did you sign a plea agreement?

14 A.    Yes.

15 Q.    Prior to signing that plea agreement did you read it?

16 A.    Yes.

17 Q.    Did you ask your attorney any questions you may have had

18 about it?

19 A.    Absolutely.

20 Q.    Did your attorney answer those questions to your

21 satisfaction?

22 A.    Yes.

23 Q.    When you signed the plea agreement did you understand its

24 terms and conditions?

25 A.    Yes.

1  Q.   Did your attorney also sign the plea agreement?

2  A.   Yes.

3  Q.   Ms. Smart, in the folder right in front of you are two

4  documents.

5         MR. DONAHUE:  Your Honor, it's my understanding for

6  exhibit series nine the defense has no objection to them being

7  admitted.

8         MR. ROTTEVEEL:  No objection, Your Honor.

9         THE COURT:  9 and 9.1 are both admitted into

10  evidence.

11  BY MR. DONAHUE:

12  Q.   Ms. Smart, you can follow along with that document or your

13  monitor there.  Do you recognize that document?

14  A.   Yes.

15  Q.   Is that the plea agreement you signed related to this

16  indictment?

17  A.   Yes.

18  Q.   I'm going to direct your attention to the last page of

19  that document.  Do you see your signature?

20  A.   Yes.

21  Q.   Do you see your attorney's signature?

22  A.   Yes.

23  Q.   Did your attorney sign that document at a time close in

24  time to the time you signed it?

25  A.   Yes.

130

1  Q.    Ms. Smart, after you signed that plea agreement did you

2  come in front of this Court and enter a guilty plea?

3  A.    Yes.

4  Q.    Ms. Smart, I want to focus your attention to paragraph one

5  on the first page of your plea agreement.  Did you enter a

6  guilty plea to conspiracy to distribute controlled substances?

7  A.    Yes.

8  Q.    Is the maximum possible penalty for that offense 20 years?

9  A.    Yes.

10 Q.    Is the maximum fine associated with that penalty $1

11 million?

12 A.    Yes.

13 Q.    Is the maximum term of supervised release life?

14 A.    Yes.

15 Q.    And is there a minimum supervised release of at least

16 three years?

17 A.    Yes.

18 Q.    Ms. Smart, are you, in fact, guilty of conspiring with

19 others to distribute controlled substances?

20 A.    Yes.

21 Q.    Ms. Smart, I'm going to direct your attention to page nine

22 paragraph 11.  Is that paragraph named specific sentencing

23 guideline recommendations?

24 A.    Yes.

25 Q.    Directing your attention to a little bit lower on the page

131

1  the first bolded paragraph number A. -- or letter A.  Is that

2  -- does that state for purposes of the USSG the parties agree

3  that the defendant is responsible for the distribution of and

4  possession with intent to distribute at least 160 grams but

5  less than 280 grams of fentanyl, a schedule two controlled

6  substance?

7  A.    Yes.

8  Q.    Are you, in fact, guilty of that offense?

9  A.    Yes.

10 Q.    Ms. Smart, directing your attention now to the second

11 paragraph that is bolded entitled B., does that state the

12 parties agree to jointly recommend to the Court that the

13 sentence imposed here be ordered to run concurrently with any

14 sentence imposed against the defendant in two Luzerne County

15 cased docketed at CP-40-CR-3650-2020 and CP-40-CR-3651-2022?

16 A.    Yes.

17 Q.    Ms. Smart, were you arrested in Luzerne County in 2022?

18 A.    Yes.

19 Q.    Are those charges to your knowledge still pending?

20 A.    Yes.

21 Q.    Were those charges drug related?

22 A.    Yes.

23 Q.    Is it your understanding that any recommendation regarding

24 your sentence to this Court will include a request that the

25 sentence run concurrent or at the same time to any sentences

132

1  you receive in those Luzerne County cases?

2  A.   Yes, it's -- it says that right there it runs concurrent

3  with this.

4  Q.   Thank you.  Ms. Smart, I'm going to direct your attention

5  to the next page, page ten, paragraph 12.  Is the name of that

6  paragraph appropriate sentence recommendation?

7  A.   Yes.

8  Q.   And does that paragraph indicate that the United States

9  may make a recommendation at the time of sentence that it

10 considers appropriate based on your participation in the

11 offense?

12 A.   Yes.

13 Q.   Later in the paragraph does the United States reserve the

14 right to recommend a maximum sentence?

15 A.   Yes.

16 Q.   Directing your attention to page 22, paragraph 22, is that

17 paragraph named Court not bound by terms?

18 A.   Yes.

19 Q.   You understand that this Court is not bound by this plea

20 agreement?

21 A.   Yes.

22 Q.   The Court is free to sentence you to any sentence

23 including up to the maximum sentence of 20 years?

24 A.   Yes.

25 Q.   Now, along with your plea agreement did you sign another

133

1  separate document that's referred to as an addendum?

2  A.   Yes.

3  Q.   Ms. Smart, in the folder there is another document exhibit

4  9.1.  Do you recognize that document?

5  A.   Yes.

6  Q.   Is that entitled addendum to the plea agreement?

7  A.   Yes.

8  Q.   Directing your attention to, I believe the second to last

9  page -- page nine -- is that your signature?

10 A.   Yes.

11 Q.   Do you also see the signature of your attorney?

12 A.   Yes.

13 Q.   Was your attorney with you when you signed that document?

14 A.   Yes.

15 Q.   Did you read it before signing it?

16 A.   Yes.

17 Q.   Ms. Smart, do you understand what the addendum to your

18 plea agreement means?

19 A.   Yes.

20 Q.   Do you understand that when you signed the addendum you

21 would have to fully cooperate with the government?

22 A.   Yes.

23 Q.   Ms. Smart, I'm going to direct your attention now to the

24 first numbered paragraph on page one.  Is that paragraph called

25 full cooperation?

1    A.    Yes.

2    Q.    You agreed to fully cooperate with the government,

3    correct?

4    A.    Yes.

5    Q.    Directing your attention, Ms. Smart, to the top of page

6    two, does your cooperation require that you testify fully and

7    truthfully before any grand jury, hearing, trial or other

8    proceeding where your testimony is deemed relevant?

9    A.    Yes.

10   Q.    Directing your attention to paragraph No. 2 on the third

11   page, is that paragraph named substantial assistance?

12   A.    Yes.

13   Q.    Does this paragraph indicate that upon your completion of

14   substantial assistance the United States may request that the

15   Court sentence you to a penalty below the applicable sentencing

16   guideline?

17   A.    Yes.

18   Q.    Directing your attention lastly to the -- page eight --

19   sorry, page seven, paragraph number eight, is that paragraph

20   named further prosecution for perjury, false statements?

21   A.    Yes.

22   Q.    Nothing in this addendum or plea agreement protects you

23   from prosecution for perjury or false statement?

24   A.    Yes.

25   Q.    If you lie about something in today's testimony you may be

135

1  prosecuted despite what's in this plea agreement?

2  A.    Yes.

3  Q.    You can put those down, Ms. Smart.  Thank you.  Ms. Smart,

4  earlier we discussed that you had cases pending in Luzerne

5  County.  Were you arrested for those offenses before you were

6  arrested for this indictment?

7  A.    Yes.

8  Q.    Did those arrests in Luzerne County have to do with the

9  sale of pills?

10  A.    Yes.

11  Q.    In terms of your past criminal history, do you have -- do

12  you also have a conviction for providing a false name to law

13  enforcement officials?

14  A.    Yes.

15  Q.    Did you plead guilty in that case?

16  A.    Yes.

17  Q.    What year approximately was that conviction?

18  A.    I don't remember.

19  Q.    Do you remember what the sentence was?

20  A.    For giving a false name, it was minute.  I don't remember

21  what it was -- probably three months or something.

22  Q.    Ms. Smart, did there come a time in your life when you

23  began to use pills?

24  A.    Yes.

25  Q.    When?

1  A.    Around 2020.

2  Q.    Where were you living at that time in your life?

3  A.    In Pittston.

4  Q.    Were you working?

5  A.    Yes, I had my own business.

6  Q.    What type of business was it?

7  A.    I owned a hair store.  We sold wigs and hair extensions

8  and all the beauty supplies to clients of all races and clients

9  with alopecia, cancer, everything, just beauty supplies.

10  Q.    When you first began to use the pills what drug did you

11  believe they were?

12  A.    Percocets, yeah, regular Percocets.  It was prescribed to

13  me by my doctor, and I was using them.  And then I started

14  abusing them, and when I started abusing them that's when I

15  started buying them from the streets.

16  Q.    Okay.  When you first started buying them from the

17  streets, did you also think those were Percocets?

18  A.    Right until after then I realized they weren't.

19  Q.    What did you learn the pills from the street to be?

20  A.    Fentanyl.

21  Q.    At the height of your pill addiction, how many pills were

22  you taking in one day?

23  A.    About eight.

24  Q.    Did you ever have any overdose episodes?

25  A.    Yes.

1  Q.    How many?

2  A.    About two or three.

3  Q.    Have you ever attended a rehabilitation program?

4  A.    Yes.

5  Q.    Ms. Smart, beginning in 2020, how did you obtain your

6  pills?

7  A.    The prescription was from the doctor.  The illegal ones

8  were from a local guy, and then that's when I started -- after

9  that I started getting them from Arizona through the mail.

10 Q.    Let's start with the time that you purchased pills

11 locally.  Who did you buy pills from?

12 A.    A guy named Joey.

13 Q.    And how frequently would you buy pills from Joey?

14 A.    Like, once a week I would buy about -- like, 50 for the

15 week and -- yeah, about 50 for the week.  That continued until

16 someone put a little bug in my ear and told me I can get them

17 cheaper through Arizona through the mail, and that's when I

18 stopped that and started getting them through Arizona.

19 Q.    Ms. Smart, before you began to get pills through the mail

20 from Arizona, did you ever purchase any from an individual you

21 knew as Hat?

22 A.    Yes.

23 Q.    How many times did you purchase pills from Hat?

24 A.    About three times.

25 Q.    And was that in 2020?

138

1  A.    Yes.

2  Q.    How much did Hat charge you those three times typically?

3  A.    I remember getting about ten pills from him about three

4  times -- probably more than three times, but I won't say more

5  because I can only remember approximately three, so I'm going

6  to say three and ten -- I would say ten pills the most, $20 a

7  pill.

8  Q.    So those three times each time you would have spent about

9  $200?

10 A.    $200.

11 Q.    Ms. Smart, is the person you knew as Hat currently present

12 in this courtroom?

13 A.    Yes.

14 Q.    Could you identify the individual you knew as Hat citing

15 an article of clothing?

16 A.    He's right there.

17 Q.    What type of clothes --

18 A.    The white shirt and the tie.

19        THE COURT:  The record will reflect the witness has

20 identified the defendant.

21 BY MR. DONAHUE:

22 Q.    Ms. Smart, did you know Hat before you began to purchase

23 pills from him?

24 A.    Yeah, his -- we always was in the club scene in

25 Wilkes-Barre.  Like, we go out -- like, everybody go clubbing

139

1  and partying, and, you know, we -- everyone rubbed shoulders

2  with each other and drink and party, and so we know each other

3  like that.  And he's usually, like, security.  He plays -- he

4  does security for the clubs a lot.

5  Q.    Ms. Smart, earlier you mentioned that there came a time

6  when you started to get the pills through the mail.  Is that

7  right?

8  A.    Yes.

9  Q.    Okay.  Who was the person that you were getting pills

10  through the mail?

11  A.    They call him Dolo.  That's his street name, but I learned

12  his real name is Beckford -- it's in my paperwork -- but Dolo

13  is what I know him as.

14  Q.    How did you get connected with the individual you knew as

15  Dolo for the pills?

16  A.    Someone said to me -- they were, like, girl, you know you

17  can get those pills for, like, $6 through Arizona, Dolo told me

18  to hit you up and he will give you them for, like, $6 a pop.

19  So I'm, like, really, let's do it.  So I didn't really have,

20  like, a lot of money like that.  I was just, like -- kind of

21  like doing this to support my habit.  So he wouldn't sell you

22  anything less than a hundred pills at a time.  He would never

23  do less than that.  So I was sending him, like, $600 each time,

24  so he was sending me a hundred pills for $600.  I would give

25  him a name, and he'll package it and send it through the mail

1  to me.

2  Q.    Ms. Smart, I just want to take a step back because I

3  forgot to ask you a question.  The pills that you were getting

4  from Hat, could you describe what those looked like?

5  A.    They're little blue pills and -- little blue round pills,

6  and it says M. 30 on it.

7  Q.    And the pills that you eventually got from Dolo, could you

8  describe those pills?

9  A.    Yeah, little round blue pills that says M. 30, and

10  sometimes I think they would say other -- other stamps on some

11  of them because, you know, Perc 30s they don't always say M.

12  30.  They say other stamps, too, but they are -- they have

13  other stamps that signifies it's the Percocet 30.  So had they

14  did not always have M. 30 on the back of them.  They had other

15  stamps, too.

16  Q.    When you first -- well, withdrawn.  How did you contact

17  Dolo?

18  A.    Messenger, Telegram, Telegram.

19  Q.    What is Telegram?

20  A.    Telegram is a -- it's on the internet.  It's, like, a --

21  it's supposed to be, like, a hidden site where no one could

22  know that you're doing anything on that site, which is crap

23  because everyone knows about it.  But you think that no one

24  knows about it.  So you're on there doing a illegality and you

25  really not hiding, like.  So that's what you use to do our

141

1  exchanges through Telegram, and so that's where you -- we would

2  conversate about how we send the money, whether it's Cash App,

3  Zelle or whatever and what's the name, what's the address.  We

4  would communicate what name we're using, what address we're

5  using through that to him, and then when we send him the

6  address and the name, he'll send the pills to that address and

7  that name.  We get it in two days tops.

8  Q.   Ms. Smart, you gave us a lot of information there.  So I

9  just want to break it down a little bit.

10 A.   Okay.

11 Q.   Just going back to the Telegram application for those of

12 us that don't know what it is, does it look like a text

13 message?

14 A.   It's a text message.

15 Q.   So you would reach out to Mr. Beckford and ask for a

16 specific amount of pills, correct?

17 A.   Yes.

18 Q.   And Mr. Beckford required an initial payment?

19 A.   Yes, you have to pay him first.

20 Q.   And you referred to Cash App and Zelle.  Were those two

21 applications you used to pay him?

22 A.   Yes.

23 Q.   Once Mr. Beckford put the package in the mail, did he

24 notify you in some way?

25 A.   Yes.

1  Q.    How did he notify you?

2  A.    Through Telegram.

3  Q.    Did he ever send you any screen shots of any pictures?

4  A.    Of the tracking -- of the tracking number or -- yeah,

5  whatever the track is that you can track it to see where the

6  mail is at, like, how far it is through the system.  He'll send

7  you a screen shot of that.

8  Q.    Did you ever track any packages?

9  A.    Yes.

10 Q.    Could you describe the packages that Mr. Beckford sent to

11 you, what they looked like?

12 A.    Okay.  So it comes in, like, a blue -- like, a U.S. postal

13 mail blue envelope, like, the big blue envelope, red, blue and

14 white envelopes.  And in the back of it is -- it has, like,

15 writing on it, and it has a flap over it.  And when you open

16 it, it usually has puzzles in it.  He usually sends the pills

17 with puzzles, like -- it always has puzzles in it.  I don't

18 know that the other people that got the pills from him.  I know

19 with mine because I usually get a little bit, I was probably

20 the only person that got the least amount of pills from him, so

21 he will always throw puzzles in it to make it seem, like,

22 heavier, but, yeah, it was the U.S. postal mail envelope, a

23 blue -- red, blue and white U.S. postal mail envelope.

24 Q.    When you say puzzles, they, like, kids toys?

25 A.    Kids toys.

143

1  Q.    Ms. Smart, I am going to publish to you and the jury

2  Government's Exhibit 1.1.  Is this the type of package that you

3  were just referring to?

4  A.    Perfect.

5  Q.    This is the type that Mr. Beckford would send the fentanyl

6  pills to you?

7  A.    With the same exact same amount price, $26.35.

8  Q.    Thank you.  You can take that down.  Ms. Smart, where

9  would you typically have Mr. Beckford send the packages?

10  A.    Well -- excuse me -- most of the packages was sent to 82

11  Parsonage Street in Pittston because that's where I lived.  So

12  that's where I would receive most of the packages from, so that

13  is where he sent most of the packages to was 82 Parsonage

14  Street in Pittston.  But like I said, I didn't really -- I got

15  packages, but I didn't get, like, a whole lot of packages from

16  him because I got packages basically -- so I got the pills to

17  support, like, my habit.  It wasn't really for sale.  It was to

18  -- I was eating them, you know, so I would get the pills from

19  him.  And if I got a hundred pills from him on Monday, I was

20  probably out of them by Friday because I was using, like, eight

21  to ten of them a day, eight to ten a day.

22  Q.    Were there times where you did sell the pills?

23  A.    I have.  I have sold occasionally, like, to one of my

24  friends that we were doing them together or something like

25  that.  But, like, I didn't go out there to, like, sell pills to

144

1  people.  Like, that wasn't my thing.  I got them to support my

2  habit.

3  Q.    Ms. Smart, how many packages would you say approximately

4  were sent to 82 Parsonage from Mr. Beckford?

5  A.    I would say about 12.

6  Q.    Out of those 12 packages, was there ever a package that

7  didn't --

8  A.    Did not.

9  Q.    -- didn't contain fentanyl pills?

10  A.    No, they all did.

11  Q.    Ms. Smart, you referenced that you were taking a lot of

12  these pills.  Did you experience a high after you took them?

13  A.    Yes.  I have arthritis in both of my knees.  I have no

14  cartilage in them, so that's why my doctor prescribed them for

15  me originally because no cartilage in my knees.  They are for

16  pain.  That's what they were originally prescribed for, but I

17  abused them.  When you abuse them, you get addicted to them.

18  So, yeah, I was doing the wrong thing with them, you know.  So

19  --

20  Q.    Ms. Smart, did there come a time where you stopped getting

21  pills from Mr. Beckford?

22  A.    Yeah, I couldn't afford it anymore.  And like I said, he

23  -- he would not send me less than a hundred.  I had to buy a

24  hundred or more.  And as you can see in my affidavit there was

25  people buying, 3, 400, 500 pills from him at a time.  My

1  hundred pills I was buying at the time was nothing.  So he

2  didn't care.  I stopped, and later on I found out there was an

3  investigation anyways.  So --

4            MR. DONAHUE:  No further questions at this time.

5            THE COURT:  Mr. Rotteveel?

6            MR. ROTTEVEEL:  Thank you.

7  CROSS EXAMINATION

8  BY MR. ROTTEVEEL:

9  Q.    Good afternoon, Ms. Smart.

10  A.    Good afternoon.

11  Q.    My name is C. J. Rotteveel.  I'm going to ask you a couple

12  questions.  I'm representing Mr. Jones, okay.  I want to talk

13  about your recent interview with the F.B.I.  It was about two

14  weeks ago.  Does that sound familiar?

15  A.    Yeah.

16  Q.    And that was in preparation for today's purposes, your

17  trial, correct?

18  A.    Okay.

19  Q.    Is that right?

20  A.    Okay.

21  Q.    Okay.  And you sat down with them, and at that date and

22  time -- that time they informed you that Mr. Jones was electing

23  to proceed with trial in this matter, correct?

24  A.    Correct.

25  Q.    And at that point in time they showed you a picture of

146

1   Kevin Jones.  Is that correct?

2   A.    Correct.

3   Q.    All right.  And did they show you multiple photos, or did

4   they just show you one photo?

5   A.    They showed me one photo.

6   Q.    Okay.  And they told you it was Kevin Jones or -- or you

7   identified him as Kevin Jones?

8   A.    I already knew who he was.

9   Q.    You testified you already knew who he was because of the

10  club scene, correct?

11  A.    No, I know -- I know him -- like, I had multiple

12  interactions with Hat.  Like, I know who Hat is through the

13  clubs, through the town, through -- we live in a small town.

14  Like, we all know each other.

15  Q.    You testified when the government asked you questions --

16  you testified due to the club scene and from drinking, correct?

17  A.    Club scene, drinking, partying, being we know each other,

18  and Wilkes-Barre is very small.

19  Q.    And what's important about this interview though is that

20  you were able to identify Kevin Jones as someone who sold you

21  little blue pills with M. 30 on it, correct?

22  A.    Correct.

23  Q.    Okay.  And I'm sorry -- when did you indicate he sold you

24  these pills?

25  A.    In 2020 -- between 2020 and 2021.

147

1  Q.   Okay.  You had indicated on -- when the government asked

2  you it was only in 2020?

3  A.   Between '20 and -- 2020 and 2021.

4  Q.   When exactly did it start in 2020?

5  A.   I'm not sure, and I'm not going to sit here and say a date

6  because I'm not positively sure of what date it was that I

7  bought those pills from him.  It was three encounters.  For me

8  to sit here and tell you what month I bought those pills from

9  him I would be lying.

10 Q.   So there was three encounters.  Do you recall telling the

11 F.B.I. agent it was in early 2020.  Is that fair?

12 A.   No, that wouldn't be fair to say.  I would be lying if I

13 said that, too.  I know it was between 2020 and 2021, and it

14 was three times I bought from him because I know it was back to

15 back, and I know this for a fact because he got -- he got

16 irritated with me because I would call him all the time and he

17 would get mad because he was taking long -- he was taking

18 forever to get to me.

19 Q.   Okay.  And so it was back to back to back, so three times

20 all within a week?

21 A.   All between -- within a month.

22 Q.   All within a month.  So 2021 then -- can we pin it down to

23 December until January 2020 into 2021?  That's one month.

24 A.   Between 2020 and 2021, sir.

25 Q.   In reality you don't remember?  It was four years ago.

1  A.    I do know that I bought pills from him about three times.

2  That I do remember, sir.

3  Q.    Again, you did enter your plea in this case, and you're

4  facing a maximum of up to 20 years, correct?

5  A.    Yes, sir.

6  Q.    Okay.  And you signed an agreement to cooperate with the

7  government, correct?

8  A.    Yes, sir.

9  Q.    All right.  You're certainly hoping not to serve 20 years

10 in prison, correct?

11 A.    Yes, sir.

12 Q.    All right.  But you also indicated that you promised the

13 government you would fully cooperate, you would not perjure

14 yourself, correct?

15 A.    Yes, sir.

16 Q.    That means you wouldn't lie to the government, you won't

17 lie to the jury, you're not lying to anyone under oath,

18 correct?

19 A.    Yes, sir.

20 Q.    That's despite the fact that you lied to the police

21 before, correct?

22 A.    I have.

23 Q.    You lied to the police when they asked you who you were

24 and you gave them some other information?

25 A.    Many, many, many years ago.  We all made mistakes in our

1  lives.

2  Q.    And many, many years ago similar to this situation many,

3  many years ago and many, many years ago it was you who began

4  buying pills from Davon Beckford, correct?

5  A.    Yes.

6  Q.    And you were a little reluctant to recall his name.  You

7  knew him as Dolo, correct?

8  A.    Yes.

9  Q.    But you do know him as Davon Beckford as well, correct?

10 A.    Yes, now I do.  When I got my paperwork, that's when I

11 knew Dolo's real name was Davon Beckford.  Before we all know

12 him as Dolo, Dolo -- just like I know Kevin Jones as Hat.  We

13 all know people's street names.  We don't really know their

14 real names.

15 Q.    I understand that.  And May 14, 2024 is the first time you

16 mentioned to the F.B.I. any information involving Kevin Jones,

17 correct?

18 A.    Yes.

19 Q.    Okay.  Because you were interviewed before, were you not,

20 by the F.B.I.?

21 A.    I was interviewed on my case, yes.

22 Q.    Back in March of 2023.  Does that sound fair?

23 A.    Yes.

24 Q.    Okay.  And March 2023 you talk about a Jaquan Wilson from

25 Arizona, correct?

150

1  A.    Yes.

2  Q.    Jaquan Wilson is -- he doesn't really exist though, does

3  he?

4  A.    That's Dolo's Facebook name.

5  Q.    That's his -- Dolo is Jaquan Wilson and is also Davon

6  Beckford, correct?

7  A.    Yes.

8  Q.    Throughout the interview though you refer to him as Jaquan

9  Wilson, correct?

10  A.    Yes.

11  Q.    You indicated that you would send money to Davon Beckford,

12  Dolo, Jaquan Wilson, however you want to call him, and again he

13  would send you packages in the mail and it would be fentanyl,

14  correct?

15  A.    Yes.

16  Q.    You described those pills as little blue pills that say M.

17  30 on it, correct?

18  A.    Correct.

19  Q.    Those were the same pills that you're claiming my client

20  sold to you sometime in 2020, maybe 2021, all within a month

21  timeframe the same blue pills with the M. 30, correct?

22  A.    Yes, sir.

23  Q.    You also pled guilty to conspiracy to distribute a

24  controlled substance, namely fentanyl, and the agreement also

25  calls for your state charges out of Luzerne County to run --

151

1  run concurrently with one other, correct?

2  A.    Yes, sir.

3  Q.    That's an agreement you have and the lawyer has and the

4  government has.  Obviously the judge doesn't have to abide by

5  that.  But that's agreement you have with the government,

6  correct?

7  A.    Yes, sir.

8  Q.    So when you say they run together, it means if you get a

9  sentence here in federal court and you get a sentence in state

10  court you don't serve your sentence in federal court first and

11  then serve your sentence -- state sentence.  They basically run

12  at the same time, correct?

13  A.    Yes, sir.

14  Q.    That's a huge break, wouldn't you agree?

15  A.    Yeah.

16  Q.    It gets you out of jail, right?  That's the goal, right,

17  to get out of jail, correct?

18  A.    Yes, sir.

19  Q.    The is goal to sit up here and testify and cooperate the

20  with the government against my client so you stay out of jail

21  or get out of jail as soon as possible?

22  A.    That's how we choose.

23  Q.    You also like to downplay what you pled guilty to here.  I

24  mean let's be honest you pled guilty to conspiracy to possess

25  and distribute fentanyl, correct?  Correct?

1  A.    The pills that I pled guilty to.

2  Q.    Yes.  So --

3  A.    Conspiracy to get pills in the mail.

4  Q.    But your testimony is that they were sent to you to feed

5  your own habit, correct?

6  A.    Absolutely.  That was definitely what they was for.  I had

7  a very bad pill addiction.

8  Q.    Who did you sell the pills to then?

9  A.    My friends.

10  Q.    Who's your friends?

11  A.    My friends.

12  Q.    What's their names?

13  A.    That I do them with.  I don't think that's relevant.

14  Q.    You pled guilty to selling pills to someone.  Who did you

15  sell them to?  You want be to fully cooperative, honest and

16  open.  You don't want to perjur yourself.

17  A.    To my friends that I do the pills with.

18  Q.    What's the name of your friends?

19  A.    Okay, well, one of my friend name is Amanda.  We do the

20  pills together.  So when I get the pills and we're doing them

21  together, I would probably sell her, like, five pills, and we

22  are doing them together.  It wasn't -- it wasn't my pills that

23  I got wasn't for me to go out there and, like, hustle.  I

24  wasn't hustling.  That's why I don't have any controlled buys.

25  Q.    Let me guess you don't know Amanda's last name, do you?

153

1  A.    Yes, I do.

2  Q.    What's her last name?

3  A.    Do I have to answer this?

4  Q.    You agreed to fully cooperate and not purger yourself.

5  Answer the question.  What are you holding back?

6  A.    Because I just don't think this -- her name is Amanda

7  Cycle. (Ph.)

8  Q.    Who else did you sell pills to?  You pled guilty to

9  delivering pills.  You are delivering to your friends.  Who are

10  they?  You want to cooperate.  Cooperate.

11  A.    Amanda Cycle, Joey Graves, Herbie Cars. (Ph.)  These are

12  all my friends that I do pills with when we do pills.  I would

13  sell them a couple to them sometimes.

14  Q.    I get you're using those pills for your own addiction.

15  You're also distributing and dealing those pills.  You're

16  downplaying now.  So why are you downplaying it?

17  A.    Okay, sir.

18         MR. ROTTEVEEL:  I have nothing further.  Thank you.

19         THE COURT:  Okay.  Redirect?

20  REDIRECT EXAMINATION

21  BY MR. DONAHUE:

22  Q.    Ms. Smart, you agreed to cooperate with the government,

23  correct?

24  A.    Yes, sir.

25  Q.    And part of the reason you agreed to cooperate with the

154

1  government is to hope you get a better sentence on your deal,

2  correct?

3  A.    Yes, sir.

4  Q.    Ms. Smart, you were arrested on this indictment in March

5  of 2023, correct?

6  A.    Yes.

7  Q.    When you were arrested did you speak with law enforcement

8  officials?

9  A.    Yes.

10 Q.    The next time you spoke with law enforcement officials was

11 May 15th of 2024?

12 A.    I got indicted March 1st of 2023 I think.  That's when I

13 got indicted.

14 Q.    You spoke with law enforcement officials sometime around

15 your arrest?

16 A.    Yes.

17 Q.    In the past month have you met with officer Yelland and

18 individuals from my office including me?

19 A.    Yes, about the trial, yes.

20 Q.    And in that interview did we ask you specifically about a

21 person you knew as Hat?

22 A.    Yes.

23 Q.    Did anyone ever ask you that question before about Hat?

24 A.    No.

25 Q.    Thank you.

155

1    MR. DONAHUE:  I have nothing further, Your Honor.

2    THE COURT:  All right.  Thank you.  You may step

3  down.  Next witness.

4    MR. O'HARA:  Your Honor, the government calls Shayna

5  Colon Acosta.

6    SHAYNA COLON ACOSTA, called as a witness, being duly

7  sworn, testified as follows:

8    THE COURT:  Ms. Acosta, pull that microphone close to

9  you and speak into it.  Thank you.

10 DIRECT EXAMINATION

11 BY MR. O'HARA:

12 Q.    Hi, Shayna.

13 A.    Yes.

14 Q.    Is that okay if I call you Shayna?

15 A.    Yes, it is.

16 Q.    You're very soft spoken.  I'm going to ask just like Judge

17 Mannion asked, keep your voice up.

18 A.    Okay.  I'm sorry.

19 Q.    You don't have to yell -- so people can hear you in the

20 very back of that box, okay.  I never like to ask a woman her

21 age.  Shayna, how old are you?

22 A.    I'm 28.

23 Q.    And do you reside in Wilkes-Barre?

24 A.    I just moved to Kingston.

25 Q.    Do you work?

1  A.    Yes, I do.

2  Q.    What do you do?

3  A.    I work at Red Lobster for 12 years.

4  Q.    Red Lobster in Wilkes-Barre?

5  A.    Yes, sir.

6  Q.    12 years?

7  A.    Yes.

8  Q.    Shayna, who do you live with?

9  A.    My mom and my two little brothers.

10  Q.    Shayna, we're going to discuss your plea agreement, okay?

11  A.    Okay.

12        MR. O'HARA:  And, Your Honor, it's my understanding

13  we will be discussing Government's Exhibit No. 10 and 10.1.

14        MR. ROTTEVEEL:  No objection, Your Honor.

15        THE COURT:  Both 10 and 10.1 are admitted.

16  BY MR. O'HARA:

17  Q.    Shayna, there's paper copies right there of your plea

18  agreement, okay.  And Sierra will bring them on the screen for

19  us.  You can look on the screen or look at the paper, okay?

20  A.    Okay.

21  Q.    Now, that's your plea agreement that was recently filed,

22  correct?

23  A.    Correct.

24  Q.    And you pled guilty in this case before Judge Mannion just

25  a few weeks ago, correct?

157

1    A.    Correct.

2    Q.    And you pled guilty to the charge of conspiracy to

3    distribute controlled substances.  Is that right?

4    A.    Correct.

5    Q.    And if you look at page one in paragraph one of that plea

6    agreement, that's what it says, correct?

7    A.    Correct.

8    Q.    You agree to plead guilty to count one of the indictment,

9    and that charges you with conspiracy to distribute controlled

10   substances, right?

11   A.    Correct.

12   Q.    You're represented by an attorney?

13   A.    Yes.

14   Q.    Did you go over that plea agreement with your attorney?

15   A.    Yes, sir.

16   Q.    In some detail?

17   A.    Yes, sir.

18   Q.    Did he answer any questions that you had about it?

19   A.    Yes, sir.

20   Q.    And then you came into open court under oath before Judge

21   Mannion and you entered a plea of guilty, correct?

22   A.    Yes, sir.

23   Q.    You know that the maximum penalty for your offense is up

24   to 20 years in prison, right?

25   A.    Yes, I do.

158

1  Q.    That's the maximum, correct?

2  A.    Correct.

3  Q.    Have you ever been -- prior to this case were you ever in

4  trouble before?

5  A.    No, sir.

6  Q.    Did you ever you get arrested for anything before this

7  case came about?

8  A.    No, sir.

9  Q.    If you would go to page nine, paragraph 11, look at the

10  paper or it's on the screen for you there.  Page nine,

11  paragraph 11, there's a specific sentencing guideline

12  recommendation to the Court, right?

13  A.    Yes.

14  Q.    And then in big black letters there it says, for purposes

15  of the sentencing guidelines, USSG, the parties agree the

16  defendant is responsible for the distribution of and possession

17  with intent to distribute at least 160 grams but less than 280

18  grams of fentanyl, right?

19  A.    Correct.

20  Q.    Fentanyl is a controlled substance, isn't it?

21  A.    Yes.

22  Q.    On page ten in paragraph 12, it will come up on the screen

23  -- there's a paragraph entitled appropriate sentence

24  recommendation, right?

25  A.    Yes.

159

1  Q.    And it says that the -- at the time you get sentenced the

2  United States may make a recommendation that it considers

3  appropriate, right?

4  A.    Yes.

5  Q.    Based on the nature and circumstances of the case, and the

6  government specifically reserves the right to recommend a

7  sentence up to and including the maximum sentence, right?

8  A.    Right.

9  Q.    Page 22, paragraph 22 -- do you see that?

10 A.    Yes, I do.

11 Q.    There is provision entitled Court not bound by terms,

12 right?

13 A.    Right.

14 Q.    You understand that your sentence is up to the judge?

15 A.    Yes.

16 Q.    Not up to the government, not up to you?

17 A.    Right.

18 Q.    You understand that again you could be sentenced up to the

19 maximum of 20 years in prison?

20 A.    Yes, I understand.

21 Q.    The judge is not a party to the plea agreement?

22 A.    I understand.

23 Q.    Page 31, that's signed by you?

24 A.    Yes.

25 Q.    And your counsel?

160

1  A.    Yes, sir.

2  Q.    And counsel for the government?

3  A.    Yes, sir.

4  Q.    There was also something called an addendum to the plea

5  agreement.  Do you remember that?  That's exhibit 10.1.  Do you

6  see it?

7  A.    Yes, I do.

8  Q.    All right.  Did you go over it with your attorney?

9  A.    Yes, I did.

10  Q.    Did he answer any questions that you had about it?

11  A.    Yes, he did.

12  Q.    Did you understand it?

13  A.    Yes, I did.

14  Q.    Okay.  We will start at the beginning.  Paragraph one

15  talks about full cooperation, right?

16  A.    Yes.

17  Q.    You agree to cooperate with the United States, correct?

18  A.    Correct.

19  Q.    And you understand that that includes complete and

20  truthful testimony?

21  A.    Yes, I do.

22  Q.    And now on page three in paragraph two there's something

23  called -- a paragraph entitled substantial assistance, right?

24  A.    Yes.

25  Q.    And upon your completion of your cooperation if the

1  government believes you provided substantial assistance the

2  Court or -- excuse me -- the government may ask the Court to

3  sentence you to a lesser sentence, correct?

4  A.    Correct.

5  Q.    You still understand it's up to the judge, not up to the

6  government, right?

7  A.    Yes, I fully understand.

8  Q.    On page seven in paragraph eight there's a provision

9  entitled further prosecution for perjury or false statement,

10 right?

11 A.    Right.

12 Q.    You understand that if you lie about something all bets

13 are off?

14 A.    I understand.

15 Q.    You can be charged with perjury or false declaration,

16 correct?

17 A.    I understand.

18 Q.    And go to page nine.  There's acknowledgements in the

19 signature page, right?

20 A.    Yes.

21 Q.    Did you sign that?

22 A.    Yes, I did.

23 Q.    Again, your counsel also?

24 A.    Yes.

25 Q.    You understand what it means, correct?

162

1  A.    Yes, I do.

2  Q.    Shayna, I want to talk to you about a little bit of some

3  unpleasant history.  Did you have an injury?

4  A.    Yes, I did.  I had a face injury.

5  Q.    How old were you then?

6  A.    I was in my teenage years between 15, 16 or 17.

7  Q.    And as a result of that injury were you prescribed pills,

8  medication?

9  A.    Yes.

10 Q.    What kind?

11 A.    Percocet.

12 Q.    Okay.  And did you continue to take Percocet?

13 A.    Yes, I did.

14 Q.    Did there come a time when the Percocet was prescribed by

15 a doctor?

16 A.    Yes, it was.

17 Q.    Did there come a time in your life when you started to get

18 pills on the street?

19 A.    Yes.

20 Q.    Why was that?

21 A.    Well, I was getting a lot of surgeries, and I was -- it

22 was coming a lot, making my appointments.  I was going to lot

23 of the appointments, and I was told that I could get the same

24 things for cheaper and I wouldn't have to see my doctor.  And I

25 took one thinking it was real, and then when I felt it, it was

1  like a sensation I couldn't -- never felt before, and I became

2  addicted.

3  Q.    From the first pill?

4  A.    Yes.

5  Q.    Okay.  Made you feel -- how did it make you feel?

6  A.    It made me feel, like, excruciating -- Percocet took the

7  pain away, but this took all my mental pain away and made me

8  feel like Super Woman.  I never felt nothing like it.

9  Q.    Did you know what you were taking?

10  A.    Not at the time, no.

11  Q.    You started getting pills on the street?

12  A.    Yes.

13  Q.    Who were you buying the pills from?

14  A.    Akee Miller.

15  Q.    Akee Miller.  Does Akee Miller have a nickname or street

16  name?

17  A.    Mitch.

18  Q.    Akee Miller is Mitch?

19  A.    Yes.

20  Q.    How often did you get from Akee Miller?

21  A.    It started off, like, once in a while.  Then it became

22  once a week, then multiple times a week, sometimes multiple

23  times a day depending -- I needed more.  As I became addicted

24  the more I needed.

25  Q.    How would you arrange these transactions with Akee Miller?

164

1   A.    I would call him.

2   Q.    And would he meet with you to serve you?

3   A.    Yes.

4   Q.    Did you know if Akee Miller has been charged in this

5   investigation?

6   A.    Yes.

7   Q.    Did what did the pills look like?

8   A.    Light blue.  They had M., and they had 30s on them.

9   Q.    How much would you pay?

10  A.    It started out 35 and then up to 30 and 20 and at the end

11  with Akee was 15.

12  Q.    Let's unpack that.  $35 a pill?

13  A.    At first, yes.

14  Q.    Did the price go down?

15  A.    Yes.

16  Q.    Is it like the more you buy the cheaper the price is?

17  A.    Yes, sir.

18  Q.    You mentioned -- how about other people that you obtained

19  pills from?

20  A.    I obtained pills from are Rahmel Wigfall and Giavanna

21  Twyman.

22  Q.    He's charged in this indictment?

23  A.    Yes.

24  Q.    Does Rahmel Wigfall have a street name?

25  A.    Inf.

165

1  Q.   Akee Miller is Mitch, and Rahmel Wigfall is Inf?

2  A.   Yes.

3  Q.   So you start getting pills from Rahmel Wigfall?

4  A.   Later on, yes.

5  Q.   When is this?

6  A.   During COVID.

7  Q.   When you say COVID, what year does that mean to you?

8  A.   2021 through -- before he got arrested, so last time I got

9  from him is 2023 before he got arrested.

10 Q.   When did you start?

11 A.   2021.

12 Q.   Who you were getting from 2021?

13 A.   At first it was both of them, and it was just Rahmel at

14 the end.

15 Q.   What prices would Rahmel Wigfall fall charge you?

16 A.   He started out high.  At the end he brought it down to

17 $12.  I started going to him because he was cheaper.

18 Q.   $12 a pill?

19 A.   Yes.

20 Q.   How bad did your habit get?

21 A.   It got really bad to the point at the end I was doing 30

22 pills a day.

23 Q.   30 pills a day.  First from Akee Miller and then from Inf

24 Rahmel Wigfall?

25 A.   Yes.

1  Q.   Did there come a time when packages started coming to your

2  house?

3  A.   Yes.

4  Q.   Where did you live?

5  A.   15 Lanning Lane.

6  Q.   What town?

7  A.   Wilkes-Barre.

8  Q.   Tell us how did that start.

9  A.   Well, I was becoming addicted, and I was spending a lot of

10 money.  And then Mitch was, like -- because it was 200, I

11 couldn't borrow more than $200.  That was the limit.  He was,

12 like, he can send them to me and he will give me $200 or $200

13 worth of pills.

14 Q.   Who would send them?

15 A.   His friend from Arizona.

16 Q.   Did you know the friend from Arizona?

17 A.   Later on I found out who he was but not at the moment.

18 Q.   What did you think -- who did you know that person was

19 back then?

20 A.   He used the name as Dolo.

21 Q.   Dolo.  Did you communicate with him in any fashion on

22 social media?

23 A.   Towards the end, yes.

24 Q.   So Dolo was in Arizona, and Mitch and Inf are in

25 Pennsylvania?

1  A.    Yes.

2  Q.    And what is the offer they make to you?

3  A.    Pay me with pills coming to your house.

4  Q.    Pills coming to your house?

5  A.    Yes, and they picked it up.

6  Q.    What do you get?

7  A.    I get pills.

8  Q.    How many pills or what value of pills?

9  A.    $200 worth of pills.  At first it was, like -- it was $30,

10 and they went to 15 and 12.  I got $200 worth.

11 Q.    Did you ever take the money?

12 A.    No.

13 Q.    Did you always take the pills?

14 A.    Yes.

15 Q.    Did you see any of the packages?

16 A.    Yes.

17 Q.    What did they look like?

18 A.    Like, it was, like, this size, and then it was, like,

19 white like when you send, like, your family pictures through

20 the mail.  It was U.P.S.

21 Q.    I am showing you what's been marked in the corner there as

22 Government's Exhibit 1.1.  Is that what the envelopes looked

23 like?

24 A.    Yes, sir.

25 Q.    Priority express mail?

168

1  A.    Yes.

2  Q.    How much would the packages come?

3  A.    Like month to month, twice a month, depending on when they

4  needed them.  I don't know the exact -- I don't have the exact

5  number of how many times that month.

6  Q.    Okay.  Did you know what was in the package?

7  A.    Yes.

8  Q.    How did you know what was in the package?

9  A.    Because they told me so I can get more pills.

10  Q.    I'm sorry?

11  A.    They told me that's how they get them sent.  That was the

12  deal so I can get pills out of it.  I always knew there was

13  pills in it.

14  Q.    Did any of the packages ever open?

15  A.    Yes.

16  Q.    Did you see what was inside?

17  A.    Yeah.

18  Q.    What was inside?

19  A.    It was pills, and there was eyelashes.

20  Q.    Eyelashes, too?

21  A.    Yes.

22  Q.    Who would pick up the pills that were sent to 8 Lanning

23  Lane?

24  A.    15.

25  Q.    15 Lanning Lane.  Who would pick them up?

169

1    A.    Mitch or Inf depending on whether it was their package.

2          THE COURT:  You can move the microphone a little --

3    you don't have to -- that's good.  Just talk normal into it.

4    There.  You're good.

5          THE WITNESS:  Sorry.  It's my first time.

6          MR. O'HARA:  We understand.

7    BY MR. O'HARA:

8    Q.    When the package was for Rahmel Wigfall he would pick it

9    up?

10   A.    Yes.

11   Q.    When the package was for Akee Miller he would pick it up?

12   A.    Yes.

13   Q.    Did the packages ever came in their names?

14   A.    I'm not sure.  I don't think so.

15   Q.    How did you come to know Dolo?

16   A.    Well, he would like my pictures on Facebook, but I knew

17   who he was when they told me about the pills being sent, but

18   the first time we spoke -- like, the first time we spoke was on

19   Facebook when he said the package was being sent.

20   Q.    Did you ever track the numbers?

21   A.    No, they did because they always told me when they were

22   coming.

23   Q.    They did, Mitch and Inf?

24   A.    Yes.

25   Q.    They let you know when a package was coming?

1   A.   Yes.

2   Q.   Did you come to know who Dolo was?

3   A.   Yes.

4   Q.   Who was he?

5   A.   Shane Barns I think, yeah.

6   Q.   Does the same Davon Beckford mean anything to you?

7   A.   No.

8   Q.   Okay.

9   A.   I think that's -- like, I know him as Dolo.  To say his

10  original name I don't know, but I know him as Dolo.

11  Q.   You know him as Dolo?

12  A.   Yes.

13  Q.   Okay.  Were there other people that you got pills from?

14  A.   Just are Rahmel, Mitch and Gia.

15  Q.   Who is that?

16  A.   Giavanna Twyman.

17  Q.   She was also charged, correct?

18  A.   Yes.

19  Q.   Now, Shayna, you had a bad pill habit?

20  A.   Yes.

21  Q.   But did you also sell some pills?

22  A.   Yes.

23  Q.   And how often do you think you did that?

24  A.   Whenever my friends, like, wrote me, I would take them to

25  Inf's house and I would tell him a different price.  I can get

171

 1  pills out of it.

 2  Q.    Is that basically to support your habit?

 3  A.    Yes, sir.

 4  Q.    You had a job?

 5  A.    Yes.

 6  Q.    Where did that money go?

 7  A.    It all went to pills.  I lost everything.

 8  Q.    Shayna, did you know a man by the name of -- went by the

 9  name of Hat?

10  A.    Yes.

11  Q.    Did you ever buy pills from Hat?

12  A.    No.

13  Q.    How did you know Hat?

14  A.    I met him at the bar.

15  Q.    Everybody kind of hang around in the same places?

16  A.    Yes.

17  Q.    We heard some testimony about the clubs and the bars and

18  the party scene in Wilkes-Barre.

19  A.    Yes.

20  Q.    Was Hat part of that?

21  A.    Yes.

22  Q.    Was Inf part of that?

23  A.    Yes.

24  Q.    Was Mitch part of that?

25  A.    Yes.

172

```
 1  Q.   Party scene?
 2  A.   Yes.
 3  Q.   Shayna, when did it stop?  How did it stop?
 4  A.   The pills, like, stop being sent to me?
 5  Q.   When did the pills stop getting sent to you?
 6  A.   In 2023 -- 2022, '23, around that time.
 7  Q.   And both Rahmel Wigfall and Akee Miller were charged,
 8  correct?
 9  A.   Yes.
10  Q.   And you got charged?
11  A.   Yes.
12  Q.   How about your addiction, Shayna?  How are you doing with
13  that?
14  A.   I'm doing okay.  I'm going to I. O. P., and I just -- I
15  went to rehab as well.
16  Q.   Have you had some problems with that?
17  A.   Yes, I have.
18  Q.   Did you go back to rehab around Christmas time?
19  A.   Yes, I did.
20  Q.   Did you go back to rehab recently?
21  A.   Yes, I did.
22  Q.   What are you doing to try to take care of that problem?
23  A.   I'm going to I. O. P.  I signed myself into I. O. P.
24  Q.   You are using some --
25  A.   Intensive outpatient.  I go three times a week, Monday,
```

173

1  Tuesday, Wednesday.

2  Q.    A couple times a week?

3  A.    Yes.

4         MR. O'HARA:  If I can have a moment, please, Judge.

5  Your Honor, I have no further questions.

6         THE COURT:  Mr. Rotteveel.

7         MR. ROTTEVEEL:  Thank you.

8  CROSS EXAMINATION

9  BY MR. ROTTEVEEL:

10 Q.    Good afternoon.  Hi.

11 A.    Hi.

12 Q.    My name is C. J. Rotteveel.  I represent Kevin Jones.  I

13 am going to ask you a few questions.

14 A.    Okay.

15 Q.    You indicated you suffered a face injury?

16 A.    Yes.

17 Q.    As a teenager?

18 A.    Yes.

19 Q.    How old are you now?

20 A.    I'm 28.

21 Q.    28, okay.

22 A.    Yes.

23 Q.    How old were you when you suffered the face injury?

24 A.    15, but I had surgeries throughout.

25 Q.    Okay.  So it was numerous surgeries?

1  A.    Yes.

2  Q.    All right.  What caused the face injury?

3  A.    I fell down the stairs.

4  Q.    You fell down the stairs, okay.  The surgeries work ed.

5  You cannot tell, so --

6  A.    Thank you.

7  Q.    -- just to let you know, all right.  I'm sorry about the

8  pills though.  The doctor originally prescribed you the

9  Percocets then, correct?

10  A.    Correct.

11  Q.    And one thing leads to another then with the pills,

12  correct?

13  A.    Correct.

14  Q.    That's what took you to the streets to buy pills?

15  A.    Yes.

16  Q.    The people selling you the pills are Rahmel Wigfall?

17  A.    Yes.

18  Q.    Akee Miller?

19  A.    Yes.

20  Q.    And Giavanna Twyman?

21  A.    Twyman man, yes.

22  Q.    And you indicated that you know my client by name,

23  correct, you know him as the Hat or Kevin Jones, correct?

24  A.    Yes.

25  Q.    Okay.  And he never sold you any kind of pills though,

175

1  correct?

2  A.    No, he never sold me anything.

3  Q.    And you know him from the clubs, too, correct?

4  A.    From Donohues.

5  Q.    Donohues.  What is Donohue's then?

6  A.    It's a bar.

7  Q.    Is it a big bar?

8  A.    No, it's kind of small.

9  Q.    All right.  A lot of people would go there?

10  A.    Yes.

11  Q.    And it's small, just packs a lot of people though,

12  correct?

13  A.    Yes.

14  Q.    Okay.  And you would attend this bar, too, correct?

15  A.    Yes.

16  Q.    Wigfall would attend this bar?

17  A.    No, not at that time, no.

18  Q.    How about Giavanna?

19  A.    Yes.

20  Q.    Would you frequent other clubs there as well, Ali Baba?

21  A.    Yes.

22  Q.    You go to that club?

23  A.    Yeah, Wigfall went to Ali Baba.

24  Q.    A much bigger club?

25  A.    Yes.

1   Q.    You would frequent that club as well?

2   A.    Yes.

3   Q.    Okay.  How often would you go to the club?

4   A.    A couple times a month.

5   Q.    You're in your 20s.  You're supposed to go to the clubs.

6   It's not a crime.  You go to those clubs?

7   A.    Yes.

8   Q.    Did you ever meet Samantha Smart at these clubs?

9   A.    No.

10  Q.    Rachel Smyden at this these clubs?

11  A.    No.

12  Q.    Tyla Griffin at these clubs?

13  A.    No.

14  Q.    You'd go to these clubs.  What about my client, Kevin

15  Jones?  Would he go to the Ali Baba?

16  A.    I'm not sure.  I knew him from Donohues.

17  Q.    Did he work at Donohues, hanging out at Donohues?

18  A.    He used to run it.  He was always there.  I don't know if

19  he actually did.

20  Q.    You perceived him as a manager, okay?

21  A.    He was working there, yes.

22  Q.    Was he a bouncer there?

23  A.    I'm not sure.  I don't know, but I know he worked there.

24  I don't know his exact title.

25            MR. ROTTEVEEL:  I have nothing further.  Thanks a

1  lot.

2          THE COURT:  Any redirect?

3          MR. O'HARA:  No redirect, Your Honor.  Thank you.

4          THE COURT:  You may step down.  Ladies and gentlemen,

5  we will take our afternoon break.  You will have ten minutes or

6  so to use the facilities.  Take a few minutes and come back in

7  and continue.  Same admonitions, no conversations or

8  discussions with anyone including among yourselves.  Keep an

9  open mind until you heard all the evidence and the law.  Don't

10 listen to or read anything about the case.  No research of any

11 kind concerning anything related to the case.  If anyone were

12 to try to speak to you, you must advise us of that immediately.

13 See you in about ten minutes.

14          (A brief recess was taken.)

15          THE COURT:  Welcome back.  MR. DONAHUE?

16          TYLA GRIFFIN, called as a witness, being duly sworn,

17 testified as follows:

18          THE COURT:  Ms. Griffin, if you'd move that mic

19 closer to you and speak into the mic, please.  Thank you.

20          THE WITNESS:  Okay.

21 DIRECT EXAMINATION

22 BY MR. DONAHUE:

23 Q.   Good afternoon, Ms. Griffin.

24 A.   Good afternoon.

25 Q.   How old are you?

178

1  A.    35.

2  Q.    Ms. Griffin, are you currently in custody?

3  A.    Yes, I am.

4  Q.    Related to this case?

5  A.    Yes.

6  Q.    Where are you housed right now?

7  A.    Lackawanna County Prison.

8  Q.    Have you -- I'm sorry.  When were you arrested?

9  A.    February 22nd of 2022.

10 Q.    Have you been in custody ever since that time?

11 A.    Yes.

12 Q.    Were you arrested as part of a criminal indictment in the

13 Middle District of Pennsylvania involving this case on trial?

14 A.    No.

15 Q.    So when you were arrested in February of 2022, it was for

16 an indictment related to the sale of controlled substances,

17 correct?

18 A.    Yes.

19 Q.    Ms. Griffin, have you entered a guilty plea in connection

20 with that indictment?

21 A.    Yes.

22 Q.    When you entered that guilty plea, you were represented by

23 an attorney?

24 A.    Yes.

25 Q.    Are you still represented by that attorney?

179

1  A.    Yes.

2  Q.    Did you enter your guilty plea before another judge in

3  this courthouse -- and I apologize.  You were under a different

4  indictment.  Was that Judge Mariani?

5  A.    Yes.

6  Q.    Was the guilty plea that you entered part of a written

7  document that had terms and conditions?

8  A.    Yes.

9  Q.    Did you sign a plea agreement?

10  A.    Yes.

11  Q.    Prior to signing that plea agreement did you read it?

12  A.    Yes.

13  Q.    Did you ask your attorney any questions that you may have

14  had about that plea agreement?

15  A.    Uh-huh, yes.

16  Q.    Did your attorney answer those questions to your

17  satisfaction?

18  A.    Yes.

19  Q.    When you signed the plea agreement did you understand its

20  terms and conditions?

21  A.    Yes.

22  Q.    Did your attorney also sign the plea agreement?

23  A.    Yes.

24  Q.    Ms. Griffin, there's a few documents in front of you.  I'm

25  just going to direct your attention to Government's Exhibit No.

180

1  11, which is entitled plea agreement.

2         MR. DONAHUE:  Your Honor, it's my understanding that

3  defense counsel does not have any objection to the admittance

4  of the series 11 exhibits.

5         MR. ROTTEVEEL:  No objection.

6         THE COURT:  So 11 and 11.1 are admitted into

7  evidence.

8         MR. DONAHUE:  Thank you, sir.

9  BY MR. DONAHUE:

10 Q.    Ms. Griffin, looking at Government's Exhibit 11, do you

11 recognize that document?

12 A.    Yes.

13 Q.    What is it is it?

14 A.    That's my plea agreement.

15 Q.    And directing your attention to what is the last page of

16 that plea agreement, do you see your signature?

17 A.    Yes.

18 Q.    Do you see your attorney's signature?

19 A.    Yes.

20 Q.    And was your attorney with you when you signed that plea

21 agreement?

22 A.    Yes.

23 Q.    Did your attorney sign the plea agreement around the same

24 time you did?

25 A.    Yes.

181

1  Q.    After you signed that plea agreement, did you come to

2  court in front of Judge Mariani and enter a guilty plea?

3  A.    Yes.

4  Q.    Ms. Griffin, I want to direct your attention to the first

5  page of your plea agreement, paragraph one on page one.  Did

6  you enter a guilty plea to conspiracy to possess and

7  distribution of a controlled substance?

8  A.    Yes.

9  Q.    Is there a maximum possible penalty for that offense?

10 A.    Yes.

11 Q.    Is that life in prison?

12 A.    Yes.

13 Q.    Is there a mandatory minimum sentence of ten years?

14 A.    Yes.

15 Q.    Is the maximum fine associated with that penalty $10

16 million?

17 A.    Yes.

18 Q.    Is the maximum term of supervised release life?

19 A.    Yes.

20 Q.    Is the minimum term of supervised release at least five

21 years?

22 A.    Yes.

23 Q.    Ms. Griffin, are you, in fact, guilty of conspiring to

24 possess and distribute a controlled substance, specifically

25 fentanyl?

1  A.    Yes.

2  Q.    Directing your attention now to page nine, paragraph 11,

3  of your plea agreement, is that named specific sentencing

4  guidelines recommendations?

5  A.    Say that again.  I'm sorry.

6  Q.    That's okay.  Is the paragraph 11 on page nine named

7  specific sentencing guideline recommendations, which is at the

8  top of the page there?

9  A.    Yes.

10 Q.    Directing your attention to the bolded paragraph, letter

11 A., does that state for the purposes of the USSG the defendant

12 is responsible for the distribution of and possession with

13 intent to distribute at least 400 grams but less than 1.2

14 kilograms of fentanyl, a schedule two controlled substance?

15 A.    Yes.

16 Q.    And you're guilty of that offense, Ms. Griffin?

17 A.    Yes, I am.

18 Q.    Directing your attention to page ten, paragraph 12, is

19 that named appropriate sentence recommendation?

20 A.    Yes.

21 Q.    Does that paragraph indicate that the United States may

22 make a recommendation at the time of sentence that it considers

23 appropriate based upon your participation in the offense?

24 A.    Yes.

25 Q.    And lastly, directing your attention to page 22, paragraph

1  22, is that paragraph named Court not bound by terms?

2  A.    Yes.

3  Q.    You understand that the Court is not bound by this plea

4  agreement?

5  A.    Yes -- no, I don't understand that.

6  Q.    Do you understand that the Court is responsible for

7  imposing the sentence upon you?

8  A.    Yes.

9  Q.    And that the Court may sentence you to any sentence

10 including up to the maximum sentence of life?

11 A.    Yes.

12 Q.    Ms. Griffin, along with your plea agreement, did you also

13 sign another separate document referred to as an addendum?

14 A.    Yes.

15 Q.    Ms. Griffin, looking at exhibit 11.1, which is now on your

16 monitor in front of you, do you recognize that document?

17 A.    Yes.

18 Q.    Is that the addendum to your plea agreement?

19 A.    Yes.

20 Q.    Directing your attention to what is the last page of that

21 addendum, do you see your signature?

22 A.    Yes.

23 Q.    Do you also see the signature of your attorney?

24 A.    Yes.

25 Q.    Was your attorney with you when you signed that document?

1   A.    Yes.

2   Q.    Did he also sign it around the same time that you did?

3   A.    Yes.

4   Q.    Did you read the addendum before you signed it?

5   A.    Yes.

6   Q.    Ms. Griffin, do you understand what the addendum to your

7   plea agreement entails?

8   A.    Yes.

9   Q.    Do you understand that when you signed the addendum to

10  your plea agreement that you would have to fully cooperate with

11  the government?

12  A.    Yes.

13  Q.    Directing your attention to the first paragraph of that

14  addendum on the first page, is that called full cooperation?

15  A.    Yes.

16  Q.    And directing your attention to the top of the second

17  page, did -- in signing this addendum does your cooperation

18  require that you testify fully and truthfully before any grand

19  jury, hearing, trial or other proceeding where your testimony

20  is deemed relevant?

21  A.    Yes.

22  Q.    On the next page three, paragraph No. 2, is that paragraph

23  called substantial assistance?

24  A.    Yes.

25  Q.    This paragraph indicates that upon your completion of

1  substantial assistance the United States may request that the

2  Court sentence you to a penalty below the applicable sentencing

3  guidelines, correct?

4  A.    Yes.

5  Q.    Directing your attention now to page 7, paragraph No. 8,

6  is that called further prosecution for perjury false

7  statements?

8  A.    Yes.

9  Q.    Nothing in this agreement protects you from prosecution

10 for perjury or false statement, correct?

11 A.    Yes.

12 Q.    If you lie about something during today's testimony you

13 may still be prosecuted despite the plea agreement and

14 addendum, correct?

15 A.    Yes.

16 Q.    Ms. Griffin, this offense that you pled guilty to, that is

17 not your first conviction, correct?

18 A.    No, sir.

19 Q.    You've had a number of different convictions in both

20 Pennsylvania and Massachusetts?

21 A.    Yes.

22 Q.    And this is not your first conviction related to drugs,

23 right?

24 A.    No.

25 Q.    Ms. Griffin, over the years did you have a drug addiction?

186

1   A.    Yes.

2   Q.    When did you first begin to use drugs?

3   A.    Probably age 19.

4   Q.    And over the years, you've been convicted of several drug

5   offenses, correct?

6   A.    Yes.

7   Q.    What type of drug offenses have you been convicted of?

8   A.    Heroin, crack cocaine.

9   Q.    Ms. Griffin, have you also been convicted of retail theft

10  or what's known as shoplifting offenses?

11  A.    Yes.

12  Q.    How many times would you estimate that you've been

13  convicted of shoplifting offenses?

14  A.    Two or three.

15  Q.    Do you know when your most recent conviction was

16  approximately?

17  A.    No, not offhand.

18  Q.    Ms. Griffin, in 2013 were you convicted of larceny on two

19  occasions and a robbery on another occasion?

20  A.    Yes.

21  Q.    Did you plead guilty in those cases?

22  A.    Yes.

23  Q.    Do you know what the sentences were for those cases?

24  A.    I don't remember.

25  Q.    How old were you in 2013?

187

1   A.    Oh, boy --

2   Q.    Sorry to put you on the spot with math.

3   A.    23.

4   Q.    Finally, Ms. Griffin, in 2018 were you convicted of access

5   device fraud and possession of unlawful device making

6   equipment?

7   A.    Yes.

8   Q.    Do you recall what your sentence was in that case?

9   A.    No.

10  Q.    Ms. Griffin, did there come a time when you met a man

11  named Davon Beckford?

12  A.    Yes.

13  Q.    When did you meet Mr. Beckford?

14  A.    2020 or -- yeah, end of 2019.

15  Q.    How did you guys meet?

16  A.    Through Facebook.

17  Q.    Did there come a time where you guys entered a romantic

18  relationship?

19  A.    Yes.

20  Q.    How long -- well, withdrawn.  Did there come a time where

21  you and Mr. Beckford moved to Arizona?

22  A.    Yes.

23  Q.    When did you move to Arizona?

24  A.    In 2020.

25  Q.    What month of 2020?

188

1    A.    February.

2    Q.    Did anyone move with you and Mr. Beckford?

3    A.    My two children.

4    Q.    Who did you stay with when you got to Arizona?

5    A.    When we first got there we stayed with my God mother.

6    Q.    How long were you with your God mother?

7    A.    For a month.

8    Q.    Did you get a job once you got to Arizona?

9    A.    I eventually did get a job, yes.

10   Q.    When was that?

11   A.    Maybe sometime in April.

12   Q.    Of 2020?

13   A.    Yes.

14   Q.    What are you doing?

15   A.    I was working at a pizza shop.

16   Q.    What about Mr. Beckford, did he get a job in Arizona when

17   you guys arrived?

18   A.    He did, but it was like more so he would, like, work two

19   days and it didn't work out and it didn't work out type of

20   thing.

21   Q.    When you say two days and it didn't work out, was he

22   starting a new job --

23   A.    Yes.

24   Q.    Then it would stop?

25   A.    Yes.

189

1  Q.   Then he would start another new job and it would stop?

2  A.   Yes.

3  Q.   Do you recall any of the jobs that he did work when you

4  first got to Arizona?

5  A.   One was out of a baseball field.  I think it was, like, a

6  concession stand and then another construction.

7  Q.   Ms. Griffin, I'm using the term Arizona.  Where were you

8  guys living in Arizona once you got there?

9  A.   We got an apartment after we stayed with my God mother.

10 Q.   And what city or town were you in?

11 A.   I think it was Glendale.

12 Q.   Is that in the Phoenix area?

13 A.   Yes.

14 Q.   Ms. Griffin, did there come a time when you and Davon made

15 a decision to try to start selling some type of drugs?

16 A.   Yes.

17 Q.   When was that?

18 A.   Like, March, April.

19 Q.   Of 2020?

20 A.   Huh-uh.

21 Q.   What drug did you start with?

22 A.   Marijuana.

23 Q.   And could you just briefly describe your experience with

24 how that went?

25 A.   Basically we, like, found somebody that wanted it.  We

1  packaged it and sent it in the mail, and then it didn't really

2  work out because, like, we weren't making anything from it.  So

3  we went on to the pills.

4  Q.    When would you say that you went on with the pills?

5  A.    Like, maybe April, May.

6  Q.    Of 2020 again?

7  A.    Uh-huh.

8  Q.    How did you guys go about finding someone to purchase

9  pills from?

10  A.    I found somebody on Snap Chat.

11  Q.    So for perhaps the members of the jury that don't know,

12  what is Snap Chat?

13  A.    It's a social media.

14  Q.    What type of things can you do on Snap Chat?

15  A.    You can, like, take videos and post them.  You can -- you

16  can go into, like, the area that you're located in and, like,

17  add friends, add different people in the area, yeah.

18  Q.    Can you communicate on Snap Chat?

19  A.    Yeah, you can text message back and forth.

20  Q.    And how were you able to find someone who was willing to

21  sell you pills on Snap Chat?

22  A.    They, like, posted it on their timeline.

23  Q.    And when you say posted it on their timeline, what does

24  that mean?

25  A.    Like, they take a picture or video of it, and they post it

1  on their story, like, during the day.  You can click their name

2  or their picture, and it will show you what they posted

3  throughout the day.

4  Q.    And this person posted it -- a picture of something and

5  advertised it -- advertised sale of pills?

6  A.    Yes.

7  Q.    Okay.  You reached out to that person?

8  A.    Yes.

9  Q.    Do you recall what that person's name was?

10 A.    Miguel.

11 Q.    How long did you purchase pills from a man named Miguel?

12 A.    I would say about, like, five to six months.

13 Q.    That's in 2020?

14 A.    Yes.

15 Q.    How much did Miguel charge you guys to purchase pills?

16 A.    I don't really remember offhand what he first started

17 with.

18 Q.    What was the average amount that you would pay Miguel for

19 pills?

20 A.    Like, two or three dollars.

21 Q.    And how many pills would you buy from Miguel at one time?

22 A.    A thousand.

23 Q.    When you first started buying pills from Miguel, it was

24 you and Mr. Beckford doing this together?

25 A.    Yes.

1  Q.    Once you bought the pills from Miguel, what did you do

2  with them?

3  A.    We would send them to somebody in Pennsylvania.

4  Q.    Did you have your own group of people that would purchase

5  pills from you?

6  A.    Yes.

7  Q.    Did Mr. Beckford have his own group of people that would

8  purchase pills from him?

9  A.    Yes.

10  Q.    Could you just describe how you guys mailed the pills out

11  to people in other states?

12  A.    Yes.  We would get, like, a toy or some -- like, an

13  envelope but, like, an -- a bubbled envelope or something, and

14  we would put it in there.  And then we would get the priority

15  mail express envelope from the post office and put that package

16  in there and then send it off.

17  Q.    And just taking a step back for a second.  The pills that

18  you were buying from Miguel, can you just describe what they

19  looked like?

20  A.    They were small circle and blue with an M. on them.

21  Q.    When you first started purchasing the pills from Miguel,

22  what did you think these pills were in terms of a drug?

23  A.    A Perc 30.

24  Q.    Over the course of the time that you were selling these

25  pills did you learn what type of substance they contained?

1  A.    Yes.

2  Q.    What was that substance?

3  A.    Fentanyl.

4  Q.    Ms. Griffin, you referenced that you would go to the post

5  office and you would put the pills in with a toy or something

6  in into an express mail package, correct?

7  A.    Yes.

8  Q.    Ms. Griffin, we are displaying on your monitor and to the

9  jury what has been previously been entered into evidence as

10  Government's Exhibit 2.1.  Is this the type of package you and

11  Mr. Beckford would use to send fentanyl pills?

12  A.    Yes.

13  Q.    Where would you guys get the toys that would go inside or

14  whatever else you put inside?

15  A.    Like, the Dollar Store.

16  Q.    Did you require a payment for the pills?

17  A.    We would do, like, half the money before they sent --

18  before we sent and half the money when they -- when the package

19  was delivered.

20  Q.    And how would you typically get that money?

21  A.    Through Cash App or Zelle.

22  Q.    Did you have a specific, like, Cash App user name?

23  A.    If I recall, Ty Aquarius.

24  Q.    When someone was purchasing these pills from you, how

25  would they contact you?

194

1  A.    Through Facebook, which is a social media, Snap Chat or

2  text messaging or calling.

3  Q.    When you first began to sell the pills from Miguel did you

4  and Mr. Beckford set a certain amount you would sell in a given

5  purchase?

6  A.    Yes.

7  Q.    How much?

8  A.    A thousand.

9  Q.    How much would you and Mr. Beckford typically charge per

10 pill?

11 A.    I think it was $6.

12 Q.    If you were charging $6 a pill and somebody was ordering a

13 thousand, you would require $6,000 total, correct?

14 A.    Yes.

15 Q.    Based upon what you said earlier, you would ask for an

16 initial payment?

17 A.    Yes.

18 Q.    And how much would you typically ask for in that initial

19 payment?

20 A.    Half, which would be 3,000.

21 Q.    Now, if for some reason the person buying these pills

22 didn't pay you that second payment, you were still making money

23 on that first payment, right?

24 A.    Right, yes.

25 Q.    One moment, please.  Ms. Griffin, when you would mail the

1  packages would you go to the post office yourself?

2  A.    Yes.

3  Q.    Was there a specific post office that you used?

4  A.    I kind of, like, try to switch it up, like, go to

5  different ones.

6  Q.    Why did you do that?

7  A.    I don't know.  I guess to try to, like, not get in

8  trouble.

9  Q.    When you were filling out the packages, did you use

10  people's real names?

11  A.    No.

12  Q.    Why not?

13  A.    I guess usually they didn't want us to.

14  Q.    And how would you know what address to send the package

15  to?

16  A.    They would give us an address.

17  Q.    Ms. Griffin, just going back to exhibit 2.1 was there a

18  specific reason you used priority mail express envelope?

19  A.    It's 24 hours.  It takes 24 hours to get wherever you send

20  it to.

21  Q.    So you can send a package from Arizona to Pennsylvania and

22  it usually got there within a day?

23  A.    Yes.

24  Q.    Did these packages come with a tracking number?

25  A.    Yes.

196

1  Q.    And what would you do with the tracking number after you
2  sent a package?
3  A.    Usually take a picture and send it to the person that
4  purchased the pills.
5  Q.    What would you take a picture of?
6  A.    The tracking number or the whole envelope.
7  Q.    You would typically mail these packages yourself?
8  A.    Yes.
9  Q.    Ms. Griffin, I'm going to show you what's been previously
10 moved into evidence as Government's Exhibit 2.10.  And I think
11 there's also a copy up there.
12 A.    Yes.
13 Q.    Do you recognize the individual in the upper right-hand
14 corner?
15 A.    Yes.
16 Q.    Who is that?
17 A.    That's me.
18 Q.    And is this a post office in Phoenix, Arizona?
19 A.    Yes.
20 Q.    Ms. Griffin, who were some of the people that bought pills
21 from you?
22 A.    Rachel, Akee Miller, Yuamir, Pablo.
23 Q.    Ms. Griffin, when you say Rachel, are you referring to
24 Rachel Smyden?
25 A.    Yes.

197

1  Q.   And did you know Akee Miller as Akee Miller, or did he

2  have a nickname?

3  A.   His nickname was Mitch.

4  Q.   And is Thugga an individual's nickname?

5  A.   Yes.

6  Q.   Do you know his real name?

7  A.   No.

8  Q.   Ms. Griffin, the individuals that you just referenced, do

9  you know if they were arrested as part of this conspiracy?

10 A.   I guess it was a separate indictment.

11 Q.   But they were also arrested?

12 A.   Yes.

13 Q.   Ms. Griffin, out of those people that you named, how many

14 of them have you personally met in person?

15 A.   Two.

16 Q.   And how --

17 A.   Or three.

18 Q.   And of those you haven't met in person, who were they?

19 A.   I never met Yuamir, Thugga.

20 Q.   How did you guys get in touch?

21 A.   Facebook or Snap Chat.

22 Q.   And you've never met them since?

23 A.   No.

24 Q.   Ms. Griffin, did you know any of the individuals who

25 bought from Mr. Beckford?

198

1  A.  Yes.

2  Q.  And who were some of the people that bought from Mr.

3  Beckford?

4  A.  Patch, Hat, somebody named Mike, Samantha Smart.

5  Q.  Was that first person Hatch or Patch?

6  A.  Patch.

7  Q.  You referenced Samantha Smart.  Did Mr. Beckford ever sell

8  to an individual named Nitty?

9  A.  Oh, yes, Nitty.

10 Q.  Ms. Griffin, did you ever meet the person you referenced,

11 Hat?

12 A.  No.

13 Q.  Did you know who he was?

14 A.  No.

15 Q.  Did you ever sell any pills to him?

16 A.  No.

17 Q.  Ms. Griffin, did there come a time where you and Mr.

18 Beckford separated?

19 A.  Yes.

20 Q.  And after that separation did you continue to sell pills?

21 A.  Yes.

22 Q.  And to your knowledge did Mr. Beckford continue to sell

23 pills?

24 A.  Yes.

25 Q.  When did you guys separate approximately?

199

1  A.    October 2021.

2  Q.    So you had testified that you and Mr. Beckford moved out

3  to Arizona in February of 2020, right?

4  A.    Yes.

5  Q.    And did you break up within that year?

6  A.    Yes.

7  Q.    All right.  Fair to say it's probably around October 2020

8  that you ended your relationship?

9  A.    Yes, about right.

10  Q.    Ms. Griffin, did you -- once you started selling these

11  pills, did you continue to do so for your entire time out in

12  Arizona?

13  A.    Yes.

14  Q.    Why did you stop selling the pills?

15  A.    Well, for, one, the money, and for, two, I was using them.

16  Q.    Why did you end up stop selling the pills?  Why did you

17  stop?

18  A.    Because I was arrested.

19  Q.    Ms. Griffin, just going back to Rachel Smyden, do you know

20  where you sent her packages?

21  A.    To Mountain Top.

22  Q.    Ms. Griffin, over the course of time that you were sending

23  pills through the mail, did you ever send any packages that

24  didn't contain fentanyl pills?

25  A.    No.

1        MR. DONAHUE:  I have no further questions at this

2   time.

3        THE COURT:  Mr. Rotteveel.

4        MR. ROTTEVEEL:  Thank you, Your Honor.

5   CROSS EXAMINATION

6   BY MR. ROTTEVEEL:

7   Q.   Good afternoon, Ms. Griffin.

8   A.   Good afternoon.

9   Q.   My name is C. J. Rotteveel.  I represent Kevin Jones.  I'm

10  going to be asking you some questions, okay?

11  A.   Okay.

12  Q.   How old are you now, 35?

13  A.   Yes.

14  Q.   Okay.  Let's talk about the agreement you signed with the

15  government.  You signed a plea agreement, correct?

16  A.   Yes.

17  Q.   All right.  You understand that your maximum penalty with

18  that plea agreement is potentially life in prison?

19  A.   Yes, sir.

20  Q.   There's another penalty in there though that calls for a

21  mandatory minimum sentence of ten years for this charge,

22  correct?

23  A.   Yes.

24  Q.   So regardless you have to serve that ten years, correct?

25  A.   Yes.

201

1  Q.    Unless your cooperation is substantial, correct?

2  A.    Yes.

3  Q.    And then you can be sentenced below that ten-year

4  timeframe, correct?

5  A.    Yes.

6  Q.    Okay.  That's the goal, correct?

7  A.    Yes.

8  Q.    All right.  That's the goal for you to get sentenced below

9  that ten years?

10 A.    I hope so.

11 Q.    Yeah.  It's to get out of jail, correct?

12 A.    I know.  I'm not going to get any time soon.

13 Q.    But you want to get back to your children because you do

14 have children, correct?

15 A.    Yes.

16 Q.    Family is watching your children now?

17 A.    Yes.

18 Q.    Where you were raising your children, correct?

19 A.    Yes.

20 Q.    Okay.  And you were raising your children out in Arizona

21 while you were selling the fentanyl, correct?

22 A.    Yes.

23 Q.    Okay.  Now, you and Davon, you met here in Wilkes-Barre,

24 correct?

25 A.    Yes.

202

1  Q.    Okay.  And shortly after you met you all moved out to

2  Arizona then, right?

3  A.    Yes.

4  Q.    You moved out to Arizona.  Again, that was established in

5  February of 2020.  Does that sound about right?

6  A.    Huh-uh.

7  Q.    And I think you moved in with your God mother.  Is that

8  correct?

9  A.    Yes.

10 Q.    Davon moved in, too?

11 A.    Yes.

12 Q.    How did your God mother feel about Davon?

13 A.    She didn't mind him.

14 Q.    She didn't mind him?

15 A.    Yeah.

16 Q.    You guys didn't stay long there?

17 A.    We were waiting for my tax refunds to come.

18 Q.    You wanted your tax refunds to come?

19 A.    Yes.

20 Q.    Okay.  Why did you move to Arizona?

21 A.    For a fresh start.

22 Q.    Did you indicate to the F.B.I. that you had received a

23 letter from the police indicating you had active warrants and

24 you wanted to flee Pennsylvania and move to Arizona to avoid

25 being picked up on those warrants?

1  A.    Yes.

2  Q.    So more than just a fresh start, you were trying to evade

3  the police, were you not?

4  A.    Yes.

5  Q.    You also testified here that it was about October 2020, so

6  I don't know -- what's that eight months -- seven months since

7  you moved there you and Davon had a falling out and you went

8  your separate ways, correct?

9  A.    Yes.

10 Q.    What happened there?  Why did you guys break up?

11 A.    He was physically abusive.

12 Q.    He beat you?

13 A.    Yes.

14 Q.    Okay.  Did he beat you in front of the children?

15 A.    They were asleep.

16 Q.    Okay.  How many times did he beat you?

17 A.    Several times.

18 Q.    Okay.  Was that all in one event, or was this several

19 times over the timeframe you lived in Arizona?

20 A.    Yeah, over the course of the time living in Arizona.

21 Q.    So finally come October, November, 2020 you had enough.

22 You took your kids and you left?

23 A.    Yes.

24 Q.    And with you in your children you took your drug dealer,

25 Miguel, correct?

204

1  A.    Yes.

2  Q.    You signed that cooperation agreement with the government

3  to fully cooperate with them, correct?

4  A.    Yes.

5  Q.    Did you give them all of the information on Miguel?

6  A.    I didn't have any information to give.

7  Q.    You didn't have his last name?

8  A.    No.

9  Q.    How about his phone number?

10  A.    I didn't have it anymore.  I was getting anymore.

11  Q.    His social media accounts, anything?

12  A.    I didn't have it.

13  Q.    Did you sit down and try to identify who Miguel was?

14  A.    I think at one point, yes.

15  Q.    Did you indicate you know where Miguel was living?

16  A.    I didn't know.

17  Q.    Okay.  Where he was working?

18  A.    That I didn't know.

19  Q.    Were you able to identify any photographs of Miguel and

20  share it with the government?

21  A.    No.

22  Q.    At some point in time though you were under the impression

23  that you were selling Percocets, correct?

24  A.    Yes.

25  Q.    All right.  Later on you realized that it was, in fact,

205

1  fentanyl, correct?

2  A.    Yes.

3  Q.    And once you figured out it was fentanyl, you didn't stop

4  though, correct?

5  A.    No.

6  Q.    You kept selling the fentanyl pills?

7  A.    Yes.

8  Q.    You are aware what fentanyl can do to someone, correct?

9  A.    Yes.

10 Q.    In fact, you sold fentanyl over here in Wilkes-Barre to a

11 plethora of customers you identified, correct?

12 A.    Yes.

13 Q.    One was Akee Miller?

14 A.    Yes.

15 Q.    Akee Miller was actually -- he was -- he was charged with

16 drug delivery resulting in death, correct?

17 A.    I guess, yes.

18 Q.    You also indicated that -- correct me if I'm wrong -- you

19 refer to them as your squad.  Does that sound familiar?

20 A.    No.

21 Q.    Did you indicate to the F.B.I. that you sold fentanyl to a

22 Clifford Clabier?

23 A.    Yes.

24 Q.    Okay.  Thugga, a/k/a Robert Thompson?

25 A.    Yes.

1  Q.    You mentioned Rachel Smyden?

2  A.    Yes.

3  Q.    You mentioned Yuamir Grayson?

4  A.    Yes.

5  Q.    Howard Bell?

6  A.    I don't recognize that name.

7  Q.    Okay.  Fatieem Grady?

8  A.    Yes.

9  Q.    And Jahad Rashaad Freeman?

10 A.    I don't recognize that name either.

11 Q.    Okay.  And what about a Chase?

12 A.    Yes.

13 Q.    Okay.  Who was Chase?

14 A.    I don't know.

15 Q.    All right.  It was someone out in Wilkes-Barre?

16 A.    Yes.

17 Q.    All right.  You never met Chase before?

18 A.    No.

19 Q.    You just knew him as Chase?

20 A.    Yes.

21 Q.    Did you help identify who Chase was?

22 A.    I couldn't.

23 Q.    You never seen him before?

24 A.    No.

25 Q.    Okay.  You also indicated -- and I'm going to go back.

207

1   This is an interview you had with the F.B.I. April 27th, 2022,

2   a few months after your arrest, correct?  You also stated some

3   of Davon's clients at that interview.  Do you recall?  Do you

4   recall mentioning a Tyreek Davis?

5   A.    Yes.

6   Q.    All right.  A Jerry McQuiller?

7   A.    Yes.

8   Q.    All right.  Vince Brown?

9   A.    I don't remember that name.

10  Q.    Okay.  And Kasey Sanchez?

11  A.    Yes.

12  Q.    And those are the only names you listed during that

13  interview on April 27th, 2022, correct?

14  A.    I really can't remember that date at that time.

15  Q.    The F.B.I. drew up a report.  It indicated you identified

16  Tyreek Dave, Jerry McQuiller, Vince Brown and Kasey Sanchez --

17  four people that Davon Beckford was dealing with.  Do you have

18  any reason to disbelieve that report?

19  A.    No.

20  Q.    Prior to that you had an interview after your arrest

21  February 23rd, 2022 because you were arrested on 2/2/22,

22  correct?

23  A.    Yes.

24  Q.    So now you had gone through two interviews.  The first

25  interview you never mentioned anyone with respect to who's

208

1  dealing fentanyl pills other than yourself and perhaps Mr.

2  Beckford, correct?

3  A.    Right.

4  Q.    The second interview April 27th, we went over that whole

5  list of individuals you were selling to, your customers and a

6  list of customers you provided that Mr. Beckford was selling

7  to, correct?

8  A.    Yes.

9  Q.    Moving on to October 17th, 2022, you had your third

10 interview with the F.B.I.  Does that sound about right, eight

11 months after your arrest?

12 A.    Yes.

13 Q.    At that point in time you provided more information about

14 Yuamir Grayson?

15 A.    Yes.

16 Q.    Sound about right?  You also provided more information

17 about Howard Bell?

18 A.    Yes.

19 Q.    Okay.  Are you sure it was Howard Bell?

20 A.    I'm not sure.

21 Q.    Okay.  And Mr. Wigfall, correct?

22 A.    I don't know that name.

23 Q.    You don't recall having any kind of conversation with the

24 F.B.I. on October 17th, 2022 being asked about these

25 individuals and providing information to them?

209

1  A.    I do remember October 17th, but I don't remember the exact

2  names.

3  Q.    Okay.  Do you believe that you gave information with

4  respect to Kevin Jones on that date?

5  A.    I'm not sure.

6  Q.    Okay.  You did undergo a trial prep interview as well.

7  This would be interview No. 4.  This is about two weeks ago?

8  A.    Yes.

9  Q.    Does that sound about right?  Were you asked at that point

10  about Kevin Jones?

11  A.    Yes.

12  Q.    Okay.  And do you recall indicating that you knew Kevin

13  Jones as one of Mr. Beckford's clients?

14  A.    Yes.

15  Q.    And, in fact, you've seen Kevin Jones before because you

16  saw him on a Face Time video with Mr. Beckford?

17  A.    Yes.

18  Q.    Correct, okay.  That's the only time you've ever seen Mr.

19  Jones on a Face Time video with Mr. Beckford?

20  A.    Yes.

21  Q.    Again, you're indicating he was, in fact, one of Mr.

22  Beckford's clients, correct?

23  A.    Yes.

24  Q.    All right.  This is despite not mentioning Mr. Jones in

25  your first interview February 23rd, 2022 you never mentioned

210

1  him?

2  A.    Right.

3  Q.    April 27th we just went over the whole list of people you

4  mentioned specifically as Mr. Beckford's clients that he was

5  sending fentanyl pills to as well as your clients you sent

6  fentanyl pills to, no mention of Kevin Jones, correct?

7  A.    Correct.

8  Q.    October 17th, 2022 the only names that came up were Yuamir

9  Grayson, Howard Bell and are a Rahmel Wigfall, no Kevin Jones,

10  correct?

11  A.    Correct.

12  Q.    Finally, two weeks prior to trial while you're facing a

13  possibility of life imprisonment, you're informed that Kevin

14  Jones is electing to exercise his right and go to trial and

15  that's when you finally recognize Mr. Jones, correct?

16  A.    Yes.

17  Q.    Okay.  Now, you mention you recognized Mr. Jones again

18  from a Face Time video that you saw with Davon Beckford, and

19  this is obviously when you and Mr. Beckford were still

20  together, correct?

21  A.    Yes, but I didn't say I recognize him.  I said I knew

22  that's who he was on Face Time with.

23  Q.    But -- so that was at some point in time while you and

24  Beckford were, in fact, together, correct?

25  A.    Correct.

211

1   Q.   So when you split up, you went your way and he went his

2   way and you never reconnected?

3   A.   No.

4   Q.   He found his new drug source.  You took your drug source.

5   You shared no children, nothing, it was done, correct?

6   A.   Yes.

7   Q.   So again this would have been 2020.  I just want to be

8   crystal clear with that.

9   A.   Yes.

10  Q.   Are you aware that the government's case centers on the

11  fact that my client Mr. Jones was involved in this conspiracy

12  sending Cash App transactions receiving packages in mail until

13  2021?

14  A.   No.

15  Q.   So how do you know he was a customer of his in 2020 when

16  they have no evidence other than evidence pertaining to Mr.

17  Jones in 2021?

18  A.   Davon used to talk about it.

19  Q.   Your criminal history is pretty extensive, too?

20  A.   Yes.

21  Q.   You would agree?

22  A.   Yes.

23  Q.   2017 you pled guilty to retail theft.  2016 you also

24  presented false identification to law enforcement.  Does that

25  sound right?

212

1    A.    Yes.

2    Q.    So again 2016 you lied to the cops about who you were,

3    correct?

4    A.    Yes.

5    Q.    2018 felony-three access device fraud?

6    A.    Yes.

7    Q.    Is that where you're stealing someone's credit card and

8    using it?

9    A.    Yes.

10   Q.    Was that the gist of it?

11   A.    Yes.

12   Q.    You conspired with others to do that, too, correct?

13   A.    Yes.

14   Q.    In 2013 you straight up just robbed somebody, right?

15   A.    Yes.

16   Q.    That's where you steal something from somebody by use of

17   force.  Did you use a weapon?

18   A.    No.

19   Q.    2016 shoplifting.  Any other crimes we're forgetting?

20   A.    No.

21   Q.    Did you get a lot of prison sentences for those?  Did you

22   serve a lot of time in jail?

23   A.    Yeah.

24   Q.    Okay.  What was the longest time spent in jail would you

25   say?

213

1  A.    A year besides now.

2  Q.    Right.  This is going to be your longest prison sentence

3  out of all those previous crimes, correct?

4  A.    Yes.

5  Q.    You signed that plea agreement promising to be open and

6  honest and not commit perjury and cooperate with the

7  government, correct?

8  A.    Yes.

9  Q.    The idea you standing up here and to tell the truth,

10 right?

11 A.    Yes.

12 Q.    Again, though you had lied to the police before about who

13 you are?

14 A.    Yes, but I was also --

15 Q.    Also talking about how --

16         MR. DONAHUE:  Objection.

17         MR. ROTTEVEEL:  Sorry.

18         THE COURT:  You can finish your answer.

19         THE WITNESS:  I was also, like, in full blown

20 addiction and, like, a junkie.

21 BY MR. ROTTEVEEL:

22 Q.    But you were making a lot of money, too, weren't you?

23 A.    It wasn't the same.

24 Q.    What kind of car were you driving in Arizona?

25 A.    Hyundai.

214

1  Q.    You had your bills paid for?

2  A.    Yeah.

3  Q.    But working at the pizza shop normal nine to five wasn't

4  cutting it for you, was it?

5  A.    No.

6  Q.    You had to pedal your poison or live a certain life-style?

7         MR. DONAHUE:  Objection, Your Honor.

8         THE COURT:  Overruled.  You can answer the question

9  if you can.

10         THE WITNESS:  Yes.

11  BY MR. ROTTEVEEL:

12  Q.    You wanted nice things, lavish things, correct?

13  A.    I really wasn't a lavish person.  I just wanted to take

14  care of me and my kids.

15  Q.    At the expense of others, correct?

16  A.    Yes.

17         MR. ROTTEVEEL:  I have nothing further, Your Honor.

18  Thank you.

19         THE COURT:  MR. DONAHUE, redirect?

20  REDIRECT EXAMINATION

21  BY MR. DONAHUE:

22  Q.    Ms. Griffin, during my earlier questioning I asked you

23  about an individual named Nitty.  Do you remember that?

24  A.    Yes.

25  Q.    And he was one of Mr. Beckford's persons who purchased

1  pills from Mr. Beckford?

2  A.    Yes.

3  Q.    Would it surprise you to know his real name is Howard

4  Bell?

5  A.    I mean I didn't know that.

6  Q.    Did you know an individual by the nickname of Inf?

7  A.    Yes.

8  Q.    Would it surprise you to know that Inf's real name is

9  Rahmel Wigfall?

10  A.    Yes.

11  Q.    Ms. Griffin, when you were arrested, you handed over your

12  phones to law enforcement, correct?

13  A.    Yes.

14  Q.    And any of the information that you would have had

15  traceable to Miguel would have been included on those cell

16  phones?

17  A.    Yes.

18  Q.    Ms. Griffin, you met several times with the F.B.I. and

19  with the United States Attorney's Office, correct?

20  A.    Yes.

21  Q.    Do you recall whether the F.B.I. or members of my office

22  asked you specifically about an individual named Hat in the

23  first three meetings?

24  A.    Not offhand.

25  Q.    But in that last meeting we specifically asked you about

216

1  an individual named Hat, correct?

2  A.    Yes.

3          MR. DONAHUE:  I have no further questions, Your

4  Honor?

5          THE COURT:  All right.  All right.  Ladies and

6  gentlemen of the jury, we're going to end for the day.  So plan

7  for tomorrow we will go until noon and be done until Monday.

8  So in the meantime when you go home tonight now for the second

9  night when you get home, whoever it is, your mother, father,

10  husband, wife, significant other is going to now really hit

11  you, what, you can't tell me what's going on after two days.

12  So you have to tell them, no, I can't, it's my sworn duty as a

13  juror to not do that.

14          So no conversation and discussion with anyone

15  including among yourselves.  Keep an open mind.  You have not

16  yet heard all of the evidence and the law related to the case.

17  Don't do any research of any kind concerning any names,

18  locations, places, people, dictionaries, anything of that

19  nature.  Everything you learn has to be within the four walls

20  of this courtroom.

21          Don't listen or read anything about the case.  If

22  there was anything on it and if anyone were to try to speak to

23  you about the case, you must advise us of that immediately.  We

24  will see everybody at 9:30 tomorrow morning.  Drive safe.

25

217

1                    REPORTER'S CERTIFICATE

2

3        I, Laura Boyanowski, RMR, CRR, Official Court Reporter for

4    the United States District Court for the Middle District of

5    Pennsylvania, appointed pursuant to the provisions of Title 28,

6    United States Code, Section 753, do hereby certify that the

7    foregoing is a true and correct transcript of the

8    within-mentioned proceedings had in the above-mentioned and

9    numbered cause on the date or dates hereinbefore set forth; and

10   I do further certify that the foregoing transcript has been

11   prepared by me or under my supervision.

12

13

14                        s/ Laura Boyanowski, RMR,CRR
                          Laura Boyanowski, RMR, CRR
15                        Official Court Reporter

16   REPORTED BY:

17       LAURA BOYANOWSKI, RMR, CRR
         Official Court Reporter
18       United States District Court
         Middle District of Pennsylvania
19       235 N. Washington Avenue
         Scranton, PA  18503
20

21       (The foregoing certificate of this transcript does not
     apply to any reproduction of the same by any means unless under
22   the direct control and/or supervision of the certifying
     reporter.)
23

24

25